IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| PAUL FLETCHER and wife, JAIME FLETCHER as next friends of their daughter, IF<br><br>     Plaintiff,<br><br><br>v.<br><br><br>LEWISVILLE INDEPENDENT SCHOOL DISTRICT, SCOT FINCH, HEBRON HIGH SCHOOL PRINCIPAL, in his Official and Individual Capacities; MARK DALTON, HEBRON 9th GRADE CENTER PRINCIPAL, in his Official and Individual Capacities; DR. KEVIN ROGERS, Lewisville Independent School District Chief Operating Officer and Title IX Coordinator, in his Official and Individual Capacities; BRIAN BRAZIL, Head Football Coach and Athletic Director, in his Official and Individual Capacities; CHRISTOPHER FAMBRO, Corners Coach, in his Official and Individual Capacities; WILLIAM FARLEY, Tight Ends Coach, in his Official and Individual Capacities, SHAWN HURD, Safeties Coach, in his Official and Individual Capacities; ERIC MACH, Defensive Coordinator, in his Official and Individual Capacities; CURREN MCMAHON, Varsity Defensive Line Coach, in his Official and Individual Capacities; ROBERT VAUGHN, Running Back Coach, in his Official and Individual Capacities; DEBRA WHITEHEAD, Counselor, in her Official and Individual Capacities; AMANDA WERNEKE, Assistant Principal, in her Official and Individual Capacities; JAMES SCOTT, Assistant Principal in his Official and Individual Capacities; CA; SB; IG; JSG; HG; RG; MG; ANDREW HINES; AH; CJ; AUDREY ANNA KRAJCA; DL; BL; CMcK; KR; KR2; MAS; STEVEN STRIFLER; SS1; SS2; AV; ANTHONY VALDERRAMA; JEAN VALDERRAMA; SW and CW; CITY OF CARROLLTON POLICE DEPARTMENT; OFFICER DENA WILLIAMS, in her Official and | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§   CIVIL ACTION NO. _____<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

ORIGINAL COMPLAINT

Individual Capacities; OFFICER COLE LANGSTON §
in his Official and Individual Capacities; DENTON §
COUNTY TEXAS DISTRICT ATTORNEY'S §
OFFICE; PAUL JOHNSON, in his Official and §
Individual Capacities; VICTORIA ABBOTT, in her §
Official and Individual Capacities; ALLISON §
SARTIN, in her Official and Individual Capacities §
                                                 §
        Defendants.                              §

# COMPLAINT

### TO THE HONORABLE JUDGE OF THE EASTERN DISTRICT OF TEXAS COURT:

NOW COMES Paul Fletcher and wife Jamie Fletcher as next friends of IF, Plaintiff, by and through

their attorneys and files this, their Original Complaint, against Defendants LEWISVILLE

INDEPENDENT SCHOOL DISTRICT, SCOT FINCH, HEBRON HIGH SCHOOL PRINCIPAL, in

his Official and Individual Capacities; MARK DALTON, HEBRON 9th GRADE CENTER

PRINCIPAL, in his Official and Individual Capacities; DR. KEVIN ROGERS, Lewisville Independent

School District Chief Operating Officer and Title IX Coordinator, in his Official and Individual

Capacities; BRIAN BRAZIL, Head Football Coach and Athletic Director, in his Official and

Individual Capacities; CHRISTOPHER FAMBRO, Corners Coach, in his Official and Individual

Capacities; WILLIAM FARLEY, Tight Ends Coach, in his Official and Individual Capacities,

SHAWN HURD, Safeties Coach, in his Official and Individual Capacities; ERIC MACH, Defensive

Coordinator, in his Official and Individual Capacities; CURREN MCMAHON, Varsity Defensive Line

Coach, in his Official and  Individual Capacities; ROBERT VAUGHN, Running Back Coach, in his

Official and Individual Capacities; DEBRA WHITEHEAD, Counselor, in her Official and Individual

Capacities; AMANDA WERNEKE, Assistant Principal, in her Official and Individual Capacities;

JAMES SCOTT, Assistant Principal, in his Official and Individual Capacities; (collectively referred

to herein as "the Educational Defendants") CA; SB; IG; JSG;  HG; RG; MG; ANDREW HINES; AH;

AUDREY ANNA KRAJCA; DL; BL; CMcK; KR; KR2; MAS; STEVEN STRIFLER; SS2; SS1; AV;

ANTHONY VALDERRAMA; JEAN VALDERRAMA; SW and CW (referred to herein without the Education Defendants collectively as "the Individual Defendants") CITY OF CARROLLTON POLICE DEPARTMENT; OFFICER DENA WILLIAMS, in her Official and Individual  Capacities; OFFICER COLE LANGSTON, in his Official and Individual Capacities; DENTON COUNTY TEXAS DISTRICT ATTORNEY'S OFFICE; PAUL JOHNSON, in his Official and Individual Capacities; VICTORIA ABBOTT, in her Official and Individual Capacities; ALLISON SARTIN, in her Official and Individual Capacities (referred to herein without the Education Defendants and the Individual Defendants as "the Municipal Defendants" and collectively herein with the Educational Defendants  and the Individual Defendants as "the Defendants") and in support thereof would show the following:

## I.     THE PARTIES

**1.**     Plaintiffs Paul Fletcher and wife, Jamie Fletcher as next friends of their daughter, IF[1] are residents of the City of Lewisville in Denton County, Texas.

**2.**     Defendant LEWISVILLE INDEPENDENT SCHOOL DISTRICT is a public school district located in Denton County, Texas which can be served through Dr. Kevin Rogers, its Chief Operating Officer at 1565 West Main Street, Lewisville, TX 75067.

**3.**     Defendant SCOT FINCH, HEBRON HIGH SCHOOL PRINCIPAL, in his Official and Individual Capacities can be served at Hebron High School at 4207 Plano Parkway, Carrollton, TX 75010.

**4.**     Defendant MARK DALTON, HEBRON 9th GRADE CENTER PRINCIPAL, in his Official and Individual Capacities can be served at Hebron 9th Grade Center, 4211 Plano Parkway Carrollton, TX 75010.

---

[1] "IF" has been substituted for Plaintiff's name for all causes of action brought through this Complaint. Plaintiff was a minor at the time of the sexual assault and aftermath complained of herein, and as of the time of the filing of this Original Complaint remains a minor.

5.      Defendant DR. KEVIN ROGERS, Lewisville Independent School District Chief Operating Officer and Title IX Coordinator, in his Official and Individual Capacities can be served at his place of business at 1565 West Main Street, Lewisville, TX 75067.

6.      Defendant BRIAN BRAZIL, Head Football Coach and Athletic Director, in his Official and Individual Capacities can be served at Hebron High School at 4207 Plano Parkway, Carrollton, TX 75010.

7.      Defendant CHRISTOPHER FAMBRO, Corners Coach, in his Official and Individual Capacities can be served at Hebron High School at 4207 Plano Parkway, Carrollton, TX 75010.

8.      Defendant WILLIAM FARLEY, Tight Ends Coach, in his Official and Individual Capacities can be served at Hebron High School at 4207 Plano Parkway, Carrollton, TX 75010.

9.      Defendant SHAWN HURD, Safeties Coach, in his Official and Individual Capacities can be served at Hebron High School at 4207 Plano Parkway, Carrollton, TX 75010.

10.     Defendant ERIC MACH, Defensive Coordinator, in his Official and Individual Capacities can be served at Hebron High School at 4207 Plano Parkway, Carrollton, TX 75010.

11.     Defendant CURREN MCMAHON, Varsity Defensive Line Coach, in his Official and Individual Capacities can be served at Hebron High School at 4207 Plano Parkway, Carrollton, TX 75010.

12.     Defendant ROBERT VAUGHN, Running Back Coach, in his Official and Individual Capacities can be served at Hebron High School at 4207 Plano Parkway, Carrollton, TX 75010.

13.     Defendant DEBRA WHITEHEAD, Counselor, in her Official and Individual Capacities can be served at Hebron High School at 4207 Plano Parkway, Carrollton, TX 75010.

14.     Defendant AMANDA WERNEKE, Assistant Principal, in her Official and Individual Capacities can be served at Hebron High School at 4207 Plano Parkway, Carrollton, TX 75010.

15.     Defendant JAMES SCOTT, Assistant Principal, in his Official and Individual Capacities can be served at Hebron High School at 4207 Plano Parkway, Carrollton, TX 75010.

**16.**     Defendant CA is a resident of the State of Texas and can be served at her residence at _____ or, during the school day at Hebron High School at 4207 Plano Parkway, Carrollton, TX 75010.

**17.**     Defendant SB is a resident of the State of Texas and can be served at her residence at _____ or, during the school day at Hebron High School at 4207 Plano Parkway, Carrollton, TX 75010.

**18.**     Defendant IG is a resident of the State of Texas and attends Hebron High School and can be served at his residence at 9640 Timberline Dr., Apt. 219, Dallas, Texas 75220, or, during the school day at Hebron High School at 4207 Plano Parkway, Carrollton, TX 75010.

**19.**     Defendant JSG, is a resident of the State of Texas and can be served at his residence at 1713 E. Branch Hollow Drive, Carrollton, Texas 75007, or, during the school day at Hebron High School at 4207 Plano Parkway, Carrollton, TX 75010.

**20.**     Defendant   HG is a resident of the State of Texas and can be served at his residence at 2328 Lady Cornwall Drive, Lewisville, Texas 75056, or, during the school day at Hebron High School at 4207 Plano Parkway, Carrollton, TX 75010.

**21.**     Defendant MG is a resident of the State of Texas and can be served at his residence at 3952 Creekside Lane, Carrollton, Texas 75010 or, during the school day at Hebron High School at 4207 Plano Parkway, Carrollton, TX 75010.

**22.**     Defendant RG is a resident of the State of Texas and can be served at his residence at 2604 Queen Elaine Drive, Lewisville, Texas 75056, or during the school day at Hebron High School at 4207 Plano Parkway, Carrollton, TX 75010.

**23.**     Defendant ANDREW HINES is a resident of the State of Texas and can be served at his residence at 1041 E. Seminole Trail, Carrollton, Texas 75007.

24.     Defendant AH is a resident of the State of Texas and resides with her mother Defendant AUDREY ANNA KRAJCA and can be served at her residence at 8275 Stonebrook Parkway, Apt., 1112 Frisco, Texas 75034.

25.     Defendant CJ is a resident of the State of Texas and can be served at her residence at _____ or, during the school day at Hebron High School at 4207 Plano Parkway, Carrollton, TX 75010.

26.     Defendant AUDREY ANNA KRAJCA is a resident of the State of Texas and can be served at her place of residence at 8275 Stonebrook Parkway, Apt. 1112, Frisco, Texas 75034.

27.     Defendant DL is a resident of the State of Texas and can be served at his residence at 4309 Saginaw Lane, Carrollton, Texas 75010, or during the school day at Hebron High School at 4207 Plano Parkway, Carrollton, TX 75010.

28.     Defendant BL is a resident of the State of Texas and can be served at his residence at _____ or, during the school day at Hebron High School at 4207 Plano Parkway, Carrollton, TX 75010.

29.     Defendant CMcK is a resident of the State of Texas and can be served at his residence at 4100 Republic Drive, Frisco, Texas 75034, or during the school day at Hebron High School at 4207 Plano Parkway, Carrollton, TX 75010.

30.     Defendant KR is a resident of the State of Texas and can be served at her residence at _____ or, during the school day at Hebron High School at 4207 Plano Parkway, Carrollton, TX 75010.

31.     Defendant KR2 is a resident of the State of Texas and can be served at her residence at _____ or, during the school day at Hebron High School at 4207 Plano Parkway, Carrollton, TX 75010.

32.     Defendant MAS is a resident of the State of Texas and can be served at his residence at 1012 Holy Grail Drive, Lewisville, Texas 75056, or during the school day at Hebron High School at 4207 Plano Parkway, Carrollton, TX 75010.

33.     Defendant STEVEN STRIFLER is a resident of the State of Texas who can be served with process at his residence at 4216 Chippewa Ct., Carrollton, Texas 75010.

34.     Defendant SS1 is a resident of the State of Texas and the son of STEVEN STRIFLER and attends Hebron High School. He can be served at his father's residence at 4216 Chippewa Ct. Carrollton, Texas 75010 or during the school day at Hebron High School at 4207 Plano Parkway, Carrollton, TX 75010.

35.     Defendant SS2 is a resident of the State of Texas and the daughter of STEVEN STRIFLER and attends Hebron High School. She can be served at her father's residence at 4216 Chippewa Ct., Carrollton, Texas 75010 or during the school day at Hebron High School at 4207 Plano Parkway, Carrollton, TX 75010.

36.     Defendants ANTHONY VALDERRAMA and his wife, JEAN VALDERRAMA are residents of the State of Texas and can be served at their residence at 3952 Creekside Lane, Carrollton, Texas 75010.

37.     Defendant AV is a resident of the State of Texas and is the son of Defendants ANTHONY VALDERRAMA and JEAN VALDERRAMA. He resides with ANTHONY VALDERRAMA and JEAN VALDERRAMA in Carrollton, Texas and attends Hebron High School. He can be served at his residence at 3952 Creekside Lane, Carrollton, Texas 75010 or during the school day at Hebron High School at 4207 Plano Parkway, Carrollton, TX 75010.

38.     Defendant SW is a resident of the State of Texas and can be served at her residence at _____ or, during the school day at Hebron High School at 4207 Plano Parkway, Carrollton, TX 75010.

ORIGINAL COMPLAINT                                                                                         Page 7

39.     Defendant CW is a resident of the State of Texas and can be served at his residence at

_____ or, during the school day at Hebron High School at 4207 Plano

Parkway, Carrollton, TX 75010.

40.     Defendant City of Carrollton Police Department is a municipal police department operating

under the City of Carrollton, Texas which can be served through its Chief of Police at 2025 E. Jackson

Road, Carrollton, TX 75006.

41.     Officer Dena Williams, in her Official and Individual Capacities is an Officer employed by the

City of Carrollton, Texas Police Department and can be served at 2025 E. Jackson Road, Carrollton,

TX 75006.

42.     Officer Cole Langston, in his Official and Individual Capacities is an Officer employed by the

City of Carrollton, Texas Police Department and can be served at 2025 E. Jackson Road, Carrollton,

TX 75006.

43.     Defendant Denton County is municipal organization recognized by the State of Texas. It can

be served through the county commissioners at the County Commissioners' offices located at 110 W.

Hickory Street, Denton, TX  76201-4116.

44.     District Attorney Paul Johnson, in his Official and Individual Capacities is the District Attorney

for Denton County and can be served at his office at 1450 E. McKinney Street, Denton, TX 76209-

4524.

45.     Assistant District Attorney Victoria Abbott in her Official and Individual Capacities is an

Assistant District Attorney for Denton County and can be served at her office at 1450 E. McKinney

Street, Denton, TX 76209-4524.

46.     Assistant District Allison Sartin in her Official and Individual Capacities is an Assistant

District Attorney for Denton County and can be served at her office at 1450 E. McKinney Street,

Denton, TX 76209-4524

## II.      COMPLAINT AND JURY DEMAND

**47.**     *This cause of action arises from the Educational Defendants' and Municipal Defendants deliberately indifferent response to multiple student-on-student sexual assaults against IF at an off premises party by Defendants IG and AV, and subsequent sex-based harassment by the Individual Defendants. The Education Defendants' failure to promptly and appropriately investigate and respond to the multiple sexual assaults and the subsequent sex-based harassment subjected IF to further sexual harassment and a hostile environment, effectively denying her access to educational opportunities. This action alleges violations of Title IX and the denial of equal protection of the laws under the Fourteenth Amendment to the U.S. Constitution.*

## III.     JURISDICTION AND VENUE

**48.**     This Court has subject matter jurisdiction over the claims against the Educational Defendants and the Municipal Defendants in this case pursuant to 28 U.S.C. § 1331, which gives district courts' jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

**49.**      This Court also has subject matter jurisdiction over the claims against the Educational Defendants and the Municipal Defendants pursuant to 28 U.S.C. § 1343, which gives district courts' original jurisdiction over (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any State Law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of their civil rights.

**50.**     Plaintiffs bring this action to redress a hostile educational environment pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), as more fully set forth herein.

**51.**     This is also an action to redress the deprivation of Plaintiff's constitutional rights under the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983.

**52.**     This Court has subject matter jurisdiction over the claims against the Individual Defendants pursuant to 28 U.S.C. § 1367 as the claims against the Individual Defendants are so related to the claims against the Educational Defendants and Municipal Defendants which are within the original

jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

53.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), since the majority, if not all, of the Defendants reside or resided in this district and the events giving rise to the claims occurred in this district.

## IV.     THE PARTIES

54.     IF, is a female and was a minor at all times relevant to the claims in this case and will remain a minor until her eighteenth (18th) birthday in 2015.

55.     At all material times Plaintiffs were residents of Denton County, State of Texas.

56.     At the time of events complained of herein, IF was a student attending a high school within the Defendant LEWISVILLE INDEPENDENT SCHOOL DISTRICT ("the School District").

57.     The Defendant School District is a public educational institution located in Denton County, State of Texas, which receives federal funding.

58.     At all material times, Defendant Dr. Kevin Rogers, the Chief Operating Officer and Title IX Coordinator ("the Title IX Coordinator"), in his official and individual capacities, worked within Denton County, State of Texas.

59.     During all material times, the Title IX Coordinator was an agent and/or employee of Defendant School District, acting or failing to act within the scope, course, and authority of his employment and his employer.

60.     At all material times, Scot Finch, ("the Principal"), in his official and individual capacities, worked within Denton County, State of Texas.

61.     During all material times, the Principal was an agent and/or employee of Defendant School District, acting or failing to act within the scope, course, and authority of his employment and his employer.

62.     At all material times, Defendant Mark Dalton, ("the 9th Grade Principal"), in his official and individual capacities, worked within the Denton County, State of Texas.

63.     At all material times, the 9th Grade Principal was an agent and/or employee of Defendant School District, acting or failing to act within the scope, course, and authority of his employment and his employer.

64.     At all material times, Defendant Brian Brazil, ("the Head Football Coach"), in his official and individual capacities, worked within Denton County, State of Texas.

65.     At all material times, the Head Football Coach was an agent and/or employee of Defendant School District, acting or failing to act within the scope, course, and authority of his employment and his employer.

66.     At all material times, Defendant Christopher Fambro ("the Corners Coach"), in his official and individual capacities, worked within Denton County, State of Texas.

67.     At all material times, the Corners Coach was an agent and/or employee of Defendant School District, acting or failing to act within the scope, course, and authority of his employment and his employer.

68.     At all material times, Defendant William Farley ("the Tight Ends Coach"), in his official and individual capacities, worked within Denton County, State of Texas.

69.     At all material times, the Tight Ends Coach was an agent and/or employee of Defendant School District, acting or failing to act within the scope, course, and authority of his employment and his employer.

70.     At all material times, Defendant Shawn Hurd, ("the Safeties Coach"), in his official and individual capacities, worked within Denton County, State of Texas.

71.     At all material times, the Safeties Coach was an agent and/or employee of Defendant School District, acting or failing to act within the scope, course, and authority of his employment and his employer.

72.     At all material times, Defendant Eric Mach ("the Defensive Coordinator"), in his official and individual capacities, worked within Denton County, State of Texas.

73.     At all material times, the Defensive Coordinator was an agent and/or employee of Defendant School District, acting or failing to act within the scope, course, and authority of his employment and his employer.

74.     At all material times, Defendant Curren McMahon, ("the Varsity Defensive Line Coach"), in his official and individual capacities, worked within Denton County, State of Texas.

75.     At all material times, the Varsity Defensive Line Coach was an agent and/or employee of Defendant School District, acting or failing to act within the scope, course, and authority of his employment and his employer.

76.     At all material times, Defendant Robert Vaughn, ("the Running Backs Coach"), in his official and individual capacities, worked within Denton County, State of Texas.

77.     At all material times, the Running Backs Coach was an agent and/or employee of Defendant School District, acting or failing to act within the scope, course, and authority of his employment and his employer.

78.     At all material times, Defendant Debra Whitehead, ("the Counselor"), in her official and individual capacities, worked within Denton County, State of Texas.

79.     At all material times, the Counselor was an agent and/or employee of Defendant School District, acting or failing to act within the scope, course, and authority of her employment and her employer.

80.     At all material times, Defendant Amanda Werneke, ("AP Werneke"), in her official and individual capacities, worked within Denton County, State of Texas.

81.     At all material times, the AP Werneke was an agent and/or employee of Defendant School District, acting or failing to act within the scope, course, and authority of her employment and her employer.

82.     At all material times, Defendant James Scott, ("AP Scott"), in his official and individual capacities, worked within Denton County, State of Texas.

83.     At all material times, AP Scott was an agent and/or employee of Defendant School District, acting or failing to act within the scope, course, and authority of his employment and his employer.

84.     The Defendant City of Carrollton Police Department is a municipal police department for the City of Carrollton which receives federal funding.

85.     At all material times Defendant Officer Dena Williams, was an agent and/or employee of the acting or failing to act within the scope, course, and authority of her employment and her employer.

86.     At all material times Defendant Officer Cole Langston, was an agent and/or employee of the acting or failing to act within the scope, course, and authority of his employment and his employer.

87.     Defendant Denton County is municipal organization recognized by the State of Texas and receives federal funding.

88.     At all material times Defendant District Attorney Paul Johnson, was an agent and/or employee of the Denton County District Attorney's office acting or failing to act within the scope, course, and authority of his employment and his employer.

89.     At all material times Defendant Assistant District Attorney Victoria Abbott was an agent and/or employee of the Denton County District Attorney's office acting or failing to act within the scope, course, and authority of her employment and her employer.

90.     At all material times Defendant Assistant District Attorney Allison Sartin was an agent and/or employee of the Denton County District Attorney's office acting or failing to act within the scope, course, and authority of her employment and her employer.

91.     At all material times, IF's attackers, IG, and AV, and Defendants CA, SB, JSG, HG, RG, AH, CJCG, DL, BL, CMcK, KR, KR2, MAS, SS2, SS1, SW and CW (sometimes hereinafter collectively referred to herein as "the Student Defendants") were students attending Hebron High School/Hebron 9th Grade Center within the Defendant School District.

## V.     APPLICABLE LAW AND POLICY

**92.**     Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), states that

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . . .

**93.**     Title IX is implemented through the Code of Federal Regulations. See 34 C.F.R. Part 106.

**94.**     19. 34 C.F.R. § 106.8(b) provides:

> . . . A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part.

**95.**     In *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1988), the United States Supreme Court recognized that a recipient of federal educational funds intentionally violates Title IX, and is subject to a private damages action, where the recipient is "deliberately indifferent" to known acts of teacher-student discrimination.

**96.**     In *Davis v. Monroe County Board. of Education*, 526 U.S. 629 (1999), the United States Supreme Court extended the private damages action recognized in *Gebser* to cases where the harasser is a student, rather than a teacher. *Davis*, 526 U.S. at 1669–76.

**97.**     The Fifth Circuit has stated that a damages remedy is available under Title IX when an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond. The Fifth Circuit has further defined deliberate indifference for purposes of finding school district liability under Title IX for student-to-student harassment as when the "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances" *Doe ex rel. Doe v. Dallas Independent School Dist.*, 220 F.3d 380, 384 (5th Cir. 2000)

98.     The Fourteenth Amendment to the United States Constitution provides in pertinent part that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

99.     Section 38.0041 of the Texas Education Code requires that "Each school district and open enrollment charter school shall adopt and implement a policy addressing sexual abuse and other maltreatment of children to be included in the district improvement plan under Section 11.252 and any informational handbook provided to students and parents."

100.    The School District published a Lewisville Independent School District Code of Conduct 2012-2013 ("the Code of Conduct") which it states is in compliance with Section 38.0041 of the Texas Education Code. A true and correct copy of the 2012 – 2013 Code of Conduct is attached hereto as Exhibit "1" and is incorporated herein for all purposes as if set forth verbatim.

101.    The Code of Conduct states, in part, that "Each student is expected to… Adhere to the requirements of the Student Code of Conduct." *See Exhibit 1 at page 4.* It further states "A student whose behavior shows disrespect for others, including interference with learning and a safe environment, will be subject to disciplinary action." *See Exhibit 1 at page 5.*  The Code of Conduct continues and states "School rules and the authority of the District to discipline apply whenever the interest of the District is involved on or off school grounds, in conjunction with or independent of classes and school sponsored activities. *Id.*  Further, the Code of Conduct states "The District has disciplinary authority over a student: … 7. When the student commits a felony, as provided by Texas Education Code 37.006 or 37.0081. *Id.*

102.    The Code of Conduct prohibits the following behavior at all school and school-related activities:

***

     Directing profanity, vulgar language, or obscene gestures toward other students or District employees or volunteers *See Exhibit 1 at Page 8*

ORIGINAL COMPLAINT                                                           Page 15

\*\*\*

Engaging in threatening behavior towards another student or District employee, on or off school property. *Id.*
Forcing an individual to act through the use of force or threat of force (coercion). *Id.*

\*\*\*

Bullying, including intimidation by name calling, ethnic or racial slurs, or derogatory statements or actions that school officials have reason to believe will disrupt the school program, incite violence, intimidate or embarrass another individual. (See Glossary) See page 42 for LISD FFI (LOCAL) on bullying. *See Exhibit 1, Page 9*

\*\*\*

Possession or distribution of pornographic materials, including accessing pornographic materials on the internet. *Id.*
Engaging in inappropriate verbal, physical or sexual contact directed toward another student, District employee or volunteer. *Id.*
Engaging in conduct that constitutes sexual or gender based harassment or sexual abuse whether the conduct is by word, gesture, or any other sexual conduct, including requests for sexual favors directed towards another student, District employee or volunteer. See page 35 for LISD policy FFH (LOCAL) on sexual harassment/abuse.) *Id.*

\*\*\*

Inappropriate or indecent exposure of a student's body parts. *Id.*

\*\*\*

Behaving in any way, or bringing, possessing, or using any item, that disrupts the school environment/educational process. *See Exhibit 1, Page 10*

\*\*\*

Use the Internet or other electronic communications to threaten district students, employees, or volunteers, including off school property if the conduct causes a substantial disruption to the educational environment. *Id.*

\*\*\*

Send, post, or possess electronic messages that are abusive, obscene, sexually oriented, threatening, harassing, damaging to another's reputation, or illegal, including cyberbullying and "sexting," either on or off school property, if the conduct causes a substantial disruption to the education environment. Id.

\*\*\*

ORIGINAL COMPLAINT                                                                                    Page 16

Use e-mail or Web sites to engage in or encourage illegal behavior or threaten school safety, including off school property if the conduct causes a substantial disruption to the education environment. *See Exhibit 1, Page 11*

\*\*\*

Engaging in conduct that constitutes dating violence. (See glossary) *Id*.

\*\*\*

Recording the voice or image of another without the prior consent of the individuals being recorded in a way that disrupts the educational environment or invades the privacy of others. *Id*.

**103.**    Each of the behaviors identified may carry a disciplinary action of removal from school to the Disciplinary Alternative Education Placement Center. *Id*.

**104.**    A teacher or administrator **must** remove a student from class if the student engages in behavior that under the Education Code requires or permits the student to be placed in a DAEP or expelled. *See Exhibit 1, page 12*.

**105.**    Texas State law prohibits students placed in a Disciplinary Alternative Education Program for mandatory removal reasons from attending or participating in school-sponsored or school-related extracurricular during the period of placement including seeking or holding honorary positions and/or membership in school-sponsored clubs or organizations. *See Exhibit 1, page 13*.

**106.**    Section 38.007 of the Texas Education Code provides:

(a)  Except as provided by Subsection (k), a student shall be expelled from a school if the student, on school property or while attending a school-sponsored or school-related activity on or off of school property:

\*\*\*

 (2)  engages in conduct that contains the elements of the offense of:
   (A)  aggravated assault under Section 22.02, Penal Code, sexual assault under Section 22.011, Penal Code, or aggravated sexual assault under Section 22.021, Penal Code;

\*\*\*

(d)  A student shall be expelled if the student engages in conduct that contains the elements of any offense listed in Subsection (a),… without regard to whether the conduct occurs on or off of school property or while attending a school-sponsored or school-related activity on or off of school property.

**107.**   Texas Penal Code §22.011 (a) provides

Sec. 22.011. SEXUAL ASSAULT. (a) A person commits an offense if the person:
(1) intentionally or knowingly:
   (A) causes the penetration of the anus or sexual organ of another person by any means, without that person's consent;
   (B) causes the penetration of the mouth of another person by the sexual organ of the actor, without that person's consent; or
   (C) causes the sexual organ of another person, without that person's consent, to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor; or
(2) intentionally or knowingly:
   (A) causes the penetration of the anus or sexual organ of a child by any means;
   (B) causes the penetration of the mouth of a child by the sexual organ of the actor;
   (C) causes the sexual organ of a child to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor;
   (D) causes the anus of a child to contact the mouth, anus, or sexual organ of another person, including the actor; or
   (E) causes the mouth of a child to contact the anus or sexual organ of another person, including the actor.

**108.**   Texas Penal Code §22.011 (b) provides

(b) A sexual assault under Subsection (a)(1) is without the consent of the other

person if:

***

(4) the actor knows that as a result of mental disease or defect the other person is at the time of the sexual assault incapable either of appraising the nature of the act or of resisting it;
(5) the other person has not consented and the actor knows the other person is unaware that the sexual assault is occurring;
(6) the actor has intentionally impaired the other person's power to appraise or control the other person's conduct by administering any substance without the other person's knowledge;

**109.**   The Code of Conduct further states:

A student **must** be placed in a Disciplinary Alternative Education Program if the student:

Selling, giving, or delivering to another person, or possessing, using, or being under the influence of any amount of marijuana, a controlled substance, or a dangerous drug, if the conduct is not punishable as a felony. *See Exhibit 1, page 15.*

ORIGINAL COMPLAINT                                                                                                  Page 18

Selling, giving, or delivering to another person, or possessing, using, or being under the influence of any amount of alcohol, or committing a serious act or offense while under the influence of alcohol, if the conduct is not punishable as a felony. *Id*.

**110.**   The Code of Conduct also provides;

A student **may** be expelled if the student engages in conduct that contains the elements of one of the

following offenses against another student without regard to where the conduct occurs:

Aggravated assault
Sexual assault
Aggravated sexual assault
Murder
Capital Murder
Criminal attempt to commit murder or capital murder
Aggravated robbery

*See Exhibit 1, page 26.*

**111.**   The Code of Conduct states "If a student is believed to have committed an expellable offense,

the principal or other appropriate administrator will schedule a hearing within three days. The student's

parent or guardian will be invited in writing to attend the hearing.

Until a hearing can be held, the principal may place the student in:

Another appropriate classroom
In-school suspension
Out-of-school suspension
Disciplinary Alternative Education Program

*See Exhibit 1, page 30.*

**112.**   In addition to the Code of Conduct the School District has adopted a Freedom from

Discrimination, Harassment and Retaliation Policy which is a part of the Code of Conduct and provides

in part:

The District prohibits discrimination, including harassment, against any student on the basis of race, color, religion, gender, national origin, disability, or any other basis prohibited by law. The District prohibits dating violence, as defined by this policy. Retaliation against anyone involved in the complaint process is a violation of District policy and is prohibited.

Discrimination against a student is defined as conduct directed at a student on the basis of race, color, religion, gender, national origin, disability, or on any other basis prohibited by law, that adversely affects the student.

Prohibited harassment of a student is defined as physical, verbal, or nonverbal conduct based on the student's race, color, religion, gender, national origin, disability, or any other basis prohibited by law that is so severe , persistent, or pervasive that the conduct:

> 1.   Affects a student's ability to participate in or benefit from an educational program or activity, or creates an intimidating, threatening, hostile, or offensive educational environment;
>
> 2.   Has the purpose or effect of substantially or unreasonably interfering with the student's academic performance; or
>
> 3.   Otherwise adversely affects the student's educational opportunities.

Prohibited harassment includes dating violence as defined by this policy. *See Exhibit 1, page 35.*

113.   The Freedom from Discrimination, Harassment and Retaliation Policy further provides that:

Sexual harassment of a student, including harassment committed by another student, includes unwelcome sexual advances; requests for sexual favors; or sexually motivated physical, verbal, or nonverbal conduct when the conduct is so severe, persistent, or pervasive that it:

> 1.   Affects a student's ability to participate in or benefit from an educational program or activity, or creates an intimidating, threatening, hostile, or offensive educational environment;
>
> 2.   Has the purpose or effect of substantially or unreasonably interfering with the student's academic performance; or
>
> 3.   Otherwise adversely affects the student's educational opportunities.
>
> *See Exhibit 1, page 36*

114.   Retaliation is prohibited against a student alleged to have experienced harassment as follows:

The District prohibits retaliation by a student or District employee against a student alleged to have experienced discrimination or harassment, including dating violence, or another student who, in good faith, makes a report of harassment or discrimination, serves as a witness, or participates in an investigation.
*See Exhibit 1, page 37.*

115.   The Freedom from Discrimination, Harassment and Retaliation Policy states;

Any District employee who suspects or receives notice that a student or group of students has or may have experienced prohibited conduct shall immediately notify the appropriate District official listed in this policy and take any other steps required by this policy.

For the purposes of this policy, District officials are the Title IX coordinator, the ADA/Section 504 coordinator, and the Superintendent.

Reports of discrimination based on sex, including sexual harassment, may be directed to the Title IX coordinator. The District designates the following employee to coordinate its efforts to comply with Title IX of the Education Amendments of 1972, as amended:
Name: Dr. Kevin Rogers
Position: Chief Operating Officer
Address: 1565 West Main Street, Lewisville, TX 75067
Telephone:  (972) 350-4729
*See Exhibit 1, page 38.*

116.     The School District, Hebron High School and Hebron 9th Grade Center adopted and published a Student Handbook 2012 – 2013 which contains an Appendix C: Extracurricular Code of Conduct which provides in part "Participation in extracurricular activities is considered a privilege and higher standards are expected from all participants as it pertains to grades, behavior in and out of school, attendance, work ethic, and commitment. Any behavior that is deemed unbecoming of an athlete or participant will be subject to punishment by the coach or sponsor of the activity. I will be held accountable for all of my actions." A true and correct copy of the Extracurricular Code of Conduct is attached hereto as *Exhibit "2"* and is incorporated herein for all purposes.

117.     The Extracurricular Code of Conduct states explicitly that use and/or possession of alcohol, drugs and/or tobacco will not be tolerated. *See Exhibit 2, Page 37.* It further states that "Any activity or conduct that the coach, director and principal deems harmful or detrimental to the reputation of the program can be subject to disciplinary action under the Extracurricular Code of Conduct (Non-School Sponsored Time). *See Exhibit 2, Page 38*

118.     18 U.S.C. §2251(a) provides:

   a. (a) Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in or affecting interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, shall be punished as provided under subsection (e), if such person knows or has reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, if that

visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed.

119.   18 U.S.C. §2251(e) provides:

e.  (e) Any individual who violates, or attempts or conspires to violate, this section shall be fined under this title and imprisoned not less than 15 years nor more than 30 years, but if such person has one prior conviction under this chapter, section 1591, chapter 71 section 1591, chapter 71, chapter 109A, or chapter 117, or under section 920 of title 10 (article 120 of the Uniform Code of Military Justice), or under the laws of any State relating to aggravated sexual abuse, sexual abuse, abusive sexual contact involving a minor or ward, or sex trafficking of children, or the production, possession, receipt, mailing, sale, distribution, shipment, or transportation of child pornography, such person shall be fined under this title and imprisoned for not less than 25 years nor more than 50 years, but if such person has 2 or more prior convictions under this chapter, chapter 71, chapter 109A, or chapter 117, or under section 920 of title 10 (article 120 of the Uniform Code of Military Justice), or under the laws of any State relating to the sexual exploitation of children, such person shall be fined under this title and imprisoned not less than 35 years nor more than life. Any organization that violates, or attempts or conspires to violate, this section shall be fined under this title. Whoever, in the course of an offense under this section, engages in conduct that results in the death of a person, shall be punished by death or imprisoned for not less than 30 years or for life.

120.   18 U.S.C. §2252(a)(4)(B)provides that any person who:

(B) knowingly possesses, or knowingly accesses with intent to view, 1 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, if—
(i) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and
(ii) such visual depiction is of such conduct;

shall be punished as provided in subsection (b) of this section.

121.   Texas Family Code § 261.101 provides:

Sec. 261.101. PERSONS REQUIRED TO REPORT; TIME TO REPORT. (a) A person having cause to believe that a child's physical or mental health or welfare has been adversely affected by abuse or neglect by any person shall immediately make a report as provided in this subchapter.

ORIGINAL COMPLAINT                                                         Page 22

(b) If a professional has cause to believe that a child has been abused or neglected or may be abused or neglected, or that a child is a victim of an offense under Section 21.11, Penal Code, and the professional has cause to believe that the child has been abused as defined by Section 261.001 or 261.401, the professional shall make a report not later than the 48th hour after the hour the professional first suspects that the child has been or may be abused or neglected or is a victim of an offense under Section 21.11, Penal Code. A professional may not delegate to or rely on another person to make the report. In this subsection, "professional" means an individual who is licensed or certified by the state or who is an employee of a facility licensed, certified, or operated by the state and who, in the normal course of official duties or duties for which a license or certification is required, has direct contact with children. The term includes teachers, nurses, doctors, day-care employees, employees of a clinic or health care facility that provides reproductive services, juvenile probation officers, and juvenile detention or correctional officers.

(c) The requirement to report under this section applies without exception to an individual whose personal communications may otherwise be privileged, including an attorney, a member of the clergy, a medical practitioner, a social worker, a mental health professional, and an employee of a clinic or health care facility that provides reproductive services.

122.   Texas Family Code §261.001 provides:

(1) "Abuse" includes the following acts or omissions by a person:
　　　（A）　　mental or emotional injury to a child that results in an observable and material impairment in the child's growth, development, or psychological functioning;
　　　（B）　　causing or permitting the child to be in a situation in which the child sustains a mental or emotional injury that results in an observable and material impairment in the child's growth, development, or psychological functioning;
　　　（C）　　failure to make a reasonable effort to prevent an action by another person that results in physical injury that results in substantial harm to the child;

*** 

　　　（E）　　sexual conduct harmful to a child's mental, emotional, or physical welfare, including conduct that constitutes the offense of continuous sexual abuse of young child or children under Section 21.02, Penal Code, indecency with a child under Section 21.11, Penal Code, sexual assault under Section 22.011, Penal Code, or aggravated sexual assault under Section 22.021, Penal Code;
　　　（F）　　failure to make a reasonable effort to prevent sexual conduct harmful to a child;
　　　（G）　　compelling or encouraging the child to engage in sexual conduct as defined by Section 43.01, Penal Code, including conduct that constitutes an offense of trafficking of persons under Section 20A.02(a)(7) or (8),

Penal Code, prostitution under Section 43.02(a)(2), Penal Code, or compelling prostitution under Section 43.05(a)(2), Penal Code;

\*\*\*

(I)      the current use by a person of a controlled substance as defined by Chapter 481, Health and Safety Code, in a manner or to the extent that the use results in physical, mental, or emotional injury to a child;

(J)      causing, expressly permitting, or encouraging a child to use a controlled substance as defined by Chapter 481, Health and Safety Code;

**123.**   Texas Family Code §261.103 provides:

REPORT MADE TO APPROPRIATE AGENCY.  (a)  Except as provided by Subsections (b) and (c) and Section 261.405, a report shall be made to:

(A)      any local or state law enforcement agency;

(B)      the department;

(C)      the state agency that operates, licenses, certifies, or registers the facility in which the alleged abuse or neglect occurred; or

(D)      the agency designated by the court to be responsible for the protection of children.

## VI.      COMMON ALLEGATIONS

**124.**   At all material times, the School District was receiving federal funding, as contemplated by Title IX, 20 U.S.C. § 1681, *et seq*.

**125.**   The School District implemented and executed policies and customs in regard to the events that resulted in the deprivation of Plaintiff's constitutional, statutory, and common-law rights.

**126.**   The School District is responsible for ensuring that all its employees are properly trained and supervised to perform their jobs, including their responsibilities in accordance with School District Policies, Title IX requirements, The Texas Family Code, as well as other state and federal statutes.

**127.**   The School District is responsible for the acts and omissions of its employees.

**128.**   At the time of the attack that gave rise to the events complained of herein, IF was a 14 year old 9th Grader at Hebron High School/Hebron 9th Grade Center ("Hebron").

**129.**    At the time of the attack that gave rise to this action, IF's attackers, Defendants AV and IG, were 9th Graders at Hebron. Both are athletes at Hebron and were at all material times to this complaint.

**130.**    In the spring of 2012, Defendant IG, together with at least two other individuals, including upon information and belief, Defendants MS and BL, began a practice of sexual aggressiveness against female students at Hebron 9th Grade Center, which remains unabated and unrestrained by the Educational Defendants.

**131.**    This course and practice of sexual aggressiveness includes, but is not limited to, the violation of 18 USC § 2251 when they enticed a 14 year old female student to perform oral sex on IG.

**132.**    Upon information and belief, Defendants IG, MS and BL conspired to create a method of surreptitiously videotaping and/or digitally recording such sexual act without the knowledge and/or consent of the minor female. Defendant IG, either successfully surreptitiously videotaped or digitally recorded such sexual acts and thereafter, in violation of USC §2252 maintained and distributed copies of the digital recording to, among others, Defendants MS, BL and others, or streamed a live broadcast of such sexual acts to Defendants MS, BL and others.

**133.**    Thereafter, in violation of 18 USC § 2252 IG maintained and distributed copies of the digital recording to, among others, Defendants MS, and BL.

**134.**    Upon information and belief, one or more of the Defendants MS, BL and/or others kept copies of the digital recording in violation of the Code of Conduct, 18 USC § 2252, and, in violation of 18 USC § 2251 published copies of the digital recording by posting the digital recording on YouTube.

**135.**    Upon information and belief, the School District, by and through its agents and/or employees, including but not limited to Defendants Finch, Dalton, Whitehead, Werneke, and/or Scott became aware of Defendants IG's, MS's, BL's and others' acts but failed to make any report of such acts in violation of Texas Family Code § 261.101, and did not implement any of the Title IX, Sexual

Harassment or Retaliation provisions of the Code of Conduct, or the Freedom from Discrimination, Harassment and Retaliation Policies.

136.    Although the School District, by and through its agents and employees,  knew the acts of Defendants IG, MS, BL and others, violated federal penal statutes, 18 USC §§ 2251 – 2252, and were violations of multiple sections of the Code of Conduct (any one of which carried possible removal from school to the Disciplinary Alternative Education Program)  as well as the Freedom from Discrimination, Harassment and Retaliation Policies, upon information and belief, each of them failed to notify the appropriate District Official listed in the Freedom from Discrimination, Harassment and Retaliation Policy and  took no action to discipline Defendants IG, MS, BL, and/or anyone else. Further, the School District took no action to warn other students, or their parents, of the fact that IG, MS and/or BL or any other child pornographers were in their midst. The educational defendants thus sent a message to the student body that sexual aggressiveness would not be subjected to any district discipline, criminal prosecution or other consequence of any meaning.

137.    Upon information and belief, the City of Carrollton Police Department, by and through Officer Cole Langston became aware of the acts of Defendants IG, MS and BL, but failed to properly investigate the incident. Specifically he failed to take any type of forensic copy of the hard disk of any phone, tablet, computer, iPad, or other digital device belonging to Defendants IG, MS and BL; failed to obtain any text messages, images or other digital information from any social media web sites or other communications systems; and, failed to utilize modern investigation techniques. Further, the City of Carrollton Police Department and Officer Cole Langston entirely failed to make state mandated reports with the appropriate educational authorities in violation of Texas State law. Such acts and/or omissions by Officer Langston and the City of Carrollton Police Department likewise sent a message to the Hebron student body that sexual aggressiveness and even child pornography would not be pursued, let alone prosecuted, by the City of Carrollton Police Department.

138.    On or about September 28, 2012, Plaintiffs Paul and Jamie Fletcher, permitted their daughter, IF, to attend a sleep-over at the home of Defendants Andrew Hines, Audrey Anna Krajca, and their daughter, Defendant AH. Plaintiffs Paul and Jamie Fletcher, entrusted the care, custody, control and wellbeing of IF to Defendants, Andrew Hines and Audrey Anna Krajca.

139.    Defendants Andrew Hines and Audrey Anna Krajca, transported IF and Defendant AH to the home of MG, a classmate of IF and AH, and advised them that they would return to pick them up at 10:00 PM.

140.    At the time that Defendants Andrew Hines and Audrey Anna Krajca dropped IF and AH off at MG's home, neither IF, nor AH had ingested any alcohol or controlled substances.

141.    When IF and AH arrived at the home of MG, Defendants SS1, CMcK, HG and others were already at MG's home. All of these Defendants were classmates with IF and Defendant AH.

142.    Defendants SS1, MG, CMcK, HG and the others then invited IF and Defendant AH to a party at the home of SS1, and they all walked from MG's home to Defendant SS1's home.

143.    After arriving at SS1's home, other kids began arriving until there were approximately forty (40) kids. The kids were predominantly athletes from the football and basketball program, but there were a small number of non-athletes in attendance as well. Upon information and belief, word of the party had spread during the week as Defendant SS2 began inviting people over and explaining that she was hosting the party while her father, Defendant Steven Strifler, was out of town for the weekend. Defendant Steven Strifler left Defendants SS1 and SS2 without adult supervision while he was away for the weekend, even though he knew, or should have known, that SS1 regularly engaged in partying and underage alcohol consumption.

144.     Shortly after entering the Strifler home, IF sat down at the kitchen table and was handed a beer. IF took a sip of the beer and then put it down and went out the kitchen door to a deck adjoining the kitchen where she discovered that many of the party attendants were smoking marijuana.

145.   After discovering the party attendants smoking marijuana, IF returned to the inside of the Strifler home and went into the family room adjoining the kitchen and sat down in a chair. Shortly thereafter she was handed a red plastic cup which she was told contained diet coke and vodka. She began drinking from the red plastic cup and within minutes became disoriented and she blacked out.

146.   The next memory that IF has is vomiting into a toilet in a bathroom at the Strifler home. She was vomiting with sufficient force that she caused her nose to bleed. Defendant SS1 was beside her, and she asked him why she was so sick and how did she get like this, and can he make her sober. She then heard someone laughing. Defendant SS1 just patted her back and said words to the effect that "it will be ok". Several days later SS1 told IF that the boys had put "bars" in her drink. Based upon information and belief, "bars" is a controlled substance, Xanax, in a very high dose which has been demonstrated to cause blackouts, create situations where a person has no memory of what happened and impairs a person's cognitive function. Combined with alcohol, the affect is even further intensified.

147.   Defendant SS1 subsequently confirmed to Plaintiff Jamie Fletcher that IF's drink had been laced with drugs. He advised Jamie Fletcher that the boys attending the party had been crushing the substances and putting them in the girls' drinks.

148.   After IF finished vomiting, Defendant SS1 walked her into the master bedroom of the Strifler house and put her in the bed and she became unconscious. Defendant SS2 then took IF's cell phone to prevent her from making any calls to anyone.

149.   Upon information and belief, shortly thereafter, Defendant DL, who was completely intoxicated, was then placed on the floor in the master bedroom so he could sober up. Defendant DL then vomited on the floor and went across the hall to the bathroom to continue vomiting.

150.   Shortly thereafter, Defendant DL's mother called his cell phone which was answered by one of the other attendees at the party who informed her that Defendant DL was intoxicated and unable to come to the phone. DL's mother then drove to the Strifler house, where, she found her son on the front porch of the Strifler home, partially dressed and thoroughly intoxicated. She began knocking on the

door. When she looked in the window she observed people running around the house and ducking behind furniture. She then called Defendant Steven Strifler but could not reach him. She left a voice message advising him that there was a party occurring at his home and that minors were being served alcohol.

151.     Shortly before 10:00 PM on September 28, 2012, Defendant AH, attempted to locate IF so that they could return to MG's home where her parents were supposed to pick them up.

152.     While attempting to locate IF, Defendant AH was confronted by Defendants SS2, KR and several boys at the party and told that IF was "too messed up" to go anywhere and if any parent saw her in the condition she was in, everyone would get in trouble. Defendants SS2, KR and the boys then instructed Defendant AH to lie to her parents and tell them that IF's father, Paul Fletcher, had changed his mind and that IF was not going to be allowed to spend the night so he had come to MG's home and taken her home earlier. Defendant AH complied with the demands of Defendants SS2, KR and several of the boys attending the party and left the party without IF.

153.     When the Defendant AH was picked up by Defendants Andrew Hines and Audrey Anna Krajca, she lied to them and told them, as she was instructed to by Defendants SS2, KR and the boys at the party, that Plaintiff Paul Fletcher had changed his mind about allowing IF to spend the night and that he had picked IF up earlier in the evening. Remarkably, Defendants Andrew Hines and Audrey Anna Krajca did not confirm this with anyone and although they were entrusted with the care, custody, wellbeing and control of IF, did not contact the Plaintiffs to confirm that IF was safely with her parents.

154.     When IF awoke at approximately 5:00 am she found Defendants HG and BL asleep on the floor in the Strifler house master bedroom. She immediately awakened Defendant HG and demanded to know why she was not at Defendant AH's home. Defendant HG, who was himself obviously impaired, told her to go back to bed. She laid on the bed for a short while and then got up and went to the bathroom. While going to the bathroom she discovered blood on her underwear. She then returned to the master bedroom and then awakened Defendant HG again and demanded to know what had

happened to her. Defendant HG told her that she had gotten "very messed up" and could not go home in that condition, and that AV and IG were telling people that "she had sex with them." She immediately denied having engaged in any sexual conduct and began searching for AV and IG in the house.

**155.** While searching for them IF found her cell phone on the night stand next to Defendant SS2's bed.

**156.** Defendant CMcK informed IF, that Defendants IG and AV had left the party.

**157.** IF then called Defendant AH, asked her why AH had left her the night before and advised Defendant AH that she believed she had been raped by at least one person at the party. Defendant AH related to IF that she had been threatened by Defendants SS2, KR and the boys at the party. Defendant AH then told IF that she would leave IF's belongings on the front porch so IF could pick them up before IF returned home.

**158.** Sometime about 7:00 am on September 29, 2012, Defendant SS2 drove IF and Defendant HG, to Defendant AH's home so she could pick up her belongings from the front porch.

**159.** As IF was walking up the front walk of Defendant AH's home to get her belongings the Defendant Audrey Anna Krajca pulled her car into the driveway and saw IF picking up her belongings and saw the automobile being driven by the Defendant SS2.

**160.** Upon information and belief, later that day, Defendants Andrew Hines and Audrey Anna Krajca confronted Defendant AH about the fact that Defendant Audrey Anna Krajca had seen IF with Defendant SS2 and that it was clear to them that the Plaintiffs had not picked up IF as AH told them the night before.

**161.** Upon information and belief, Defendant AH then confessed to Defendants Andrew Hines and Audrey Anna Krajca that IF had become impaired after Defendants Andrew Hines and Audrey Anna Krajca had dropped them off the night before and pleaded with them not to tell IF's parents. Incredibly, Defendants Andrew Hines and Audrey Anna Krajca agreed not to tell the Plaintiffs what had happened.

162.     At various times over the next several days IF called and/or texted Defendants IG, and AV and accused them of raping her. Both admitted to her that they had sexual contact with her, and AV stated that after he had sex with her he left the party. Defendant AV, has admitted to several of the persons at the party that he surreptitiously placed a controlled substance in IF's drink. He has further admitted to others that while IF was under the influence of the controlled substance that he penetrated IF's vagina with his penis, and attempted to have IF perform oral sex on him by placing his penis in her mouth. Both actions constitute criminal acts of sexual assault pursuant to Chapters 21 and/or Chapter 22 of the Texas Penal Code. Both actions also constitute violations of the Code of Conduct which may merit AV's expulsion from the school.

163.     Unbeknown to IF on or about September 28, 2012 Defendant AV maintained a photo on his social media home page which prominently displayed the slogan "It Ain't Rape if I Got Swag." A true and correct copy of a screen shot of Defendant AV's Twitter home page is attached hereto as Exhibit "3" and is incorporated herein for all purposes as if set forth verbatim.

164.     Within a few days after September 28, 2012, IF began to have flash backs and hazy memories of certain events occurring at the party including someone groping her breasts and pulling her shorts and underwear down. When IF attempted to resist she was restrained by this individual. She asked him to stop but he refused. Unable to see him because of the darkness, the effects of the drugs and the position she was in she asked him who he was. He stated "It's Tyler the Creator." She further recalls asking why he was doing this and hearing another person tell her "because we love you." She then heard laughter from a crowd of boys as she was sexually assaulted by the person claiming to be Tyler the Creator.

165.     Tyler the Creator is a stage name for Tyler Gregory Okonma, an American rapper who the Defendant IG believes he looks like and who IG refers to himself as on social media.

166.     In the days immediately after the assault Defendant AV admitted to IF that he laughed hysterically when he heard Defendant IG tell her that he was "Tyler the Creator".

ORIGINAL COMPLAINT                                                                                    Page 31

**167.** Defendant AV has acknowledged to others that he attempted to get IF to perform oral sex on him, but that she refused and he continued to attempt to place his penis in her mouth while she refused. He has further admitted to others that while he was attempting to get IF to perform oral sex, the Defendant IG penetrated her vaginally and then he and Defendant IG "switched positions."

**168.** Both actions by AV and IG constitute criminal acts of sexual assault pursuant to Chapters 21 and Chapter 22 of the Texas Penal Code. Both acts constitute violations of the Code of Conduct which merit the expulsion of AV and/or IG from Hebron

**169.** In addition to telling Defendant AH on the morning of September 29, 2012 that she had been raped, within 24 to 48 hours of the party IF also told others that she had been raped. One or more of these individuals directly confronted Defendants AV and/or IG. After each tried to initially deny that anything had occurred, they each admitted that they had sexual contact with IF. Defendant AV stated "Not only is that against my morals I went against my religion and what I stand for and just can't fucking believe what I did" Further, Defendant AV has admitted that IF was impaired and has told other individuals that he has never seen anyone that drunk in his life, that IF would not remember a thing, and "Even if I can't take back what I did I need to apologize to her in person and tell her what happened". True and correct copies of these  statements by Defendant AV are attached hereto as Exhibits "4", "5" "and "6"  respectively and are incorporated herein for all purposes.

**170.** Defendant IG admitted he should have stopped Defendant AV. A true and correct copy of the Defendant AG's statement is attached hereto as Exhibit "7" and is incorporated herein for all purposes as if set forth verbatim. When IF told him "I'm going to have to tell me husband the first time I had sex I was raped" Defendant IG replied "I didn't realize you would and yes that is bad… Ellie I really am sorry that it happened to you! You didn't deserve to lose it that way" A true and correct copy of the Defendant IG's statement is attached hereto as Exhibit "8" and is incorporated herein for all purposes. Later he told others "… I made a huge mistake I know but you aren't Jesus so you shouldn't be judging me for it. I had a long talk with myself and im [sic] going to change and better myself no

more partying girls and. Bs!! I didn't mean to hurt Ellie I really didn't!! I even came home and thought

about Killy [sic] my self [sic] that's how bad of a person I felt like and I still think about killing u self

!!  *my" and "All of you guys are the one that make me think like that all the tweets the txt everything

is just making me fall apart!! Wait until tomorrow people are going to look at me like I'm some type

of animal I can't deal with that for the rest of my life! I just want this to go away I didn't mean to hurt

Ellie! It wasn't even me!"  True and correct copies of these statements are attached hereto as Exhibit

"9" and are incorporated herein for all purposes.

171.    While professing his remorse, after the fact Defendant AV acted with none. In the days

following the assault he appeared at Hebron wearing the same shorts that he wore the night of the party

which he pointedly told IF and others contained her blood stains across the front. Not satisfied with

having simply confronted and humiliated IF face to face, he later stood on one of the cafeteria chairs

or tables and shouted for anyone within hearing distance words to the effect of "Hey everyone, see

these blood stains on my shorts? I got these when I popped IF's cherry last Friday night."

172.    Soon after having bragged about these matters, it appears the Defendant AV began to realize

the potential criminal exposure that he had and began to build defenses against the probable claims

against him. He asked to speak to one of IF's friends saying "I can't explain it over text I can tell you

in person because I can't even have proof this happened Ellie fucked up bad and she twisted it and

made it sound like I'm a rapist or some shit and that's not true at all." A true and correct copy of the

Defendant AV's request to speak to IF's friend is attached hereto as Exhibit "10" and is incorporated

herein for all purposes as if set forth verbatim.

173.    Upon information and belief, shortly after admitting to Plaintiff and others that he had assaulted

IF, AV confessed to Defendants Anthony Valderrama and Jean Valderrama what he had done. Rather

than telling him to do the right thing and accept responsibility they advised him that he should start

dating IF.  Upon information and belief, the practice of a rapist dating a victim after the assault is

known to experts in the field as "grooming" and is intended to create a false display of a consensual

relationship between the assailant and his victim to diminish the chance that a victim can later prove that the sexual contact that occurred between the assailant and his victim was nonconsensual.

174.    In addition to the help and assistance provided by Defendants Anthony Valderrama and Jean Valderrama, the Defendant AV then solicited the help and assistance of the Defendants SS1, SS2, KR, JSG, RG, MG, DL, BL, CMcK, MS, HG, and others to concoct a story that IF and Defendant AH had arrived at the party drunk, that they were coming on to the boys at the party and that IF solicited him and wanted to have sex with him. All but HG agreed to this concocted story.

175.    The Defendants identified in the preceding paragraph then began bullying and humiliating IF and the Defendant AH. The bullying and humiliation occurred both verbally and through texting and electronic media. As IF walked the halls between classes she was pointed at, called various slurs such as slut and whore, and heard statements to the effect that "her pussy is so loose it drags on the ground"

176.    The bullying became so intense that Defendants Andrew Hines and Audrey Anna Krajca pulled AH out of Hebron and moved her to a school in another city.

177.    The bullying against the Defendant HG was no less intense.  Defendants IG, AV, CA, JSG, RG, MG, CJCG, DL, BL, CMcK, KR, KR2, MAS, SS2, SS1, and others isolated him and shunned him. He stopped going out socially, he quit attending football games and he approached his father about moving to Houston to get away from the bullying.

178.    Defendants SS1, JSG, HG, RG, MG, DL, BL, CMcK and MS know that IF was assaulted by Defendants AG and AV, and perhaps others, but they have engaged in a conspiracy with AV and IG, to portray AV and IG as victims and to impugn, defame and slander IF to successfully protect them from discipline by Hebron, the athletics teams coaches at Hebron, and any police or other investigation.

179.    Within days of the assault, word began to spread through Hebron that IF had been assaulted. This became common knowledge and upon information and belief, shortly thereafter, the Head Football Coach, the Corners Coach, the Varsity Football Coach, the Safeties Coach, the Football Coach, the Varsity Defensive Line Coach, and the 9th Grade Football Coach, called a meeting of all of

the football teams. One or more of these Defendants told the Defendants SS1, JSG, RG, MG, DL, BL, CMcK, MS, HG, AV, and IG, that they knew the party had occurred, that there had been sex at the party, that there had been drugs at the party, that there had been alcohol at the party and that such activities were not acceptable behavior. No disciplinary action was taken despite the clear and unequivocal terms and conditions of the Code of Conduct and the Extracurricular Code of Conduct. Upon information and belief, despite explicit knowledge of the clear violations of both the Code of Conduct and the Extracurricular Code of Conduct, and School District Policies, no investigation was initiated. Moreover, upon information and belief, no notification was made to the Title IX administrator or any other designated individual in violation of the School District's Freedom from Discrimination, Harassment and Retaliation Policy.

180.     Although the Head Football Coach, the Corners Coach, the Tight Ends Coach, the Safeties Coach, the Running Back Coach, the Varsity Defensive Line Coach, and the Defensive Coordinator all advised Defendants SS1, JSG, RG, MG, DL, BL, CMcK, MS,  HG, AV, and IG that they had such knowledge, and such knowledge in and of itself was sufficient to make a person of ordinary sensibilities realize that there was a high probability that a child had been abused as defined by the Texas Family Code, upon information and belief, not a single one of these Defendants reported the potential child abuse to authorities in complete derogation of their statutory duties. Instead, they imparted the message that if this ever happened again the offenders would be kicked off of the team. They further imparted the message that the team needed to stick together in order to get through this,  and that if everyone stuck together, this would all blow over.

181.     The failure of the Head Football Coach, the Corners Coach, the Tight Ends Coach, the Safeties Coach, the Running Backs Coach, the Varsity Defensive Line Coach, and the Defensive Coordinator to make such a report, and to initiate the notifications under the Texas Family Code and the School District's Freedom from Discrimination, Harassment and Retaliation Policy constitutes a failure to act by the School District.

ORIGINAL COMPLAINT                                                                                      Page 35

**182.**    Within approximately two weeks of the assault against IF, the coach of the cheer squad, of which IF was a member, called a meeting of the entire cheer squad and told them that IF was not present in school because she was experiencing a problem. The coach explained that IF had been sexually assaulted at a party and that no one was to discuss this or speak to anyone about what had happened to IF. Despite the fact that the cheer coach clearly had knowledge of the assault against IF, and such knowledge in and of itself was sufficient to make a person of ordinary sensibilities realize that there was a high probability that a child had been abused as defined by the Texas Family Code, upon information and belief, the cheer coach wholly failed to report the potential child abuse to authorities in complete derogation of her statutory duties. Instead, she imparted the message that what happens to the cheer squad stays within the cheer squad.

**183.**    Evidence of the fact that the message imparted by the Head Football Coach, the Corners Coach, the Running Backs Coach, the Safeties Coach, the Tight Ends Coach, the Varsity Defensive Line Coach, the Defensive Coordinator and the cheer coach took with the Defendants IG, AV, JSG, RG, MG, DL, BL, CMcK, MAS, SS1, SB and others is demonstrated by the intense bullying conducted by these individuals against IF, AH, and HG. Further evidence of the fact that the message was received and understood is demonstrated by the social media statement of Defendant SS1 that "Snitches get Stitches".   A True and correct copy of such statement is attached hereto as Exhibit "11" and is incorporated herein for all purposes as if set forth verbatim.

**184.**    In the two weeks that followed the assault, Plaintiffs Paul and Jamie Fletcher knew that something had happened to IF by virtue of the extreme change in her behavior. Instead of getting up and going to school without any request from the Plaintiffs, IF began to sleep in, she claimed she was not feeling well, she did not want to go to school, she was having nightmares, she looked and acted depressed, and more critically, she began cutting herself with knives and other objects, and expressed suicidal ideations. Frequently, when Jamie Fletcher would pick IF up from school she would get into the car with red and puffy eyes from crying.

185.    In response to the change in her daughter Jamie Fletcher began asking different people if anything had happened to IF. She questioned the Defendant Audrey Anna Krajca specifically asking if anything had happened the night that IF spent over at her home. Audrey Anna Krajca lied, and explicitly and unambiguously stated that the girls spent the night of September 28, 2012 at her house, and further denied any knowledge that anything had happened to IF.

186.    Ultimately, on or about October 8, 2012, after IF got into the car after school with her eyes red and swollen from crying, Jamie Fletcher told her she was not going to move the car until IF told her why she was so upset. IF screamed and kicked the dashboard and told Jamie Fletcher that kids were saying awful things about her throughout the school. IF explained that everyone was saying that she was a "whore" and a "slut", and that remarks such as "her pussy is so loose it drags on the floor" were being made as she walked through the halls at school, and that others were pointing at her and whispering about her. When Jamie Fletcher asked why they would say such things IF said she did not want to talk about it.

187.    Upon returning home, Jamie Fletcher immediately called Hebron High School and spoke with Defendant Debra Whitehead and advised her that IF was being bullied, the nature of the statements being said about IF, and that IF would not be returning to school while the bullying continued. Defendant Whitehead expressed surprise and stated words to the effect of "How can that be, this is anti-bullying week." Jamie Fletcher again stated that IF would not return to school unless the school took action to stop the bullying. Jamie Fletcher demanded that the school immediately intervene to stop the bullying.

188.    On or about October 12, 2012, while attending the Hebron High School football game, Jamie Fletcher was stopped twice by mothers of IF's friends. The first woman advised Jamie Fletcher that rumors were floating around that IF had sex with boys at a party. The second woman, Amy Roark, was the mother of one of IF's friends. IF told Amy Roark's daughter about the rape within forty eight (48) hours of the assault. With the consent of IF, Amy Roark's daughter then advised Amy Roark about the

ORIGINAL COMPLAINT                                                                    Page 37

rape. Amy Roark told Jamie Fletcher that they needed to talk. When Jamie Fletcher asked "what about?" Amy Roark said "IF".  Amy Roark then told Jamie Fletcher that multiple boys had assaulted IF while she was under the influence of drugs and/or alcohol at a party at Steven Striflers' house, and that the boys had bragged about it to their friends, posted statements about it on social media and otherwise communicated about the assault.

189.    At about this same time, the Defendant Audrey Anna Krajca appeared, and Jamie Fletcher asked her if she had any knowledge about IF being assaulted. Defendant Audrey Anna Krajca denied that anything had happened to IF and stated that IF had spent the night of September 28, 2012 at her home and under her care, custody and/or control. An argument ensued and Amy Roark told Defendant Anna Audrey Krajca that Jamie Fletcher "deserved to know what happened to her daughter." Defendant Anna Audrey Krajca claimed that Amy Roark was lying.  Defendant Andrew Hines then appeared and suggested that he, Anna Audrey Krajca and Jamie Fletcher leave and go somewhere where they could talk, and figure out what the misunderstanding was.

190.    Jamie Fletcher then found her daughter IF, and took her home. Jamie Fletcher and IF were followed home by the Defendants Andrew Hines, Anna Audrey Krajca, and AH. Upon arrival at the Doe house, Defendant Andrew Hines and Anna Audrey Krajca reviewed the events of the night of September 28, 2012 with Paul and Jamie Fletcher. Defendants Andrew Hines and Anna Audrey Krajca admitted that they had dropped the girls off at Defendant MG's home but adamantly claimed that IF had spent the night at their home, and that nothing had happened to her.

191.    Approximately a day later, Defendant Andrew Hines called Jamie Fletcher and suggested that they drive by the Strifler home to see how far a distance it was from MG's home. Defendant Andrew Hines then came by the Doe's home with Defendant AH, picked up Jamie Fletcher and drove them all to view the Strifler home. During the drive Jamie Fletcher asked Defendant AH what she knew about what happened. Defendant AH repeatedly stated that she did not really know what IF had done at the party, that she really wasn't with her the whole time at the party, and was very evasive about her and

IF's activities at the party. Jamie Fletcher continued to press Defendant AH and began to realize that there were too many unanswered questions and too much contradictory information that she was getting from different sources. She also began to suspect that IF had not spent the night at the Defendant Andrew Hines and Anna Audrey Krajca's home as they claimed.

192.     Only after Jamie Fletcher continued to question Anna Audrey Krajca over the course of the next several days did the Defendant Anna Audrey Krajca admit, for the first time, that she had been "mistaken" about having picked up IF from MG's home.

193.     Later, when Jamie Fletcher confronted Defendant AH with the admission by Defendant Anna Audrey Krajca, she finally related what had happened while she was at the party and how Defendants SS2 and KR and the boys prevented her from taking IF home, and instructed her to lie to her mother about Paul Fletcher having picked IF up earlier.

194.     Jamie Fletcher continued to ask the parents of IF's classmates if they had any knowledge about what had happened to her daughter. She texted Natalie Grainger, the Defendant RG's mother, to inquire if she knew anything at all about what had happened to IF. Natalie Grainger later called Jamie Fletcher in response to the text and told Jamie Fletcher that Defendant RG had come home from the party very upset and begged her not to ever tell anyone in IF's family that he had been in attendance at the party. Jamie Fletcher continued to press for information about what had happened and although Natalie Grainger never specifically told Jamie Fletcher what Defendant RG related to her, she stated words to the effect of "Whatever you can imagine as the worst thing that could occur to her, it's worse than that."

195.     Within days of learning of IF's assault Paul and Jamie Fletcher went with IF to Hebron High School to see Defendants Mark Dalton, James Scott, Debra Whitehead and Amanda Werneke. Defendant Mark Dalton refused to see them. Defendant Debra Whitehead met with Paul and Jamie Fletcher who told her that IF had been assaulted at an off campus party by at least two boys, AV and IG, and perhaps others, that this was the reason that the bullying was going on and that IF would not

be returning to Hebron High School if the boys were attending school. Plaintiffs demanded that AV and IG be removed from the school population for the safety and protection of their daughter IF.

196.    Defendant Debra Whitehead told Plaintiffs that it was "going to get really ugly" and "you don't understand what it's going to be like when you go against the football team". She stated several times that she had seen this before and that it would "get very ugly." She encouraged Paul and Jamie Fletcher to place IF in another school. When Paul and Jamie Fletcher told her that they thought the boys should be asked to transfer to another school and did not think it was appropriate to move the victim IF to another school, Defendant Debra Whitehead again stated "you don't understand how ugly this is going to get going against the boys." Upon information and belief, this advice and position is consistent with the advice and position that the School District, by and through its agents and employees have given to numerous other victims of similar sexual assaults, including, but not limited to the victim of a sexual assault in the fall of 2011.

197.    At the conclusion of the meeting Defendant Whitehead stated that she would inform the necessary individuals of the assault and would file the appropriate reports. Upon information and belief, contrary to the School District policy Defendants Mark Dalton, Debra Whitehead and Amanda Werneke failed and refused to notify Defendant Scot Finch and Dr. Kevin Rogers the Title IX Administrator of the allegations of sexual assault. Further, contrary to the School District policy, Defendants Mark Dalton, James Scott, Debra Whitehead and Amanda Werneke failed and refused to initiate a mandatory Title IX investigation, failed and refused to investigate the bullying against IF in violation of School District Policies, and failed and refused to make any report in accordance with the Texas Family Code.

198.    Further, although the report made by Paul and Jamie Fletcher made it plain to Defendant Whitehead that IF had been sexually assaulted and thus gave the School District, Defendants Mark Dalton, Scot Finch, James Scott and Amanda Werneke information to believe that Defendants AV and IG had committed expellable offenses, which required that a hearing be conducted within three (3)

days according to the Code of Conduct, no such hearing was scheduled or conducted. Moreover, AV and IG were not placed in alternative classrooms, placed in any In-school suspension, placed in any Out-of-school suspension, and/or placed in any Disciplinary Alternative Education Program in accordance with the Code of Conduct. Nor were any reports filed with the appropriate authorities as required by the Texas Family Code.

199.    Upon information and belief, there are at least six other instances of student on student sexual assault which one or more of the Educational Defendants are aware of from September 2011 through to the present. Upon information and belief, none of the other claims of student on student sexual assault have resulted in any disciplinary action, the proper notification of the Title IX administrator, or an appropriate investigation in accordance with federal law, state law, and School District Policy.

200.    For several days Paul and Jamie Fletcher contemplated how best to proceed forward. Ultimately, they determined that they would not put IF in another school and again notified Defendant Debra Whitehead of this decision. Defendant Debra Whitehead then said that Safety Resources Officer Cole Langston would be able to protect IF while she was at school. Officer Langston spoke with Jamie Fletcher by phone and told her he could protect IF.  Given the level of bullying, and the geographic size of Hebron, Plaintiffs had no reasonable basis to believe Officer Langston was capable of protecting IF, and were unwilling to accept this as a means of eliminating the hostile environment against IF.

201.    Shortly thereafter, Paul and Jamie Fletcher attended a meeting at Hebron High School to discuss how best to proceed. When Plaintiffs expressed concerns about the hostile environment created by the presence of the Defendants IG, AV, SS2, SB KR and the other students who were bullying IF being on the campus, Defendant Amanda Werneke advised Plaintiffs that IF could be isolated in a special education class, and took Plaintiffs to see the class she would be placed in. When Plaintiffs entered the class room and conferred with the teacher they discovered that the class members were kids with special needs who were not capable of functioning normally in the regular school environment, and that few if any of them, were learning at or near the levels which IF was at in her

school work. When Plaintiffs Paul and Jamie Fletcher suggested that the Defendants AV and IG be isolated in this classroom for the safety of the other students, they were laughed at.

202.     Plaintiffs Paul and Jamie Fletcher made it clear that isolating the victim IF was inappropriate and unacceptable, that they would not agree to move her to another school, and that they would not agree to IF returning while the boys who had assaulted her, and the students who were bullying her were on the school campus. Defendants Amanda Werneke and Debra Whitehead once again advised that the preferred solution for them, Defendants James Scott, and Mark Dalton and apparently the School District was to move IF to another school. Shortly thereafter, Defendants Amanda Werneke and Debra Whitehead notified Plaintiffs that if Plaintiffs would not agree to move IF to another school, or to have IF return to school, either in the general school population or in the proposed isolation program, then IF would be treated as truant.

203.     While the Defendant School District by and through the Defendants Scot Finch, James Scott, Mark Dalton and Amanda Werneke were intent on trying to persuade Plaintiffs to move IF to another school, they appear to have been equally intent upon trying to keep other School District alternatives that were available to IF from the Plaintiffs. Only when Plaintiff Jamie Fletcher contacted a counselor at Children's Medical Center in Frisco, Texas who specializes in work with rape victims did she learn of a "Homebound" program that was available in the School District.

204.     When IF confronted Amanda Werneke and Debra Whitehead about the Homebound program she was told it was completely inappropriate for IF, that it required application to the program, that the application process could take weeks and that it was really only for terminally ill students.

205.     When IF related what Amanda Werneke and Debra Whitehead had told her about the Homebound program to the counselor at Children's Medical Center the counselor told IF that Amanda Werneke and Debra Whitehead had given her inaccurate information. In truth, there were a number of non-terminally ill students in the Homebound program, there were others without severe medical issues

in the program, and the counselor could provide the necessary information to permit IF to qualify for the program.

206.    When Paul and Jamie Fletcher confronted Defendants Amanda Werneke and Debra Whitehead with the information received from the Children's Medical Center counselor they again repeatedly tried to convince Plaintiffs that it would be better to move IF to another school and that the Homebound program should be utilized only as an absolute last resort.

207.    Only when Plaintiffs insisted that IF should be enrolled in the Homebound program, did the School District, Defendants Scot Finch, Scott James, Mark Dalton, Amanda Werneke and Debra Whitehead agree to enroll her. Even then, defendants insisted that they would only permit IF to enroll in the Homebound program if she had a medical diagnosis which stated that she could not return to school. Plaintiffs provided a statement from Regina McFarland, MD, a board certified Adult, Child and Adolescent Psychiatrist, stating that IF suffered from Post-Traumatic Stress Disorder. A true and correct copy of this statement is attached hereto as Exhibit "12" and is incorporated herein for all purposes. In response to this statement, IF finally was allowed to enroll in the School District's Homebound program, but as a condition of her being allowed to enroll in the Homebound program, the School District, imposed a complete ban on IF's presence from the Hebron campus. She was required to quit the cheer team, to turn in her cheerleader uniform and was not permitted to attend any athletic events, social events or other student activities of any kind. Upon information and belief, no other student enrolled in the Homebound program was subjected to such a ban. Such a ban constitutes nothing more than forbidden retaliation by the School District in violation of Title IX, and its own policies.

208.    Defendant SB, the captain of the cheer squad at the time in question, then told other students that IF had been kicked off the cheer team, and that she wished IF was dead because of the allegations she was making against AV and IG. This further reinforced the perception among other students that

IF was suffering a punishment while her assailants and the other defendants were not subjected to any discipline or even an investigation.

209.    After enrolling IF in the Homebound program, the School District, by and through its agents and employees then embarked upon a further course of retaliation against the Plaintiffs, and IF in particular, by requiring her to assume responsibilities far beyond those of other students in the program, or those in regular attendance at the school, failing to give regular and routine notices of meetings, insisting on meetings on limited or no notice, failing to provide the required personal instruction to IF unless and until it was insisted upon by Paul and Jamie Fletcher, and generally embarking on a course of conduct which was calculated to cause her parents to remove IF from Hebron High School entirely and to enroll her in another school.

210.    Continuing the pattern of trying to get rid of the Plaintiffs by making them move IF to another school, at the beginning of the second semester, in January 2013, without warning, the School District, by and through Defendants Amanda Werneke, and Debra Whitehead advised Plaintiffs that IF would not be permitted to continue in the Homebound program for the second semester of the 2012-2013 school year unless they provided the School District with an updated statement from a physician stating that IF continued to suffer from Post-Traumatic Stress Disorder, even though at the time, the original physician's statement was less than ninety (90) days old. Once again Plaintiffs provided the necessary physician's statement permitting IF to enroll in the Homebound program.

211.    As they had during the first semester, the School District, by and through its agents and employees then continued its course of retaliation against the Plaintiffs, and IF in particular, by requiring her to assume responsibilities far beyond those of other students in the program, or those in regular attendance at the school, failing to give regular and routine notices of meetings, insisting on meetings on limited or no notice, failing to provide the required personal instruction to IF unless and until it was insisted upon by Paul and Jamie Fletcher, and generally embarking on a course of conduct which was calculated to cause her parents to remove IF from Hebron High School entirely and to enroll

her in another school. Ultimately, this course of conduct succeeded and Paul and Jamie Fletcher enrolled IF in a different school for the 2013 – 2014 school year.

212.    As Plaintiffs Paul and Jamie Fletcher continued trying to determine exactly what had happened to IF they contacted Robert Girvin to arrange to speak with his son, Defendant HG, Paul Fletcher related what he knew to Robert Girvin, who stated "that explains a lot". He then advised that Defendant HG had quit going out with friends, had quit going to football games and had asked him if they could move to Houston shortly after the party on September 28, 2012. He further related that he and his ex-wife, Michelle Girvin, had argued because Hunter had called and asked him to pick him up from the party, but he had refused to pick him up.

213.    Later Robert Girvin, called Paul Fletcher and told him that HG wanted to speak with him and tell him what had occurred at the party and to give a deposition. Defendant Robert Girvin arranged for Paul Fletcher and HG to meet at Defendant Robert Girvin's home. When Paul Fletcher arrived to meet with Defendant HG, two Hebron football players were at Robert Girvin's house with HG. At the suggestion of Robert Girvin, Paul Fletcher and Defendant HG then left together. When Paul Fletcher asked HG what he knew, he stated that he saw IF sitting at the kitchen table when he arrived at the Strifler home shortly after 8:00 PM. He stated that he next saw her a short time later sitting in the living room and she "looked really messed up." He indicated that the next time he saw her SS1 was helping her to the bathroom because she could hardly walk. He indicated that IF was getting sick and vomiting in the bathroom while several boys were milling around outside the bathroom. He identified one of the boys as Defendant IG. He stated that he saw SS1 help IF to a bedroom where she passed out.  He stated he later returned to the bedroom and found boys who he told to get out and leave her alone. He stated that he slept on the floor next to the bed so that no one else would "mess with her anymore" and to protect her. When Paul Fletcher told him that he knew the boys had concocted a lie and were all sticking to the same story to protect each other he began crying and stated that he didn't know anything, that he had been playing computer games in another bedroom and was not aware of what happened to IF.

ORIGINAL COMPLAINT                                                                      Page 45

When confronted with his statements to his father, that he wanted to speak to Paul Fletcher and to give a deposition, he again began crying and said he "just wanted this whole thing to go away." When Paul Fletcher and HG returned to Robert Girvin's house, the two Hebron football players were waiting for HG.

214.    Thereafter, HG began to cooperate with Defendants IG and AV, and became a part of the conspiracy to bully, impugn, slander and libel IF and paint IG and AV as the victims.

215.    Throughout October, November and December 2012, in complete derogation of its Title IX responsibilities, School District policies, the Code of Conduct and the Extracurricular Code of Conduct the School District, Defendants Scot Finch, James Scott, Mark Dalton, Amanda Werneke and Debra Whitehead undertook no investigation of any kind concerning the sexual assault of IF or the bullying conducted by the Student Defendants immediately thereafter.

216.    Throughout October, November and December of 2012, IF continued to be bullied through text messages, twitter postings, and other social media communications. Although Jamie Fletcher had unambiguously told Defendant Debra Whitehead of the bullying in early October of 2012, no investigation or other action was undertaken by the School District, Scot Finch, James Scott, Mark Dalton, Amanda Werneke, Debra Whitehead and/or anyone acting or purporting to act on their behalf.

217.    The bullying became more intense in the early days of January 2013. Jamie Fletcher went to Hebron High School and confronted Defendant Amanda Werneke about the bullying. She asked to speak to Defendant Mark Dalton, but was told he was not on the school property. Jamie Fletcher handed Defendant Amanda Werneke a list of students who she believed had engaged in cyberbullying against IF and demanded that Defendant Amanda Werneke take action. Initially, Amanda Werneke refused to even accept a copy of the list, and only when Jamie Fletcher stated she would not leave until both Defendants Mark Dalton and Amanda Werneke signed the document acknowledging that they had received the list, did Defendant Amanda Werneke sign the list. Defendant Amanda Werneke then took the list, left the office and returned shortly stating that Defendant Mark Dalton had signed the list and

returned the original to Jamie Fletcher. A true and correct copy of the list is attached hereto as Exhibit "13" and is incorporated herein for all purposes. In truth, the document is not signed by Defendant Mark Dalton, but by someone claiming to be the assistant principal, presumably James Scott.

218.    Instead of complying with Title IX requirements and School District policies and conducting a prompt and appropriate investigation when they learned of the sexual assault and subsequent bullying against IF, Defendants Scot Finch, James Scott, Mark Dalton and Amanda Werneke did nothing.  Only in January 2013, after receiving a list of students who Plaintiffs believed were engaged in cyberbullying IF was physically handed to them did they actually initiate any investigation.

219.    When the Defendant School District, Scot Finch, James Scott, Mark Dalton and Amanda Werneke finally did initiate an investigation they conducted it with individuals who were not trained or qualified to conduct a Title IX investigation. Further, the individuals who did conduct the investigation failed to use well recognized and accepted investigative techniques, including but not limited to, separating witnesses, preventing witnesses from communicating with each other during and/or immediately after questioning, and/or timely requesting digital data from witnesses phones, computers, tablets and/or other devices. Because of the months of delay before even beginning their investigation the Defendant School District, Scot Finch, James Scott, Mark Dalton and Amanda Werneke failed to obtain digital data from witnesses' phones, computers, tablets and other devices. When investigators did ask for the opportunity to examine such devices they had no understanding of how to retrieve and capture data contained on these devices, and were incapable of retrieving and downloading the data. Additionally, they failed to interview witnesses with direct knowledge of the events, advised those witnesses they did interview that there had been no crime committed as they started the interview, and directed most of their questioning not towards the assault of IF, but to whether IF had ingested any alcohol.

220.    Throughout the period of the investigation, IF continued to be bullied by Defendants, SB, JSG, RG, CJCG, DL, BL, CMcK, KR2, KR, MAS, SS1, SS2, SW and CW. These individuals repeatedly

denied that any attack happened, indicated that Plaintiff was exaggerating regarding the sexual assault, and/or posted vicious messages on social media and sent text messages saying the same things. These messages continued as recently as February 2014 on various social media sites, and students have directed specific texts, twitter feeds and similar communications to IF. Rather than doing anything to stop the bullying, the School District, Scot Finch, Scott James, Mark Dalton, and Amanda Werneke determined that IF would not be permitted to set foot on the Hebron campus effectively punishing her for having complained about the sexual assault and the bullying. Ultimately the School District achieved its stated preferred outcome of forcing the Plaintiffs to move IF to another school.

**221.**     Students noted that neither AV nor IG appeared to have been disciplined and concluded that IF was either lying or exaggerating regarding her claims of sexual assault.

**222.**     More than three months after IF was assaulted, and presumably only because Jamie Fletcher forced Amanda Werneke to accept a list of individuals who she believed had been cyberbullying IF, the School District initiated its investigation. Some six months after IF was assaulted, the investigation concluded. During the entire investigation, IF was interviewed only once and only for a very short period of time. The interviewers were unqualified, and never asked IF for full details about the events on the night of September 28, 2013, or the admissions made by the Defendants IG and AV, but instead focused on whether IF had anything to drink during the evening of the assault and even the School District's lawyer repeatedly asked her whether she was certain she was a virgin before September 28, 2013. When Plaintiff asked to know the relevance of such questions she was simply told "It's relevant" and she was told to "answer the question."  Plaintiff was never provided with any information regarding any allegations made by her assailants or any other witnesses and she was never afforded any opportunity to rebut the statements or allegations made by such witnesses. No grievance procedures which incorporated appropriate due process standards were ever utilized in violation of the Title IX implementing regulation at 34 D.F.R. § 106.8(b). Interestingly, the investigation was delayed and only concluded after the end of both the Hebron High School football and basketball seasons ensuring that

all of the Student Defendants would be available for all athletic events during the entire fall and almost the entire spring semesters.

223.    The investigation concluded with a finding of no conduct by the Defendants which would subject them to discipline.

224.    The only person disciplined by the School District, and/or the Defendants Scot Finch, James Scott, Mark Dalton, Amanda Werneke, and/or Debra Whitehead was IF, the victim of multiple sexual assaults.

225.    Plaintiff suffered sex-based harassment that was severe, pervasive, and objectively offensive.

226.    The sex-based harassment deprived Plaintiff of access to the educational opportunities or benefits of the school.

227.    School District officials, including Defendants Scot Finch, James Scott, Mark Dalton, Amanda Werneke and Debra Whitehead had the authority to take remedial action to correct the sex-based harassment.

228.    The School District and its Defendants had actual knowledge of the sex-based harassment.

229.    The School District and its agents and employees responded with deliberate indifference to the sex-based harassment.

230.    Plaintiff found it difficult to concentrate in performing her class work and frequently became tearful and unable to continue class work.

231.    Plaintiff required mental health counseling and increased medication for depression and anxiety to cope with the stress of completing the unreasonable class work load and dealing with the constant harassment and bullying.

232.    Plaintiff's grades dropped.

233.    The School District's response and its officials' conduct was such that future reasonable students in Plaintiff's circumstances would be chilled from reporting sexual harassment. This has occurred, as the most recent victims, a 14 year old victim who was assaulted after boys at Hebron got

her intoxicated at a party over the 2013 Thanksgiving weekend, and two 14 year old girls who were assaulted within the last thirty (30) days have all failed to report the assaults, and apparently do not intend to do so. Upon information and belief, the School District has knowledge of these assaults, and its agents have actually spoken to the victims, but despite this knowledge, has failed to make any report as required by the Texas Family Code, has failed to initiate any Title IX investigation, and has completely ignored its responsibilities under state and federal law and its own Code of Conduct and Policies.

234.    As a direct and proximate result of the harassing educational environment created by Defendants' deliberately indifferent response to the sexual assault and subsequent harassment, as well as violations of her Fourteenth Amendment rights, Plaintiff has suffered and continues to suffer psychological damage, emotional distress, loss of standing in her community, and damage to her reputation, and her future relationships have been negatively affected.

235.    Plaintiff has been forced to choose between returning to Hebron High School and accepting a continuing hostile environment, being completely isolated and cut off from the normal school environment (and being forbidden to step foot on the Hebron campus), or to change schools. Ultimately, Plaintiff chose to change schools in order to experience some semblance of a normal childhood education. However, the electronic bullying reaches even to the new school and there continue to be repeated instances of bullying from the Defendants against IF even to this day.

236.    Plaintiff has required ongoing counseling and elevated levels of medication to address her depression and anxiety caused by Defendants' conduct and the resulting harassing educational environment.

237.    Plaintiff has also been deprived of a normal childhood education due to Defendants' conduct and the resulting educational environment.

**238.**   Plaintiff has also been damaged by missed educational opportunities and her future earning capabilities have been damaged by Defendants' conduct and the resulting hostile educational environment.

**COUNT I**
**VIOLATION OF TITLE IX**
**AS TO DEFENDANT LEWISVILLE INDEPENDENT SCHOOL DISTRICT**
(20 U.S.C. § 1681, et seq.)
(The School's Deliberate Indifference to Alleged Sexual Harassment)

**239.**   Paragraphs one through 237 are incorporated by reference as if stated in full herein.

**240.**   The sex-based harassment articulated in the Plaintiffs' General Allegations was so severe, pervasive, and objectively offensive that it deprived Plaintiff of access to educational opportunities or benefits provided by the Defendant School District.

**241.**   The Defendant School District created and/or subjected Plaintiff to a hostile educational environment in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX"), because

a) Plaintiff was a member of a protected class;

b) she was subjected to sexual harassment in the form of a sexual assault by another student;

c) she was subjected to harassment based on her sex; and

d) she was subjected to a hostile educational environment created by the School District's lack of policies and procedures, failure to follow federal and state laws, failure to follow School District stated policies and procedures,  and failure to properly investigate and/or address the sexual assault and subsequent harassment.

**242.**   Defendant School District and its officials had actual knowledge of the sexual assault and the resulting harassment of Plaintiff created by its failure to investigate and discipline Plaintiff's attackers in a timely manner and consistent with its own policy and federal and state law.

**243.**   The Defendant School District's failure to promptly and appropriately respond to the alleged sexual harassment, resulted in Plaintiff, on the basis of her sex, being excluded from participation in,

being denied the benefits of, and being subjected to discrimination in the Defendant School District's education program in violation of Title IX.

244.     Defendant School District failed to take immediate, effective remedial steps to resolve the complaints of sexual harassment and instead acted with deliberate indifference toward Plaintiff.

245.     Defendant School District persisted in its actions and inaction even after it had actual knowledge of the harm suffered by Plaintiff.

246.     Defendant School District engaged in a pattern and practice of behavior designed to discourage and dissuade students and parents of other students who had been sexually assaulted from seeking prosecution and protection and from seeking to have sexual assaults fully investigated.

247.     This policy and/or practice constituted disparate treatment of females and had a disparate impact on female students.

248.     Plaintiff has suffered emotional distress and psychological damage, and her character and standing in her community have suffered from the harassment fostered as a direct and proximate result of Defendant School District's deliberate indifference to her rights under Title IX.

**COUNT II**
**VIOLATION OF TITLE IX**
**AS TO DEFENDANT LEWISVILLE INDEPENDENT SCHOOL DISTRICT**
(20 U.S.C. § 1681, et seq.)

(Retaliation by Withholding Protections Otherwise Conferred by Title IX)

249.     Paragraphs one through 247 are incorporated by reference as if stated in full herein.

250.     Immediately after Plaintiffs advised the Defendants Amanda Werneke and Debra Whitehead, and through them, Defendants Scot Finch, James Scott and Mark Dalton of the violent sexual attack, these Defendants discouraged them from pursuing a claim, and encouraged Plaintiffs to enroll IF in another school.

**251.**     Once Plaintiff and her parents requested a criminal investigation and insisted upon pursuing a claim however, Defendants Amanda Werneke, and through her, Defendants Scot Finch, James Scott and Mark Dalton acting as the School District retaliated against Plaintiff by declining to promptly and appropriately investigate the matter or to otherwise comply with their responsibilities as mandated by Title IX.

**252.**     Fellow students harassed Plaintiff for reporting her attack to the school and police. Plaintiff's parents reported this harassment to School officials, who declined to intervene to stop it.

**253.**     Plaintiff has suffered emotional distress and psychological damage, and her character and standing in her community have suffered from the harassment fostered as a direct and proximate result of Defendant School District's deliberate indifference to her rights under Title IX.

**COUNT III**
**1983 VIOLATION AS TO**
**DEFENDANTS LEWISVILLE INDEPENDENT SCHOOL DISTRICT,**
**FINCH, SCOTT, DALTON, WERNEKE and WHITEHEAD**

(42 U.S.C. § 1983)

**254.**     Paragraphs one through 252 are hereby incorporated by reference as if set forth in full herein.

**255.**     Under the Fourteenth Amendment, Plaintiff had the right as a public school student to personal security and bodily integrity and Equal Protection of Laws.

**256.**     Defendants Finch, Scott, Dalton, Werneke and Whitehead were all state actors acting under the color of state law.

**257.**     Defendants each subjected Plaintiff to violations of her right to personal security and bodily integrity and Equal Protection of Laws by: failing to investigate AV and IG's misconduct; failing to appropriately discipline the Student Defendants; failing to adequately train and supervise Finch, Scott, Dalton, Werneke and Whitehead; and manifesting deliberate indifference to the sexual assault and ongoing harassment of Plaintiff by other students, including IG and AV.

**258.** The School District has and/or had unconstitutional customs, practices or policies of a) failing to investigate evidence of criminal and tortious misconduct against School District students in the nature of violations of their right to personal security and bodily integrity and b) failing to adequately train and supervise School District employees with regard to maintaining, preserving and protecting students from violations of their right to personal security, bodily integrity, and Equal Protection of the Laws.

**259.** On information and belief, the School District has followed these unconstitutional customs and policies not only with regard to Plaintiff but also with regard to criminal and tortious misconduct committed against other School District students.

**260.** The School District's policies, customs and/or practices constituted disparate treatment of females and had a disparate impact on female students.

**261.** Defendants Finch, Scott, Dalton, Werneke and Whitehead are or were at the time of events complained of within, policymakers for the purpose of enforcing and implementing the School District's unconstitutional policies or customs.

**262.** Plaintiff has suffered emotional distress and psychological damage, and her character and standing in her community have suffered from the harassment fostered as a direct and proximate result of Defendant School District's deliberate indifference to her rights under the Fourteenth Amendment.

### COUNT IV
### *MONELL* LIABILITY FOR FAILURE TO TRAIN AND SUPERVISE
### AS TO RESPONSE TO SEXUAL ASSAULT
### AS TO DEFENDANT LEWISVILLE INDEPENDENT SCHOOL DISTRICT

(42 U.S.C. § 1983)

**263.** Paragraphs one through 261 are hereby incorporated by reference as if set forth in full herein.

**264.** Defendants Finch, Scott, Dalton, Werneke and Whitehead, were "state actors" working for Lewisville Independent School District, a federally funded school system.

ORIGINAL COMPLAINT

**265.** Defendants Finch, Scott, Dalton, Werneke and Whitehead acted under "color of law" when refusing to respond to Plaintiff's sexual assault off school premises.

**266.** Defendants Finch, Scott, Dalton, Werneke and Whitehead failed to preserve Plaintiff's constitutional right to equal protection as guaranteed by the Fourteenth Amendment.

**267.** Under the Equal Protection Clause of the Fourteenth Amendment, Plaintiff had the right to equal access to an educational environment free from harassment and discrimination.

**268.** Defendants Finch, Scott, Dalton, Werneke and Whitehead should have known that their response to sexual assault allegations must comply with federal law, particularly as outlined in Title IX's published and widely promulgated implementing regulations.

**269.** Defendants Finch, Scott, Dalton, Werneke and Whitehead each violated Plaintiff's right to equal access by:

a. Failing to take immediate and appropriate action to investigate or otherwise determine what occurred once informed of possible sexual violence;

b. Failing to take prompt and effective steps to end the sexual violence, prevent its recurrence, and address its effects, whether or not the sexual violence is the subject of a criminal investigation;

c. Failing to take steps to protect the Plaintiff as necessary, including interim steps taken prior to the final outcome of the investigation;

d. Failing to provide a grievance procedure for students to file complaints of sexual discrimination, including complaints of sexual violence. The procedures must include an equal opportunity for both parties to present witnesses and other evidence and the same appeal rights; and

e. Failing to use a preponderance of the evidence standard to resolve complaints of sex discrimination in grievance procedures;

**270.**     Defendant Lewisville Independent School District violated Plaintiff's Fourteenth Amendment right to equal protection by failing to properly train and supervise its employees as to these mandated investigative requirements.

**271.**     These policies and/or practices constituted disparate treatment of females and had a disparate impact on female students.

**272.**     Defendants' actions and lack of actions were the proximate cause of Plaintiff's emotional distress and psychological damage, and her character and standing in her community have suffered from the harassment fostered as a result of Defendant School District's deliberate indifference to her right to equal protection under the Fourteenth Amendment.

### Count V
### 1983 VIOLATION AS TO DEFENDANTS CITY of CARROLLTON POLICE DEPARTMENT, WILLIAMS, LANGSTON, DENTON COUNTY DISTRICT ATTORNEY'S OFFICE, JOHNSON, ABBOTT and SARTIN

### (42 U.S.C. § 1983)

**273.**     Paragraphs one through 271 are hereby incorporated by reference as if set forth in full herein.

**274.**     Under the Fourteenth Amendment, Plaintiff as a United States Citizen, a Texas citizen and a resident of the County of Denton, Texas had the right to personal security and fair and Equal Protection of Laws.

**275.**     Defendants Williams, Langston, Johnson, Abbott and Sartin were all state actors acting under the color of state law.

**276.**     Defendants each subjected Plaintiff to violations of her right to fair and Equal Protection of Laws by: failing to properly investigate AV and IG's misconduct; failing to interview witnesses with personal knowledge, failing to utilize appropriate and well recognized interviewing and interrogation techniques, advising witnesses at the beginning of interviews that no crime had been committed, failing to obtain digitally stored information and evidence from phones, tablets, computers, and other devices; failing to adequately train and supervise Williams and Langston as police officers, failing to adequately

train and supervise Johnson, Abbott and Sartin as district attorney and assistant district attorneys; failing to follow the Denton County policies and procedures with respect to keeping victims involved and apprised of the status of their case, failing to even interview IF, failing to apprise Plaintiffs of the date and time for the grand jury proceedings, denying Plaintiffs any opportunity to make any presentation for the benefit of the grand jury by Johnson, Abbott and Sartin; and manifesting deliberate indifference to the sexual assault and ongoing harassment of Plaintiff by other students, including the assailants IG and AV.

277.     The City of CARROLLTON Police Department and the Denton County District Attorney's office have and/or had unconstitutional customs or policies of a) failing to investigate evidence of criminal and tortious sexual assaults/misconduct by and between minors; failing to prosecute sexual assault cases against minor females by minor males, failing to indict sexual assault cases against minor females by minor males; and b) failing to adequately train and supervise City of CARROLLTON Police Department and Denton County District Attorney's office employees with regard to investigating, charging, indicting, prosecuting, trying, and convicting minor males who are alleged to have committed sexual assaults against minor females thereby denying minor females their right to personal security, bodily integrity, and Equal Protection of the Laws.

278.     On information and belief, the City of CARROLLTON Police Department and the Denton County District Attorney's Office have followed these unconstitutional customs and policies not only with regard to Plaintiff but also with regard to criminal and tortious misconduct committed against other minor females.

279.     The City of CARROLLTON Police Department and Denton County District Attorney's Offices' policies and/or practices constituted disparate treatment of females and had a disparate impact on females.

**280.**    Defendant Johnson is or was, at the time of events complained of within, a policymaker for the purpose of implementing and enforcing the Denton County District Attorney's office unconstitutional policies or customs.

**281.**    Plaintiff has suffered emotional distress and psychological damage, and her character and standing in her community have suffered from the harassment fostered as a direct and proximate result of Defendant City of CARROLLTON Police Department and Denton County District Attorney's office deliberate indifference to her rights under the Fourteenth Amendment.

**COUNT VI**
**SEXUAL ASSAULT/ASSAULT AS TO DEFENDANTS AV and IG**

**282.**    Paragraphs one through 280 are hereby incorporated by reference as if set forth herein fully.

**283.**    Defendants AV and IG sexually assaulted Plaintiff IF on September 28, 2012 by, according to their own admissions, placing their penises into her vagina, when they knew and perceived that she was "the most drunk I've ever seen anyone in my LIFE" and incapable of giving informed consent. Such actions were taken without her consent and constitute an assault and a sexual assault by each of the Defendants AV and IG. Moreover, Defendant AV has admitted to others he brought "bars" to the party and that he laced Plaintiff's drink with the medication. He therefore knew or should have known that she was cognitively impaired because he caused her to be by lacing her drink with such drugs without her knowledge or permission.

**284.**    The actions of the Defendant in lacing the Plaintiff's drink demonstrate malice as that term is used and defined under Texas law, making it clear that Plaintiff AV's actions were calculated and intentional.

**285.**    Defendants AV and IG sexually assaulted Plaintiff IF on September 28, 2012 by, according to their own admissions, placing their penises into her mouth even while she was, again, according to their own admissions, refusing to engage in such sexual activity. Both Defendants knew and were aware of her refusal to engage in such sexual activity and despite such stated refusals, continued to

force their penises into Plaintiff's mouth without her consent. Such action demonstrate malice as that term is used and defined under Texas law, making it clear that the actions of both AV and IG were calculated and intentional.

286.    As a direct and proximate result of the sexual assault by Defendants AV and IG Plaintiff has suffered physical trauma, psychological trauma, mental anguish, humiliation and embarrassment. Plaintiff has lost sleep, requires anxiety medication, and her character and standing in her community have suffered from the harassment fostered by these defendants. Plaintiff has required ongoing counseling and elevated levels of medication to address her depression and anxiety caused by Defendants' conduct and the resulting harassment fostered by these Defendants.

287.    Plaintiff here and now sues for recovery of all past, present and future damages caused by such sexual assault.

### COUNT VII
### CONSPIRACY TO CONCEAL SEXUAL ASSAULT/ASSAULT AS TO DEFENDANTS ANTHONY VALDERRAMA, JEAN VALDERRAMA and AV

288.    Paragraphs one through 286 are hereby incorporated by reference as if set forth herein fully.

289.    Based upon information and belief, Defendant AV confessed to his parents at least part of what he did to Plaintiff IF. Later, Defendant AV told Plaintiff IF that his mother, Defendant Jean Valderrama told him he could be charged with rape, and that his parents advised him that he should start dating IF.

290.    Such actions constitute a combination of two or more people, namely AV, Anthony Valderrama, and Jean Valderrama, with a meeting of the minds of each to accomplish the objective of successfully avoiding criminal prosecution of the Defendant AV. However, Defendant AV acting in furtherance of this conspiracy engaged in cyberbullying, bullying, stalking, humiliating and degrading the Plaintiff IF and thereby employed an unlawful means of accomplishing the objective. Moreover, AV utilized a cell phone, computer, tablet or other digital device to engage in such cyberbullying, bullying, stalking, humiliation and degradation against IF. Upon information and belief, one or more of the phones, computers, tablets or other digital devices are actually owned and registered in the name

of Anthony Valderrama or Jean Valderrama. Anthony Valderrama and Jean Valderrama knew or should have known that such device(s) owned and registered in their names were being utilized for the purpose of cyberbullying, stalking, bullying, harassing, embarrassing, humiliating, and/or degrading IF and are therefore liable for such acts under Texas law.

291.    Such conspiracy and the actions of AV in furtherance of the conspiracy have directly and proximately caused harm to the Plaintiff IF including but not limited to psychological trauma, mental anguish, humiliation and embarrassment. Further, Plaintiff has lost sleep, requires anxiety medication, and her character and standing in her community have suffered from the harassment fostered by the conspiracy engaged in by these Defendants. Plaintiff has required ongoing counseling and elevated levels of medication to address her depression and anxiety caused by Defendants' conduct and the conspiratorial conduct fostered by these Defendants.

292.    Plaintiff here and now sues for recovery of all past, present and future damages caused by such conspiracy.

## COUNT VIII
## NEGLIGENCE and NEGLIGENCE PER SE
## AS TO DEFENDANTS STEVEN STRIFLER, SS1 and SS2

293.    Paragraphs one through 291 are hereby incorporated by reference as if set forth herein fully.

294.    Defendants SS1 and SS2 knew they were going to have a party while Defendant Steven Strifler was out of town on September 28, 2012.

295.    Defendants SS1 and SS2 knew that there would be alcohol served at this party and that there would be underage drinking at the party. Defendants SS1 and SS2 took no steps to prevent such illegal activity but instead encouraged it.

296.    Defendant Steven Strifler knew, or in the exercise of reasonable care should have known that SS1 and SS2 were going to have a party at his home while he was absent. Upon information and belief, kids actually began showing up for the party before he left for the weekend.

**297.**     Defendant Steven Strifler knew, or in the exercise of reasonable care, should have known that there would be alcohol served at this party and that there would be underage drinking at the party. Defendant Steven Strifler took no steps to prevent such illegal activity but instead has on numerous occasions, based upon information and belief, actually supplied alcohol to SS1 and SS2 prior to September 28, 2014.

**298.**     Defendants Steven Strifler, SS1 and SS2 all had a duty to provide a safe environment for guests attending the party and to comply with local, state and federal laws regarding providing alcohol to minors, allowing the use of alcohol by minors, providing illegal drugs to minors, and allowing illegal drugs to be used by minors, and/or the combination of one or more of these activities.

**299.**     Defendants Steven Strifler, SS1 and SS2 individually and collectively breached the duty owed to Plaintiff IF as a guest attending the party, to provide a safe environment, by allowing and encouraging the providing of alcohol to minors, the use of alcohol by minors, the providing of illegal drugs to minors and the use of illegal drugs by minors. Moreover, Defendants SS1 and SS2 knew or in the exercise of reasonable care should have known that other party guests, were combining controlled substances such as "bars" with alcohol which has the effect of impairing a person's cognitive abilities, their memory, and can even lead to death. Such actions constitute negligence per se.

**300.**     Given the fact that Defendants Steven Strifler, SS1 and SS2 knew that illegal alcohol consumption and illegal drug consumption and/or a combination of both was occurring at the party, it was reasonably foreseeable that a minor female such as IF would be harmed or injured as a direct and proximate result of partaking in such activities.

**301.**     As a direct and proximate result of the Defendants Steven Strifler, SS1 and SS2's negligence and negligence per se, Plaintiff IF suffered physical harm and injury including but not limited to a sexual assault, battery, physical pain and suffering, emotional pain and mental anguish, humiliation and embarrassment. Further, Plaintiff has lost sleep, requires anxiety medication, and her character and standing in her community have suffered from the subsequent harassment by the Defendants SS1 and

SS2. Plaintiff has required ongoing counseling and elevated levels of medication to address her depression and anxiety caused by these Defendants' negligent conduct.

302.    Plaintiff here and now sues for recovery of all past, present and future damages caused by such negligence.

**COUNT IX**
**NEGLIGENCE and CONSPIRACY**
**AS TO DEFENDANTS ANDREW HINES, AUDREY ANNA KRAJCA and AH**

303.    Paragraphs one through 301 are hereby incorporated by reference as if set forth herein fully.

304.    On the evening of September 28, 2012, Defendant ANDREW HINES, AUDREY ANNA KRAJCA and AH were each individually and collectively entrusted with the health, care, wellbeing and safety of the Plaintiff IF. Each individually and collectively had a duty to protect the health, care, wellbeing and safety of the Plaintiff IF.

305.    On the evening of September 28, 2012, Defendants Andrew Hines, Audrey Anna Krajca and AH individually and/or collectively breached such duties in one or more of the following particulars:

    a.    Dropping IF and AH at the home of MG without determining whether there was appropriate adult supervision at the home of MG;

    b.    Dropping IF and AH at the home of MG without determining who else besides MG was at the home and what plans IF and AH had for after their arrival at MG's home;

    c.    Failing to determine what activities AH and IF were going to engage in after dropping them off at MG's home;

    d.    Failing to determine what activities AH and IF had engaged in when they picked up AH and IF was not with her;

    e.    Failing to contact Paul and Jamie Fletcher to determine the whereabouts of IF when they picked up AH and IF was not with her;

    f.   Failing to contact Paul and Jamie Fletcher when Defendant Audrey Anna Krajca discovered IF picking up her belongings on the morning of September 29, 2014 and saw her with Defendant SS2;

    g.   Failing to contact Paul and Jamie Fletcher after communicating with their daughter AH on the morning of September 29, 2014 and learning that IF had not been picked up by Paul and Jamie Fletcher from MG's home the night before;

    h.   Leaving IF at the party at Steven Strifler's house;

    i.   Not determining the status of IF's wellbeing before leaving the party at Steven Strifler's house;

**306.**    It was reasonably foreseeable to a person of ordinary sensibilities that if they did not maintain care, safety and control of IF that as a minor she would be subject to harm and/or injury. Accordingly, Defendant AH knew or should have known that leaving Defendant IF at a party when she was "too messed up" to go home could result in her being harmed or injured.

**307.**    It was equally foreseeable to Defendants Andrew Hines and Audrey Anna Krajca that if they failed to pick up Plaintiff IF that harm or injury could come to her.

**308.**    In fact, as a direct and proximate result of the acts and/or omissions as set forth above, Plaintiff IF suffered physical harm and injury including but not limited to a sexual assault, battery, physical pain and suffering, emotional pain and mental anguish, humiliation and embarrassment. Further, Plaintiff has lost sleep, requires anxiety medication, and her character and standing in her community have suffered from the subsequent harassment by these and other Defendants. Plaintiff has required ongoing counseling and elevated levels of medication to address her depression and anxiety caused by these Defendants' negligent conduct.

**309.**    Upon Defendant Audrey Anna Krajca's discovery of Plaintiff IF retrieving her belongings on the morning of September 29, 2012 and seeing SS2 driving IF to retrieve her belongings, Audrey Anna

Krajca knew or should have known that Defendant AH had lied to her the night before when AH told her that Paul and Jamie Fletcher had picked up IF at the home of MG. Upon information and belief, Defendant Audrey Anna Krajca then confronted AH and AH explained that IF had become "too messed up" to come home with her.

310.    At this point, again upon information and belief, Defendants Andrew Hines, Audrey Anna Krajca and AH had a meeting of the minds to conceal the fact that IF had not spent the night of September 28, 2012 at their home. The purpose of this meeting of the minds was to attempt to escape any liability for their acts and/or omissions as set forth above. The course of action agreed upon was to deny that IF had spent the night of September 28, 2012 at anyone else's home, and to insist that she had spent the night at their home.

311.    One or more of the Defendants Andrew Hines, Audrey Anna Krajca, and/or AH then engaged in false and malicious texting, e-mails and writings which constitute harassment, cyberbullying and wire fraud, in furtherance of the conspiracy.

312.    As a direct and proximate result of the acts and/or omissions as set forth above, Plaintiff IF suffered harm and injury including but not limited to, emotional pain and mental anguish, humiliation and embarrassment. Further, Plaintiff has lost sleep, requires anxiety medication, and her character and standing in her community have suffered from the subsequent harassment by these and other Defendants. Plaintiff has required ongoing counseling and elevated levels of medication to address her depression and anxiety caused by these Defendants' negligent conduct.

313.    Plaintiff here and now sues for recovery of all past, present and future damages caused by such negligence and conspiracy.

**COUNT X**
**HARRASSMENT, CYBERBULLYING and CONSPIRACY**
**AS TO DEFENDANTS CA, SB, IG, JSG, HG, RG, MG, AH, CJ, DL, BL, CMcK, KR,**
**KR2, MAS, SS1, SS2, SW, and CW**

314.    Paragraphs one through 312 are hereby incorporated by reference as if set forth herein fully.

315.    Based upon information and belief, subsequent to the assault on IF, IG and AV, realizing the fact that they had engaged in sexual assault sought and obtained assistance from CA, SB, JSG, HG, RG, MG, AH, CJ, DL, BL, CMcK, KR, KR2, MAS, SS1, SS2, SW and CW to orchestrate a campaign of texting, e-mails, postings on social media sites, whispers and verbal insults towards and against IF in order to shame and humiliate her as well as to portray her as the perpetrator and IG and AV as the victims.

316.    Such actions constitute a combination of two or more people, namely CA, SB, JSG, HG, IG, RG, MG, AH, CJ, DL, BL, CMcK, KR, KR2, MAS, SS1, SS2, AV, SW and CW with a meeting of the minds of each to accomplish the objective of successfully avoiding criminal prosecution of the Defendants AV and IG. Defendants CA, SB, JSG, HG, IG, RG, MG, AH, CJ, DL, BL, CMcK, KR, KR2, MAS, SS1, SS2, AV, SW and CW acting in furtherance of this conspiracy engaged in cyberbullying, bullying, stalking, humiliating and degrading the Plaintiff IF and thereby employed an unlawful means of accomplishing the objective. Moreover, CA, SB, JSG, HG, IG, RG, MG, AH, CJ, DL, BL, CMcK, KR, KR2, MAS, SS1, SS2, AV, SW and CW utilized a cell phone, computer, tablet or other digital device to engage in such cyberbullying, bullying, stalking, humiliation and degradation against IF in violation of Texas law.

317.    Such conspiracy and the actions of CA, SB, JSG, HG, IG, RG, MG, AH, CJ, DL, BL, CMcK, KR, KR2, MAS, SS1, SS2, AV, SW and CW in furtherance of the conspiracy have directly and proximately caused harm to the Plaintiff IF including but not limited to psychological trauma, mental anguish, humiliation and embarrassment. Further, Plaintiff has lost sleep, requires anxiety medication, and her character and standing in her community have suffered from the harassment fostered by the conspiracy engaged in by these Defendants. Plaintiff has required ongoing counseling and elevated levels of medication to address her depression and anxiety caused by Defendants' conduct and the conspiratorial conduct fostered by these Defendants.

**318.**    Plaintiff here and now sues for recovery of all past, present and future damages caused by such conspiracy.

**PRAYER**

WHEREFORE, Plaintiff respectfully requests judgment in her favor and against Defendants Lewisville Independent School District, and Defendants Finch, Dalton, Werneke and Whitehead, as follows:

A. Compensatory damages for Plaintiff's psychological and emotional distress and damages, loss of standing in her community, damage to her reputation, and her family's unreimbursed out of pocket expenses incurred in response to these circumstances;

B. Punitive damages;

C. Injunctive relief requiring Defendant School District to take effective steps to prevent sex-based discrimination and harassment, including sexual assault, in its education programs; fully investigate conduct that may constitute sex-based harassment and /or sexual assault; appropriately respond to all conduct that may constitute sex-based harassment and /or sexual assault; and mitigate the effects of harassment and/or assault including by eliminating any hostile environment that may arise from or contribute to it.

D. Injunctive relief requiring Defendant City of CARROLLTON Police Department and the Denton County District Attorney's Office to take effective steps to investigate, charge, prosecute and try minor male offenders for sexual assaults against minor females, and to comply with Texas and federal victim rights laws;

D. Statutory interest;

E. Costs; and

F. Such other and further relief as the Court deems appropriate

**<u>JURY DEMAND</u>**

Now Comes the Plaintiffs, and demand a trial by jury.

Respectfully submitted

**THE SANDLER LAW FIRM, PLLC**
6600 LBJ Freeway, Suite 183
Dallas, Texas 75240
Telephone: (972) 284-0731
Facsimile: (214) 453-2435
chris@sandlersiegel.com

By _____
    CHRISTOPHER A. PAYNE
    State Bar No. 15651500


SCHEPPS LAW OFFICES
GARY N. SCHEPPS
State Bar No. 00791608
5430 LBJ Freeway,
Suite 1200
Dallas, Texas 75240
Telephone: (972) 200-0000
Facsimile: (972) 200-0535
legal@schepps.net