IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

IF,

*Plaintiff,*

v.

LEWISVILLE INDEPENDENT SCHOOL DISTRICT,
*Defendant.*

CIVIL ACTION NO.
**4:14-CV-00359-DDB**

## PLAINTIFF'S EXPERT WITNESS DESIGNATION

COMES NOW, Plaintiff IF and makes and files her Expert Witness Designation as follows:

### PLAINTIFF'S RETAINED EXPERTS

1.  **Edward F. Dragan, Ph.D.**
    Education Management Consulting, LLC
    49 Coryell Street
    Lambertville, NJ 08530
    (609) 397-8989

Dr. Dragan is Plaintiff's expert on school administration and policies and procedures, including Title IX.  His professional experience includes having been an official with a state department of education. In this position he was responsible for training school administrators regarding applicable laws and regulations governing Title VI, Title IX and other federal laws as well as topics regarding student and staff supervision and the provision of a non-hostile learning environment. In addition, he was responsible for the interpretation and enforcement of such laws and implementing regulations in public and private schools within the state.  Dr. Dragan's qualifications are set forth in his CV and ***attached hereto as Exhibit 1***.  He has been qualified as an expert witness by multiple courts and has testified numerous times.  A list of the cases in which he has testified during the last four years is ***attached hereto as Exhibit 2***.

To assist in formulating his opinions in this matter, Dr. Dragan reviewed the following materials:

1. Plaintiffs' Original Petition in Fletcher v. IG, et al;
2. Plaintiff's Fourth Amended Complaint in Fletcher v. LISD;
3. Defendant Lewisville Independent School District's Original Answer, Affirmative Defenses, and Jury Demand;
4. United States Department of Education Office for Civil Rights, Dear Colleague Letter on Sexual Violence dated, 04/04/11;
5. U.S. Department of Education Office of Civil Rights, Revised Sexual Harassment Guidance: Harassment of Students By School Employees, Other Students, or Third Parties, Title IX, dated, January, 2001;
6. Lewisville Independent School District Response to Request for Information Letter to U.S. Department of Education Office of Civil Rights, dated, 04/10/14;
7. Carrollton Police Department Memo of Understanding Letter and Contract re: Continuance of the School Resource Officer Agreement, Co-signed by Dr. Waddell, dated, 07/09/12;
8. Carrollton Police Department Investigation File and Report re: IF;
9. Lewisville Independent School District Code of Conduct Handbook, 2012-2013;
10. Lewisville Independent School District Online Policies obtained from District Website;
11. Hebron High School Student Handbook, 2012-2013;
12. Lewisville Independent School District Title IX and Bullying Training Material: Slideshow Presentation by Robert Luna dated 04/23/13 on Title IX of the Education Amendments of 1972; Human Resources and Staff Development Departments Harassment Training Guide, 2011-2012; and 2012-2013 Compliance Course Overview;
13. Lewisville Independent School District Job Description of Ninth Grade Principal, dated, 09/29/09 and Chief Operating Officer, dated 03/2011;
14. Lewisville Independent School District Bullying and Sexual Assault Investigation Records re: IF;
15. Lewisville Independent School District Student Records for IF;
16. Phone and Social Media Communication Records re: IF;
17. Email Communication Records re: IF;
18. Email Chain between Whitehead and Fletcher;
19. Handwritten Affidavit of SS;
20. Deposition Transcript of IF and Exhibits, dated 10/23/15;
21. Deposition Transcript of IF's mother and Exhibits, dated 10/26/15;
22. Deposition Transcript of IF's father and Exhibits, dated 10/26/15;
23. Deposition Transcript of SS and Exhibits, dated 10/29/15;
24. Deposition Transcript of Steven Strifler and Exhibits, dated 10/29/15;
25. Deposition Transcript of Sydney Strifler and Exhibits, dated 10/29/15;

26.     Deposition Transcript of David Brazil and Exhibits, dated 11//04/15;
27.     Deposition Transcript of Amanda Werneke and Exhibits, dated 11/04/15;
28.     Deposition Transcript of AV and Exhibits, dated 11/06/15;
29.     Deposition Transcript of Tommy Rogers and Exhibits, dated 12/10/15;
30.     Deposition Transcript of Mark Dalton and Exhibits, dated 12/14/15; and
31.     Deposition Transcript of Debra Denson-Whitehead and Exhibits, dated 01/22/16.

Dr. Dragan is expected to testify that Title IX is a civil rights law enacted in 1972. It prohibits sex discrimination in education and addresses sexual harassment, attempted sexual violence, sexual assault, as well as harassment related to sexual violence or gender. Title IX gives students at districts/schools that receive federal funding the right to all educational opportunities in an environment conducive to learning and free from sexual violence and harassment. School districts that receive federal education funding have a proactive duty in ensuring that schools in the recipient district are free of sex discrimination including harassment and hostile school environment related to sexual violence.  Title IX requires schools to take immediate steps to address any sexual violence and/or harassment and prevent it from affecting students further.

Dr. Dragan is further expected to testify that Title IX regulations require funding recipients to adopt and publish grievance procedures providing for the prompt and equitable resolution of complaints alleging any action that would be prohibited by Title IX, including sexual harassment and sexual assault.  Throughout Title IX's existence, the U.S. Department of Education, Office of Civil Rights (OCR) has published guidance for funding recipients to explain the practical application of Title IX requirements in the educational settings.  Dr. Dragan is further expected to testify that, based on his education, training, and professional experience, the community of education administration and supervision professionals recognizes the practical methods, examples, and other information in OCR guidance documents as the marker for what is reasonable in handling sexual harassment and sexual violence complaints in the school setting.

Dr. Dragan is further expected to testify that, among other things, District policies must identify the designated Title IX Coordinator, provide adequate definitions of sexual harassment (which includes sexual assault), explain when such conduct creates a hostile environment, and set out reporting policies and protocols. The accepted standard of care for investigation of Title IX sexual assault and sexual harassment reports uses the investigative methods described in OCR Guidance documents. Schools are required to use a "preponderance of the evidence" standard to make their conclusions, meaning discipline should result if it is more likely than not that discrimination, harassment and/or violence occurred.

Dr. Dragan is further expected to testify that, on April 4, 2011, the OCR released its Dear Colleague Letter as a guidance to school districts by regarding student-on-student sexual harassment and sexual violence. This guidance sets out the practical steps schools must take to meet their responsibilities to respond promptly and effectively to sexual violence against

students in accordance with the requirements of Title IX. This guidance provided examples about key elements and how they relate to sexual violence, discussed proactive efforts schools can take, and provides examples of remedies and enforcement strategies that schools may use to respond to sexual violence. The accepted standard of care for investigation of Title IX sexual assault and sexual harassment reports uses the investigative methods described in OCR Guidance documents. Schools are required to use a "preponderance of the evidence" standard to make their conclusions, meaning discipline should result if it is more likely than not that discrimination, harassment and/or violence occurred.

Dr. Dragan is further expected to testify that the Dear Colleague Letter addressed what is expected of funding recipients with respect to a criminal investigation into allegations that also for the basis of the Title IX complaint before the recipient. A contemporaneous police investigation does not relieve a school of its duty under Title IX to resolve complaints promptly and equitably. Lack of immediate and effective school response to address the issues and complaints can result in a hostile school environment and discrimination of students who are forced to endure harassment, bullying, or presence of their aggressors and leave them with no choice but to remove themselves from such an environment.

Dr. Dragan is further expected to testify that school accommodations and responses should not overburden complainant-victims or limit their educational opportunities and schools can require the accused to make changes in order to ensure there is not an ongoing hostile educational environment. Schools may not retaliate against the complainant and must take steps to keep the victim safe from other retaliatory harassment or behavior, including that of third parties. Retaliation and harassing behaviors should be reported to the Title IX Coordinator.

Dr. Dragan is further expected to testify that, under Title IX, if a school knows about discrimination, harassment or sexual violence that is creating a "hostile environment" for any student, it must act immediately to eliminate it, remedy the harm and prevent future recurrence. Schools may not discourage reporting victims from continuing their education or force a complaining student in any way to remove herself/himself from the school environment. Student victims have the right to remain at school and continue participating in every educational program and opportunity available and schools are required to address the issue and allow them to do so. It is the school's responsibility and duty to reasonably respond through its administration and other staff to implement the school's Title IX policies and procedures in order to protect the victim students from any further harm.

Dr. Dragan is further expected to testify that schools must have established procedures for handling complaints of sexual violence and harassment. Every school is required to have a designated and trained Title IX Coordinator responsible for managing complaints and overseeing investigations. Those procedures must ensure the school must promptly investigate complaints of prohibited conduct regardless of whether the same conduct was reported to the police. A police investigation may very briefly delay a school's investigation, however, schools are not

allowed to wait for the conclusion of police investigations or criminal proceedings.  Instead, Schools are required to conclude their own investigations in a timely manner.

Dr. Dragan is further expected to testify that courts have held school district is liable in a private action brought under Title IX if it acts clearly unreasonably after receiving actual knowledge of sexual harassment and/or sexual assault when acts or fails to act in a way it exposes the complainant to undergo additional harassment or makes the claimant liable of vulnerable to harassment. The professional standard of care requires that those responsible for the safety of students at school respond immediately and with appropriate reasonable care when there is a report or even a rumor of inappropriate sexual harassment or violence impacting students.

Dr. Dragan is further expected to testify that reasonable schools respond to Title IX complaints of sexual assault and sexual harassment by referring to and attempting to implement the procedures and methods discussed in the Department of Education's Title IX guidance documents. Those schools take steps to train administrators/staff to recognize and promptly investigate reports of sexual harassment and sexual assault under the appropriate school policies. Schools and districts act outside of accepted industry practices when they have actual knowledge of harassment and respond with complete disregard of Title IX guidance and fail to appropriately investigate reported harassment. fail to take effective action and a lack of an appropriate investigation, Other unreasonable actions include the lack of involvement by a Title IX Coordinator and lack of remedial action constitutes deliberate indifference.

Dr. Dragan is further expected to testify that Title IX funding recipients have the following responsibilities to address sexual harassment and sexual violence under Title IX:

1.  Duty to develop, publish and distribute policy against sex discrimination which must identify and designate a trained Title IX Coordinator and require that complaints involving sexual violence and harassment must be referred to the school's Title IX Coordinator. The Title IX Coordinator is responsible for for overseeing complaints, investigations, and compliance with Title IX.
2.  Duty to respond promptly and effectively, if a school knows about sexual harassment and sexual violence that creates a hostile environment.
3.  Duty to take immediate action to eliminate the sexual harassment, sexual violence, prevent its recurrence and address its effects.
4.  Duty to provide interim measures as soon as the incident is reported and before the investigation is completed. Student victims are entitled to immediate help and the burden on the victim should be minimized. This includes helping student victims on finding confidential support services (i.e., counseling and academic support). Remedial action includes providing remedies for the entire student and staff population such as training in order to prevent recurrences.
5.  Duty to promptly conduct a reliable and impartial investigation to determine whether the harassment/violence occurred and take appropriate action. This duty

applies even if a student or his parent does not want to file a complaint or does not request any action on the student's behalf. Prompt and equitable requirements allow both the victim and accused student to be given opportunity to present witnesses and other evidence.

6.      Schools are required to be proactive and protect all of their students and the school community and not just the victim/complainant.

Dr. Dragan is further expected to testify that the documents reviewed show that LISD was informed of a policy update suggested by the Texas Association of School Boards ("TASB") in Fall of 2011. (TASB Update 91) TASB's Update 91 referenced legislative changes in law expected impact governance and management of the District. That update addressed a variety of topics, including legal policies reflecting an ever-changing legal context for governance and management of the District.

Dr. Dragan is further expected to testify that Update 91 stated: "[T]he policy recommendations in this update will need close attention by both the administration and the Board to ensure they reflect the practices of the District and the intentions of the Board. This document indicates that there are 106 policies in Update 91." (TASB Update 91) TASB Update 91 also highlighted TASB's suggested FFH policy update that included a dating violence definition and examples. It did not mention or highlight updates or policy guidance and changes as reflected in the April 4, 2011, Dear Colleague Letters and Title IX. LISD's records show that LISD's administration presented a brief overview of the significant legal requirements that impact the District as well as policy recommendations for Board consideration as part of the December 2011 Board meeting. However, it is clear based on the available documents and the testimony of the District Administrators and/or other staff, that any training provided as a result of update was inadequate since all District administrators/staff exhibited a complete failure to implement the District's own policies and satisfy the legislative requirements in the course of the District's management and handling of IF's Title IX complaints.

Dr. Dragan is further expected to testify that his review and analysis identified the below listed policies and procedures of the District which are applicable in this matter, and which LISD failed to fully implement through its administration and/or other employees in addressing the sexual harassment, sexual assault, bullying/cyberbullying and retaliation reports related to the AV and IG raping IF:

1.      <u>Hebron High School Student Handbook for 2012-2013</u>: District states that it complies with Title IX of the Education Amendments of 1972 prohibiting discrimination and lists Dr. Kevin Rogers as the Title IX coordinator.

2.      <u>Policy #061902 Freedom from Discrimination, Harassment and Retaliation (FFH)</u>: LISD's policy and procedures for responding to allegations of unlawful discrimination, prohibited harassment, including sexual harassment, or retaliation.

3.   <u>LISD's District Code of Conduct 2012-2013</u>: Met the District-specific response to requirement of Chapter 37 of the Texas Education Code that requires that the District define misconduct that may or must result in a range of specific disciplinary consequences.

4.   <u>LISD Policy on Freedom From Bullying (FFI)</u>: Addresses bullying of District students and indicates that it "shall" be used in conjunction with FFH (described below) for certain prohibited conduct. The District prohibits bullying as defined in the policy.

Dr. Dragan is further expected to testify that the testimony reveals that none of the administrators or staff involved in handling IF's reports of harassment/violence followed the written procedures set out by LISD. The District's failure to supervise, train and ensure that its administration and/or other employees follow and implement the standards set in District's own policies, was a breach of the professional standard of care in the field of education administration and supervision, and in this case resulted in the discrimination of IF and indifference towards her rights to benefit from an education in a non-hostile school environment conducive to learning.

With regards to LISD Freedom from Discrimination, Harassment and Retaliation (FFH) policy, Dr. Dragan is expected to testify that, in October of 2011, the District updated its Policy #061902 Freedom from Discrimination, Harassment and Retaliation (FFH) and that policy was identified as LISD's policy and procedures for Title IX complaints.  LISD's new policy Dr. Kevin Rogers, LISD's Chief Operating Officer, as the District's Title IX Coordinator.  FFH provided that sexual harassment of a student may constitute discrimination on the basis of sex in violation of Title IX.  The policy also required the District to reasonably respond to known student-on-student harassment in instances where the District had disciplinary authority over the harasser(s). It provided that the freedom from harassment policy "shall" be used in conjunction with District's policy against bullying.

<u>FFH Definitions</u>: LISD's policy defined "sexual harassment" of a student as "conduct that is so severe, pervasive and objectively offensive that it can be said to deprive the victim of access to the educational opportunities or benefits provided by the school." A list of behaviors in the policy gave LISD, its students, and parents examples of conduct that met the policy definition of prohibited sexual harassment. The District's examples included humiliating conduct, offensive jokes, name calling, slurs or rumors. FFH further stated that the District prohibited dating violence.

<u>FFH Reporting Requirements</u>: Under the policy, allegations of unlawful discrimination, prohibited harassment, including sexual harassment, or retaliation shall be made according to local FFH policy (described below). Copies of reports and complaints, investigation reports and related records shall be maintained by the District for a period of at least three years, for minors until the person reaches 21. FFH instructed students

to immediately report the alleged prohibited acts to teachers, counselors, principals and other school employee, and required those receiving such reports to notify the appropriate District Official of prohibited conduct. Only two people were identified as "District Officials" for purposes of FFH: (1) the designated Title IX Coordinator, and (2) the LISD Superintendent. In October 2012, Dr. Kevin Rogers was the District's Title IX Coordinator responsible for handling complaints and for coordinating efforts to comply with Title IX. Dr. Steven Waddell served as Superintendent of LISD at the time.

FFH LISD Receipt of Reports: According to the policy, the District could request, though it was not required, complainants submit a written report of the prohibited harassment conduct.  In instances where a Complainant made an oral report, the FFH policy required a "District Official"--- Dr. Rogers or the Superintendent--- to reduce the oral complaint report to written form.

FFH Investigation Procedures: Upon receipt or notice, FFH required the District to immediately undertake an investigation, regardless of whether a criminal investigation was pending. Likewise, the policy required LISD to promptly take interim action calculated to address the prohibited conduct or bullying during the course of its investigation. The investigation could be conducted by a designated "District Official" or a designee, An investigation could consist of personal interviews with the person making the report, the person against whom the report was filed, others that may have knowledge of the circumstances surrounding the allegations, and could include analysis of other information or documents related to the allegations. Absent extenuating circumstances, FFH stated that LISD's investigation should be completed within ten District business days from the date of the report, noting however, the investigator can take additional time necessary to complete a thorough investigation.

FFH Investigation Documentation: According to LISD's FFH policy, the investigator was required to prepare a written report of the investigation, and the report must include a determination of whether prohibited conduct or bullying occurred. The report was required to be filed with the "District Official" overseeing the investigation.

FFH Investigation Conclusion: If the District investigation concluded that the alleged prohibited conduct occurred, FFH required the District to promptly respond by taking appropriate disciplinary action in accordance with the LISD Student Code of Conduct and take corrective action reasonably calculated to address the conduct. Corrective action, according to FFH, could include training for those involved, a comprehensive education program for school community, counseling of to the victim and student who engaged in prohibited conduct, follow-up to determine if any new incident or instances of retaliation had occurred, involving parents and students in efforts to identify problems and improve school climate, increasing staff monitoring and reaffirming the District's policy against discrimination and harassment. Even if the conduct did not rise to the

level of prohibited conduct the policy allowed the District to take action in accordance with other policies in the LISD Student Code of Conduct.

With regard to LISD's Freedom From Bullying (FFI) policy, Dr. Dragan is expected to testify that LISD's FFI policy in effect during the 2012-2013 school year explained that "bullying" occurs when a student or group of students engages in written or verbal expression, expression through electronic means or physical conduct that occurs on school property at school sponsored or related events and is sufficiently severe, persistent, and pervasive enough that the action or threat creates an intimidating, threatening, or abusive educational environment for a student. It provided reports of bullying be made as soon as possible after the alleged act or knowledge of the alleged act, and noted that the failure to immediately report could impair the District's ability to investigate and address the prohibited conduct.

Dr. Dragan is further expected to testify that LISD's bullying policy included a tie-in to the District's FFH policy.  It provided that a Principal or designee would determine whether the allegations in a bullying report, if proven, would constitute prohibited conduct as defined by policy FFH, including dating violence and harassment or discrimination on the basis of race, color, religion, gender, national origin, or disability.  In such cases, the District was required to proceed under the above-described FFH policy.

Dr. Dragan is further expected to testify that FFI further required a Principal or designee to conduct an appropriate investigation based on the allegations in a bullying report, and to promptly take interim action calculated to prevent bullying during the course of an investigation, if appropriate.

Dr. Dragan is further expected to testify that, as with the FFH policy, FFI provided that corrective action could include a training program for the individual involved in the complaint; a comprehensive education program for the school community, follow-up inquiry to determine if any new incident or any instances of retaliation have occurred, involving parents and students to identify and improve the school climate, increasing supervision in areas where bullying happened and reaffirming the district's policy against bullying. Even if conduct did not rise to the level of prohibited conduct or bullying the District's FFI policy authorized it to take action in accordance with the Student Code of Conduct.

With regard to LISD's District Code of Conduct 2012-2013, Dr. Dragan is expected to testify that LISD's Code of Conduct stated that the school rules and authority of the District to administer discipline applied to students whenever the interest of the District is involved on or off school grounds (emphasis added) in conjunction with or independent of classes and school sponsored activities. The District had disciplinary authority over a student when the student committed a felony, as provided by Chapter 37 of Texas Education Code  and when "criminal mischief" was committed on or of school property.

Dr. Dragan is further expected to testify that, additionally, the Code of Conduct prohibited the following acts and authorized the District and its schools to exercise disciplinary authority over the same:

1. Bullying, including intimidation by name calling, ethnic or racial slurs, or derogatory statements or actions that school officials have reason to believe will disrupt the school program, incite violate, intimidate or embarrass another individual; engaging in conduct that constitutes sexual or gender based harassment or sexual abuse whether the conduct is by word, gesture, or any other sexual conduct;

2. Use the Internet or other electronic communications to threaten district students, employees, or volunteers, including off school property if the conduct causes a substantial disruption to the educational environment;

3. Sending, posting, or possessing electronic messages that are abusive, obscene, sexually oriented, threatening, harassing, damaging to another's reputation, or illegal, including cyberbullying and "sexting," either on or off school property, if the conduct causes a substantial disruption to the education environment; and violating extracurricular standards of behavior.

Dr. Dragan is further expected to testify that LISD's Code of Conduct further stated that general misconduct violations would result in application of one or more discipline management techniques consistent with the law and the Student Code of Conduct. Under the Code of Conduct, LISD Principals or administrators would notify a student's parent by phone or in writing of any violation of code that could result in suspension, removal to Disciplinary Alternative Education Program (DAEP) placement, or expulsion. General misconduct could result in routine referral or use of any other discipline management technique. Students could be suspended for any behavior listed in the Student Code of Conduct as a general misconduct violation, DAEP placement, or expellable offense. The number of days of a student's suspension, which could not exceed three school days, was to be determined by the principal or other appropriate administrator.

Dr. Dragan is further expected to testify that the Code provided that LISD could place a student in DAEP for conduct punishable as a felony that occurred off school property and not at a school sponsored or related event and for which the Superintendent or designee has reasonable belief or determines that the student's presence at school threatens the safety of others and will be detrimental to the educational process and not in the best interest of the District students. Lewisville Learning Center was named as the District's DAEP Center.

Dr. Dragan is further expected to testify that under Discretionary Expulsions a student could be expelled for engaging in criminal mischief punishable as a felony no matter where the conduct took place or if conduct contained elements of offenses such as sexual assault and aggravated sexual assault, without regard to where the conduct occurred.

Dr. Dragan is expected to testify that his review of the materials provided revealed the following factual scenario:

I.      IF Experienced Severe, Pervasive, and Objectively Offensive Harassment.

The records indicate that 14 year-old IF was a freshman at Hebron High School 9TH Grade Center ("HHS9") when she attended a party hosted by HHS9 football player SS on Friday, September 28, 2012.  Numerous students from HHS9 and upperclassmen from Hebron High School ("HHS"), as well as some students from schools outside LISD, attended the party as well. SS's HHS9 football teammates IG and AV were amongst the partygoers.

While at the party, IF became severely intoxicated and incapacitated. SS described IF's condition during the party, explaining that IF was so drunk that she stumbled, actively threw up, and was speaking gibberish. (SS: 71-74)  He testified that it was obvious that IF did not have the ability to consent to sex the night of the party at his house. (SS: 71-74) Testimony and police records indicate that drugs were also present at the party and that, in all likelihood, IF received a drink laced with drugs.

During the party, AV and IG took advantage of IF's intoxicated and incapacitated state and sexually assaulted her. IF immediately realized that she was raped when she awoke at SS's house the next day. She confided in her female classmate and friend by texting her about the rape and identified her aggressors. IF also confronted AV and IG about their actions that Saturday and Sunday (Sept. 29-30th).

By the time IF arrived at school on Monday, October 1st, 2012, students at both Hebron campuses were talking about IF having sex with AV, and IG at the party. Students immediately began bullying, harassing, and cyberbullying IF at school and after school in relation to the sexual assault that took place on September 28, 2012. In the two weeks that followed the rape, IF's classmates called her a "slut", a "whore", and circulated rumors that she was pregnant. The students also circulated rumors that IF was part of an orgy, and asked IF if her baby would be black, white, or Hispanic (referring to AV and IG's ethnicities). (IF: 80-82, 210-211)

Even alleged rapist, AV, testified that students used social media to ridicule IF both in and out of school, and he classified these posts as hurtful to IF. He admitted that students called IF a "slut" and a "whore" while IF was on campus. (AV: 76-82)

Sydney Strifler, SS's sister and HHS upperclassman, testified that she told multiple people that IF had sex with two boys at her house, and that she said it in a laughing manner to make fun of IF. She admitted spreading rumors when she knew that IF was humiliated. Sydney also testified that other students were saying nasty things about IF, and that when IF went back to school after the rape it was certainly quite a hostile environment for IF because a lot of harassment and bullying was taking place. (Sydney Strifler: 69-70, 91)

SS testified that in the weeks following the party a decent amount of students were discussing IF and what took place at the party and that she was called hurtful words like "slut" and "whore." SS indicated that he realized why IF eventually did not return to classes on the HHS9 because people were mean and toxic and he could understand why anyone wouldn't want to be in such an environment where everyone was saying the things students said to IF. (SS: 45-54, 80-88)

The District's Title IX coordinator admitted that it would create a hostile environment for a student if she had to attend school with had rapist. (Rogers: 217) Principal Dalton also testified that if the conduct that was reported by the Fletchers in October was deemed to be bullying and if there was a hostile environment due to the rape it would fall under the discrimination against a student and would be covered under the District's FFH policy which lists name calling, slurs or rumors. (Dalton: 69) The Principal further admitted he understood that the physical presence on campus of the alleged assailant alone creates a hostile environment under Title IX when there is an allegation of rape. (Dalton: 39)

Dr. Dragan is further expected to testify that, based on testimony and information available from documents, it is his opinion that the treatment IF endured qualified as severe and pervasive bullying and harassment, and as such should have been investigated, documented, and followed-up by District action as required by the District's FFH and FFI policies, as described in the previous sections of this report. As a result of the above described hostile environment IF missed school and started exhibiting harmful behaviors, including suicidal thoughts, cutting, and possibly trying to overdose on drugs.

II.     <u>LISD's Actual Notice of Peer-on-Peer Sexual Harassment and Sexual Assault</u>.

After finding out about the bullying and sexual harassment taking place at school and on social media, Mrs. Fletcher, IF's mother, made a report to Debra Whitehead on October 10, 2012. Mrs. Fletcher was not aware that her daughter had been sexually assaulted by her male classmates at the time of her report, and did not know the bullying was related to the sexual assault. She informed Ms. Whitehead that students were calling her daughter a "slut" and a "whore" as well as making sexually harassing remarks while pointing and whispering. Mrs. Fletcher identified above-mentioned Sydney Strifler as one of the students who was bullying IF. (J. Fletcher: 125) According to email communications, Ms. Whitehead was going to interview IF to find further information, but failed to do so.

The hostility, discussion, name-calling, and rumors about IF having sexual intercourse with the two HHS9 football players spilled so far into the community that Mrs. Fletcher learned that IF was sexually assaulted at the party from other parents during a school football game on Friday, October 12, 2012. The Fletchers reported the double sexual assault to the police, and went to the HHS9 campus on Monday, October 15, 2012. They asked to see Principal Dalton to report that two fellow students had sexually assaulted IF, but were diverted to speak to Ms.

Whitehead.  At that point, the Fletchers informed Ms. Whitehead that the bullying against IF, previously reported to her on October 10, 2012, was the result of sexual assault. (J. Fletcher: 95, 165-168)

Ms. Whitehead did not report the bullying and harassment to the HHS9 administrators until IF's parents came to the school on October 15, 2012, and reported that IF was sexually assaulted. She did not do so even though Ms. Whitehead had notice of the bullying on October 10, 2012, and the District Code of Conduct requires that "any District employee who suspects or receives notice that a student or group of students has or may have experienced bullying shall immediately notify the principal or designee" (Whitehead: 89-91) and the District's FFI policy requires immediate investigation into bullying and action to prevent recurrence. In breach of the professional standard of care and the District's own policies and procedures, Ms. Whitehead failed to report the bullying to the School administration and no investigation was initiated prior to IF's report of the sexual assault.

According to the testimony of Mr. and Mrs. Fletcher, on October 15, 2012, Ms. Whitehead attempted to dissuade them from making the report of sexual assault against IF because of the consequences it could have on the accused male students. IF's parents informed Ms. Whitehead that IF could not continue attending school if the male students involved in the sexual assault remained in school with her, and said that they were considering withdrawing IF from school. (J. Fletcher: 128-131) Ms. Whitehead told the Fletchers that she would speak to Principal Dalton, Vice Principal Werneke, and the School Resource Officer Cole Langston. (J. Fletcher: 128-131)

Ms. Fletcher stated that when she first reported the sexual assault she was told by Ms. Whitehead that it would be very difficult going against the football team and that the best thing for IF would be to transfer schools. (J. Fletcher: 81)

Dr. Dragan is further expected to testify that, based on the requirements of Title IX and the District's own policy, it is his opinion, in agreement with testimony of the District's Title IX Coordinator, that Mrs. Fletcher's report to the school that IF had been sexually assaulted was a Title IX complaint, and as such the District was required to immediately follow policy, begin investigation and remediation efforts in order to protect IF from further harm related to her sexual assault. (Rogers: 110)

Dr. Dragan is further expected to testify that his review and analysis of documents and testimony indicates that in addition to Principal Dalton, Ms. Whitehead, and the highest-ranking District administrators had actual notice of the sexual assault against IF in October of 2012. Despite having access to numerous OCR resources and the Title IX-complaint procedures LISD itself had adopted, the District chose not to protect IF from the hostile environment she endured at HHS9 comply with Title IX requirements. The failed to initiate an investigation in October or early November of 2012 and failed to take any meaningful action to

allow IF to continue her education free from harassment and a hostile school environment created by the presence of her rapists. Instead, IF and her parents were left no choice but to remove IF from the hostile environment in order to protect her.

Dr. Dragan is further expected to testify that his review and analysis of e-mail communications between District administrators clearly indicates that HHS9 Principal Dalton, Assistant Principal Werneke, East Zone Leader and Assistant Area Superintendent Rebecca MacDonald, District's Title IX coordinator Dr. Rogers, and LISD Superintendent Dr. Waddell were fully aware and had actual notice regarding the October 15, 2012, sexual assault complaint by IF, but failed to implement applicable District policies and comply with Title IX requirements in order to protect IF from further harm and discrimination.

### III.   LISD Ignored IF's Complaints, Title IX, LISD Policy, and the Professional Standard of Care.

Dr. Dragan is further expected to testify that his review and analysis of documents and testimony regarding Mrs. Fletcher's report regarding bullying of IF on Wednesday, October 10, 2012, concluded that Ms. Whitehead had sufficient information to take action and implement District policies to protect IF from sexual harassment, but failed to do so. (Whitehead: 88-90) Ms. Whitehead testified that she did not take any notes during her initial conversation with Mrs. Fletcher. Whitehead admitted that she let Wednesday, Thursday, and Friday of that week pass without telling Principal Dalton or Vice Principal Amanda Werneke about the sexual harassment Mrs. Fletcher reported. (Whitehead: 89-90)  Saturday and Sunday passed, and still Whitehead did not communicate the complaint to school administrators. (Whitehead: 89-90) Ms. Whitehead let most of Monday pass without communicating Ms. Fletcher's sexual harassment complaint to the principals. (Whitehead: 89-90)

HHS9 Principal Dalton testified that when Debra Whitehead got information from Ms. Fletcher about the bullying, the way this policy reads, she should have notified one of those three people but that even though it states that is the policy it appears that that is not really the policy and that is not what they always do and it is not a custom, practice or habit. (Dalton: 98-99)

Dr. Dragan is further expected to testify that the FFI bullying procedure required Whitehead immediately notify either the Principal or a designee of bullying complaints and to consider whether or not the particular conduct described implicated LISD's anti-harassment policy (FFH). (Whitehead: 79-81, 88-96) Whitehead testified that she understood from her superiors that she had authority to decide whether or not bullying complaints should be referred to a Vice Principal for investigation. (Whitehead: 94-96)

Ms. Whitehead took no action to immediately end the bullying that was reported to her or to prevent further recurrence. (Whitehead: 173-175) Ms. Whitehead did not report the

bullying and harassment against IF to Dr. Rogers, the District's Title IX Coordinator, although the HHS9 Principal Dalton testified that calling IF a "slut", "whore", and making other inappropriate comments about her sex classified as harassment and was required to be reported to the Title IX Coordinator, Dr. Rogers, as the District's FFH Policy included name calling, slurs, and rumors. (Dalton: 34-35) Principal Dalton testified Whitehead had authority under the FFI policy to determine whether bullying allegations met the policy requirements for requiring an investigation. (Dalton: 36)

Principal Dalton also testified that the first thing procedure requires for bullying reports is to interview the student. He stated that a campaign of bullying would implicate Title IX, and that under Title IX an investigation needed to be conducted and documented. (Dalton: 27-29) Principal Dalton stated that he did not see any document showing Ms. Whitehead made an effort to interview IF.  Mr. Dalton testified that he did not question Ms. Whitehead regarding her responsibilities after having learned about the bullying. (Dalton: 36)

In addition to testimony, the District Code of Conduct states under investigation and reporting of bullying that if appropriate, the District shall promptly take interim action calculated to address prohibited conduct or bullying during the course of an investigation" and both FFH and FFI policies require that the implementation of either policy be within the context of each other. After the report that IF was being bullied, Dr. Rogers testified that an immediate and full investigation was not conducted, meaning that no interim action was taken, as per the policy. (Rogers: 76-77).

Principal Dalton also testified that there was no investigation conducted in regards to the allegations of bullying made on October 10, of 2012, and so there was nothing done to prevent any future harassment or bullying or bullying in the interim. (Dalton: 293) Dr. Dragan is expected to testify that this, in his firm opinion, is a clear breach of the professional standard of care and it is indicative of the indifference toward IF's rights, as well as a lack of training and supervision of Ms. Whitehead regarding implementation of District policies and procedures in order to ensure that there is no hostile school environment for any student and allowing that students benefit from education.

On October 26, 2012, LISD's Title IX Coordinator emailed HHS Principal Finch and copied East Zone Leader Ms. MacDonald, stating: "You know how rumors are . . ." He went on to explain that LISD's Superintendent (Dr. Waddle) was informed from Trish Sheffield, a School Board Trustee, of rumors surrounding the possible sexual assault of a student at a party over Columbus Day weekend. The HHS responded and copied HHS9 Principal Dalton.  The response confirmed that HHS was aware of a rape in which one of its students was suspected. Dr. Rogers also emailed Ms. MacDonald separately simply asking her to collect information from both Principals and then bring him up to speed.

After gathering information Ms. MacDonald emailed Dr. Rogers on November 2, 2012, giving him a synopsis of the situation and informing him that two weeks prior a mother of a ninth grade girl came in and reported that her daughter was drugged and sexually assaulted by two 9th grade football players. Ms. MacDonald did not mention that Mrs. Fletcher also had made a report of bullying and harassment. She further informed Dr. Rogers that the police were investigating, but were not ready to file charges. According to Ms. McDonald, the police asked the HHS9 not to talk to the two male student-assailants about the sexual assault. However, by the time Ms. McDonald asked Principal Dalton about the rumors of sexual that made their way to Trustee Sheffield, the police had already give the permission to begin investigating the alleged assailants two days prior to her email (approximately October 30 or 31, 2012).

Ms. MacDonald also informed Dr. Rogers that IF was diagnosed with PTSD and had not been at school since her parents reported the sexual assault to LISD. By that time, LISD homebound services were scheduled due to Ms. Fletcher's insistence that her daughter be provided an education and a safe environment. (J. Fletcher: 95, 167) Ms. Macdonald, however, failed to inform Dr. Rogers that the reason that IF was not in school was because the parents took her out due to a hostile environment caused by attending school with accused rapists and due to bullying and harassment from other students.

Ms. MacDonald also sent the above email (which also included information regarding the sexual assault by a student at HHS that took place off school property) to Dr. Waddell, the District Superintendent. The Superintendent responded the same day, indicating that the reports regarding sexual assault involving HHS9 and HHS students were very disturbing and that LISD administrators needed to make sure that high school "principals" knew that there was an issue of rape.  According to LISD's Superintendent, LISD's response to the reports needed to be strong from a disciplinary standpoint in cases like the reported sexual assaults.

Responding to McDonald, Dr. Waddell touched upon the alternative program placements of DAEP and JJAEP for the other case of rape referenced in the e-mail that took place over Columbus Day weekend. In reference to that case, Ms. MacDonald responded that she agrees this is disturbing and indicates that based on the Student Code of Conduct, because the victim is a student at another LISD school, this can be a discretionary expulsion and students can be expelled for sexual assault if the conduct was against another student, no matter where it occurred. Dr. Waddell in response to this directs Ms. MacDonald to pages 23 and 24 of the Code of Conduct and that students may be placed in the DAEP pending hearing and that sexual assault is a second degree felony under Title Five of Texas Penal Code. (DEF002763; DEF002767-DEF002759)

Dr. Rogers, Title IX coordinator, testified that he did not become aware of the sexual assault report by IF until late October 2012, and felt that he should have been notified sooner, as required by District policies and procedures when there is an allegation of sexual assault or rape by any student at HHS. (Rogers: 19-20)  Dr. Rogers testified that he considered this incident

to be one which required a Title IX investigation. (Rogers: 22) Mr. Dalton, ninth grade principal, stated that he did not directly communicate with Dr. Rogers, the Title IX administrator, and he instead passed information through Becky MacDonald who was his superior who also worked for Dr. Rogers. Mr. Dalton stated that he communicated to Ms. MacDonald regarding when they were asked not to investigate and then when the School received approval to begin investigation. (Dalton: 65-66)  Ms. MacDonald's notes during this time and while she was gathering information indicate that she was also aware of the hostile school environment and cyberbullying that was taking place related to the sexual assault of IF. (DEF002759-DEF002762) In breach of the professional standard of care and in violation of Title IX requirements, Ms. MacDonald's notes also clearly show that the District based their decision regarding the investigation of IF's sexual assault and hostile school environment on the results of the police investigation and whether the police was going to press charges against the accused students.

Dr. Dragan is further expected to testify that, according to the Dear Colleague Letter published by OCR in April of 2011  (which the District's Title IX Coordinator Dr. Rogers was not aware of until December 2012), police investigations may be useful for fact-gathering, but because the standards for criminal investigations are different, police investigations or reports are not determinative of whether sexual harassment or violence violates Title IX. Conduct may constitute unlawful sexual harassment under Title IX even if the police do not have sufficient evidence of a criminal violation. In addition, a criminal investigation into allegations of sexual violence does not relieve the school of its duty under Title IX to resolve complaints promptly and equitably and take remedial action to protect students. Schools should not wait for the conclusion of a criminal investigation or criminal proceeding to begin their own Title IX investigation and, if needed, must take immediate steps to protect the student in the educational setting. For example, a school should not delay conducting its own investigation or taking steps to protect the complainant because it wants to see whether the alleged perpetrator will be found guilty of a crime.

Dr. Dragan is further expected to testify that any agreement or Memorandum of Understanding (MOU) with a local police department must allow the school to meet its Title IX obligation to resolve complaints promptly and equitably. Although a school may need to delay temporarily the fact-finding portion of a Title IX investigation while the police are gathering evidence, once notified that the police department has completed its gathering of evidence (not the ultimate outcome of the investigation or the filing of any charges), the school must promptly resume and complete its fact-finding for the Title IX investigation. In this case, the District was not focused on simply gaining the go ahead to proceed with their investigation, as represented in Ms. MacDonald's notes, other documents and testimony, but the District was wrongfully, and in violation of Title IX requirements, focused on finding out from the police whether they would be charging the accused students.

Dr. Dragan is further expected to testify that, in addition, and as outlined in the Dear Colleague Letter, Title IX requires the District to take steps to protect the complainant and to

take interim steps before the final outcome of the investigation. These steps should be taken promptly once the District has notice of a sexual harassment or violence allegation. In addition, the District should have also been aware that complaints of sexual violence may be followed by retaliation by the alleged perpetrator and those associated with him, and the District is under duty to have and implement their policies and procedures in place to protect against retaliatory harassment.

Dr. Dragan is further expected to testify that, in this case, facts are clear that the District failed to both investigate the report of sexual assault and the reported retaliation in the form of bullying, sexual harassment, and cyberbullying despite notice of both, and to take any interim and remedial action to protect IF Beyond a simple inquiry done by the administrators of the District in October of 2012. Dr. Dragan's review and analysis in this matter revealed no effective, equitable, prompt investigation or action to prevent discriminatory effects of bullying and a hostile school environment caused by the sexual assault of IF which was known to the District.

Dr. Dragan is further expected to testify that facts also indicate that the District received police clearance on October 30, 2012, to begin their investigation, which was known to high level administrators and the Title IX Coordinator, but failed to begin their investigation until January, 2013. This failure of the District, and breaches of the professional standard of care in the field of education administration and supervision resulted in IF being forced to remove herself from the environment which was not conducive to learning and make changes to her educational arrangements, without possibility to participate in extracurricular activities or benefit from school resources. This was in violation of Title IX, which specifically instructs Districts to make sure that all of the burden is not placed on the complainant students and that they are to be protected from discriminatory effects and changes to their education. Both the District's Title IX Coordinator and the ninth grade principal testified that they were not aware of the Dear Colleague Letter until December 2012, which is indicative of the District's failure to properly train its administration and other employees, and also to implement those regulations they were not trained on.

Dr. Dragan is further expected to testify that, based on his review of District policies and procedures, testimony and other documents, it is clear that the District had actual notice of both bullying, and the hostile school environment and sexual assault against IF, which would require them to implement their policies and immediately begin an adequate, reliable, and impartial investigation and take remedial action. Mr. Dalton testified that based on what Ms. Whitehead reported to him he was not aware that the bullying and harassment was so severe and if what they reported happened it would merit investigation and such conduct would be covered by the policy on sexual harassment and it would constitute sexual harassment. (Dalton: 71-72)

Dr. Dragan is further expected to testify that Ms. Whitehead's lack of training and implementation of District policy is evident in her testimony that she did not think of the complaint from the Fletchers in terms of Title IX (Whitehead: 127-128) and Principal Dalton's

own failure and lack of training is evident in the fact that even after being notified of IF's sexual assault, he testified that at the time the sexual report was made along with an allegation of a hostile environment as defined by Title IX, there still was no determination made about whether to investigate because very quickly after the report he was told by the School's Resource Officer, Cole Langston, not to investigate. (Dalton: 40-42)

The Principal testified that he did not document anywhere that they were told not to investigate by the police. (Dalton: 45)  Mr. Dalton testified that he understood this to mean that they could not conduct an investigation into either the bullying or the rape. (Dalton: 51) He confirmed in his testimony the prior report of bullying was not investigated (Dalton: 52) and according to Mr. Dalton during the months of October, November, and December, the School did not undertake any type of Title IX investigation regarding IF because the police was investigating. Assistant Principal, Amanda Werneke, testified that the School had notice that there were allegations of sexual assault and underage drinking, but the first time that these issues were investigated by the district was on January 8, 2013. (Werneke: 45-46)

Dr. Dragan is further expected to testify that, based on his review and analysis of the LISD applicable Policies and Procedures as well as related testimony, he concluded that the District had appropriate policies and procedures relating to Title IX, student discipline, bullying and harassment, and cyberbullying. However, the District failed to adequately train its administration and/or other staff regarding the requirements and implementation of those policies as it relates to Title IX. Specifically, LISD failed to provide adequate training to Chief Operating Officer and Title IX Coordinator Dr. Kevin Rogers, East Zone Leader McDonald, 9th Grade Principal Mark Dalton, 9th Grade Assistant Principal Amanda Werneke, Assistant Principal James Scott, Counselor Debra Denson-Whitehead, Head Football Coach Brian Brazil, and other coaches involved with the football team.

Dr. Dragan is further expected to testify that the standard of care for education professionals in this instance is not only to adopt policies and procedures that are consistent with Title IX, but also to implement the policies and procedures adopted. As explained below, the materials and testimony he reviewed indicate that the District did not follow its written policies after it received actual notice of IF's sexual assault and related bullying.  The District breached the professional standard of care when it failed to implement its policies and procedures. LISD's failure to follow its policies included its decision not to conduct an adequate and timely investigation in response to IF's reports of bullying, harassment, cyberbullying and sexual violence against her. By doing so, the District acted deliberately indifferent to the rights and protection of IF and breached the professional standard of care and failed to satisfy their obligation and duty as required by Title IX.

IV.    <u>January 2013 Investigation</u>.

Principal Dalton testified that at some point in December of 2012, a meeting took place with Dr. Rogers, Ms. Werneke, Ms. MacDonald and LISD's attorney. At that time, administrators decided they needed to investigate after getting the go-ahead from the police, which Principal Dalton believed he received from Officer Langston in December of 2012. (Dalton: 78-79) In other words, LISD made the decision to seek police approval to investigate in December even though Dr. Rogers, Ms. MacDonald and the District's Superintendent were aware that they had police approval as of October 30, 2012, as discussed in the previous section of this report and reflected in email communications between District administrators. Dr. Dragan is further expected to testify that it is his opinion that the District was waiting to know whether the police was going to file charges, and based their decision to investigate on that.

Dr. Rogers, the District's Title IX Coordinator, testified that he was asked to read the previously referenced Dear Colleague Letter in December of 2012. He found the contents of the letter to be enlightening and something he wished that he knew sooner, especially the part where it states that the District should be conducting its own investigation concurrent with the police investigation. (Rogers: 14-17)  Significantly, he also testified that he should have been notified sooner about the Title IX law that requires the investigation immediately regardless of the status of the police investigation  (Rogers: 220), despite the fact that as Title IX Coordinator it was his responsibility to ensure that the investigation was in compliance with Title IX and the District's Code of Conduct and other policies and procedures. The District's Memorandum and Agreement with Carrollton Police Department indicates that the parties are subject to the provisions of all applicable State and Federal laws. Dr. Rogers testified that he wished the District's investigation had occurred sooner and does not doubt that it could have made a difference for IF's life. (Rogers: 78-79)

Dr. Dragan is further expected to testify that, despite all of the above, the District failed to begin investigating IF's complaints until January 8, 2013, 10 weeks after receiving police approval and 88 days after IF's first complaint. Dr. Dragan's review and analysis of available documents and testimony did not find any indication that the investigation, started in January 8, 2013, was done in compliance with Title IX regulations, or accepted professional practices. Dr. Dragan is further expected to testify that, in his opinion, the investigation was not adequate nor was it managed and conducted by adequately trained District officials in regards to Title IX requirements.

Dr. Dragan is further expected to testify that the Dear Colleague Letter indicates that schools must ensure that employees designated as Title IX Coordinators have adequate training on what constitutes sexual violence and harassment and that they understand how the recipient's grievance procedure operate and that employees should receive copies of the school's Title IX policies. The school's Title IX Coordinator or designee should be available to provide assistance, guidance and management of all Title IX complaints, identifying and addressing any

patterns or problems that arise during review of such complaints with ultimate oversight responsibility and coordinate efforts with the school's police force unit during the investigation. Clearly, Dr. Rogers, based on his lack of training and knowledge regarding Title IX in this case was unable and failed to fulfil this role as the District's Title IX Coordinator. Dr. Dragan's review and analysis leads him to conclude that when the District finally decided to initiate the investigation there is no evidence that Dr. Rogers was overseeing or part of the investigation beginning on January 2013 at all, or that they met their own policy requirements regarding documentation and investigation, and failed to do a proper hostile environment investigation surrounding the sexual assault of IF prior to Mrs. Fletcher reporting the second wave of bullying on January 8, 2013.

Dr. Dragan is further expected to testify that the significantly delayed and compromised District investigation was started on January 8, 2013, after IF had not been to school for months, was struggling to keep up with home instruction, and was forced to stop all of her extracurricular activities and was not provided any remedial services and counseling by the District to help her cope with the situation. Dr. Dragan is further expected to testify that the investigation simply involved School Principals, Mr. Dalton, Mr. Scott and Assistant Principal Ms. Werneke, interviewing students months after the incident and months of rumors, bullying, harassment and cyberbullying had been directed at IF placing the blame on her, which in his opinion, was allowed and encouraged by the District when they failed to take action and focused their investigation around the issue of consent and distorted the students' beliefs of the real problem of IF being sexually assaulted placing the sole blame on her.

Dr. Dragan is further expected to testify that his review and analysis of testimony, student affidavits taken by School Resource Officer Langston in October/November of 2012, student statements of January/February of 2013 and other documents concluded that there was a real difference of how students reported what happened and it is clear that their statements and interviews in January/February of 2013 had shifted towards placing the blame on IF and indicating she deserved it. The requirement of Title IX to conduct a timely investigation is exactly intended to avoid this and protect the victim from retaliation and further harm. Based on the student affidavits of October/November of 2012 and interviews and statements conducted by the District in January/February 2013 it is very clear that the School had sufficient information to meet the "preponderance of evidence standard" as required by Title IX, meaning that it is more likely than not that the sexual harassment or violence occurred.

Dr. Dragan is further expected to testify that it is his opinion that the District's 2013 investigation and conclusion was skewed by the District's reliance on the police investigation and lack of charges being filed regardless of the fact that the information the District had beginning in October of 2012, from student affidavits and later gathered by the District in 2013, clearly indicated that IF was in no condition to consent to sexual intercourse, two accused males admitted to sexual conduct with her after she had fallen down and information received from students consistently indicated that she was in a very incapacitated state. Dr. Dragan's review

and analysis also revealed that when the investigation was finally done in 2013, there is no evidence that the Title IX standards were followed or that the District, as part of their investigation, addressed the complaint of a hostile school environment reported to the school in October of 2012.

Dr. Dragan is further expected to testify that his review and analysis of testimony and documents regarding the January 2013, investigation indicate that the focus of the investigation was the events of the party on Friday, September 28, 2012, but did not include inquiry into a hostile school environment as reported in October of 2012. His review revealed that the District did not focus on investigating whether IF experienced a hostile school environment and only focused on the events of the party, although according to their summaries of interviews, some students still disclosed information regarding rumors and everyone talking.

Dr. Dragan is further expected to testify that the District documentation from the 2013 investigation show evidence of the District only investigating the second wave of bullying reported on January 8, 2013, and not the report made in October 2012. However, students interviewed by Principal Dalton, Principal Scott, and Vice Principals Werneke and Vargas, were told that this was a campus level investigation in an effort to collect evidence to ensure all students were able to attend school in a safe non-threatening environment, even though his review and analysis found no evidence that the School focused on anything but the events of the party and interviewed a different group of students related to cyberbullying reported on January 8, 2013.

Dr. Dragan is further expected to testify that Assistant Principal Werneke involved in the investigation and interviewing of students testified that the investigation about the cyberbullying wasn't an investigation about a hostile environment for IF, it was actually an investigation into the party. (Werneke: 71) Dr. Rogers, Title IX Coordination, was not aware of any cyberbullying against IF until early 2013. (Rogers: 44)  Mr. Dalton, ninth grade Principal, testified that during the interview of IG on January 8th, 2013, he does not recall any question to IG about whether or not he witnessed any bullying of IF from the time this was reported up to and including the date that he conducted this interview. Mr. Dalton further testified that they just talked about the events at the party. Mr. Dalton stated that they did not focus on bullying at that time. (Dalton: 236-238)

Dr. Dragan is further expected to testify that Forms completed in regards to bullying reported on January 8, 2013, were checked to indicate that this was the first time that the student was bullied and that bullying took place off campus, despite the fact that Mrs. Fletcher reported bullying on October 10, 2012, that was taking place at school. This was in contradiction to their FFH and FFI policy which required that the investigation of bullying be conducted in the context of harassment and any related events under FFH and in breach of professional standard of care because the District had clear notice that the bullying of IF was related to her

sexual assault and under Title IX was a very significant component which the District had a duty to investigate and address within the context of their overall investigation.

Dr. Dragan is further expected to testify that Assistant Principal Werneke testified that in order to determine whether cyber bullying had occurred, administrators reviewed the social media posts that were provided by Mrs. Fletcher, and it was determined that the tweet was offensive, but not bullying since there was no relationship between the students, it didn't happen on campus, there was no pattern of behavior, and the tweet didn't seem to be directed at IF, but rather, in response to IF's comment about being a Christian. (Werneke: 73-76) This testimony indicates that the District deliberately chose to treat and make conclusions regarding bullying against IF in a vacuum independently from the IFs reported sexual assault, failed to inform the Title IX coordinator and meet the requirements of Title IX and recognize it for what it was.

Dr. Dragan is further expected to testify that, in addition, the District failed to implement their own policies in regards to FFI, which clearly prohibits harassing electronic communications and conduct off school property including sending, posting, or possessing electronic messages that are abusive, obscene, sexually oriented, threatening, harassing, damaging to another's reputation, or illegal, including cyberbullying and "sexting," either on or off school property. Based on his review and analysis of the social media posts and comments which were provided and reviewed by the District, and contrary to the conclusions of the District, this constituted bullying and was severe and pervasive enough when considered in the totality of the situation and within the application of the District's policies, procedures and known facts surrounding the sexual assault of IF The District breached the professional standard of care and their own policies when they represented and concluded that it could not substantiate bullying as defined in their policy and sometimes even if they do not find bullying they might take action if conduct is improper. The latter, wrongly represented that in this case the actions that were alleged to be bullying seem to be primarily social media comments and verbal statements and that the District had no general disciplinary jurisdiction over student use of social media that does not occur on campus, but that the District did take action and discouraged students from further similar conduct.

Dr. Dragan is further expected to testify that his review and analysis did not find any evidence that District took any steps aside from discouraging students to repeat the same conduct. There was no additional training or warning regarding disciplinary consequences that was provided to students despite evidence that students continued to engage in similar conduct and the School administration was aware that this type of conduct was an issue among their student population. Mr. Dalton testified that there was cyberbullying even after the January investigation but they were not the same individuals. (Dalton: 294)

Dr. Dragan is further expected to testify that, in addition, his review indicates that the sparse documentation available regarding the 2013 investigation does not mention Title IX or

the Title IX Coordinator and his involvement or the type of information that the District was seeking to collect as required by Title IX. There are no complaints or forms completed and he only found District forms filled out regarding bullying reported by Mrs. Fletcher in January of 2013. Significantly, there was only a special and separate list of questions that was developed and used for the interview of IF, who was the only student who was interviewed off school grounds and in presence of Vice Principal Ms. Werneke, East Zone Superintendent Ms. MacDonald and District attorney Robert Gibbs. All other students were interviewed on school grounds, by one Vice Principal or Principal or both, and no specific list of questions was used for those students, not even those accused of sexual assault.

Dr. Dragan is further expected to testify that information collected from student Interviews and statements in 2013 included sufficient information to indicate that:

1. Sexual conduct occurred, AV and IF were outside, IF was intoxicated and performed oral sex and engaged in sexual acts with AV.
2. Things got out of hand with drugs and alcohol and a rumor was going around that IF was sexually assaulted.
3. IF was drinking at the party and all of the sexual incidents happened outside. IG Garry denied having sex with IF but admits that she performed oral sex on him and indicated that AV had vaginal sex with her.
4. There was hydrocodone at the party and alcohol.
5. AV indicated that IF arrived to the party and appeared to have been drinking. She went outside and they were kissing. IG came outside and started making out with IF and took her shirt and pants off but denied having sex with her. IF participated in oral sex with AV who left her with IG outside. AV indicated that IF accused him of rape the next day. AV also indicated that he posted the image "it's not rape if you have swag" prior to the incident during the summer.
6. A number of people were drunk at the party by 9:00 PM. IF had to be dragged out of bed and was tripping over things. IF was said to have given oral sex outside and was in the bathroom vomiting at 10:15 PM. Everyone was talking about AV "getting some" from IF. It was also said that IF might not have friends if she returned to school. IF was too drunk and it was obvious.
7. IF was walking around drunk. IF was involved in oral sex outside. IF threw up and got sick.
8. Students were talking about and told that IF, AV, and IG had sex. IF confided in a friend that she thought she was raped and she said she remembered telling AV to get off her. When AV was confronted by IF's friend he told her that IF ran out of the house and started making out with him and IG came out and all three of them started doing stuff and that one was on top and the other one was on the bottom and that they switched and switched again. This friend also texted IG who told her that he told AV they should stop, but later admitted that he had sex with IF and that AV was involved at the same time. On Monday following the

party AV said he forced his penis in IF's mouth and said it is not like she wanted to do it but I wanted her to do it. IF was too drunk and too high to actively participate. AV indicated to IF's friend that he knew what he was doing and he said he forced his penis into her mouth. AV also said he popped "[IF]'s cherry." IF's friend felt that AV forced IF both vaginally and orally, although to her he only mentioned orally.

9. AV told another female student that IF gave him oral sex while having sex with another guy at the same time. AV told her IF was drunk. This same female posted a very inappropriate Twitter message in response to I.F's message about being a Christian.

10. IF appeared to be drunk. She was walking around acting dumb and was in the bathroom throwing up.

11. Everyone was drinking. During the party one student heard that IF went outside with a couple of other male students.

12. IF obviously intoxicated and one student saw her on the ground on the side of the house with another guy.

13. A student reported that IF was intoxicated and her words were slurred. This student said hi to IF and immediately knew she was intoxicated.

14. A student indicated that IF was intoxicated and when he was leaving the party AV said he had sex with IF

15. A student indicated that IF was intoxicated.

16. A student indicated IF was intoxicated and other people said she had sex with three different boys.

17. A student indicated that IF had too much to drink because she was unable to walk a distance without falling. When the student came to say hi to her, her words were slurred and that's when the person realized she was drunk. There were times during the party that she randomly disappeared. During that time someone said that IF, AV and IG had sex.

Dr. Dragan is further expected to testify that, despite the above information, the District concluded in an April 5, 2013, letter from LISD School District Attorney that after review of all information the District does not have sufficient information to impose disciplinary measures on any student and if criminal proceedings reveal any additional facts or circumstances the issue could be revisited. According to testimony of the District administration, no action was ever taken against AV, IG, or SS or Sydney Strifler. Dr. Dragan's review and analysis further revealed that no steps were taken to further train students, staff or administrators when there were clear indications that there was a lack of bullying, harassment, cyberbullying and Title IX training in regards to sexual violence and investigating and addressing sexual violence and related hostile school environment. The District tolerance of Code of Conduct violations was also discovered in his review, and he found no evidence that they effectively addressed drug and alcohol violations under their Code of Conduct. This is indicative of their failure to meet the

professional standard of care for their students and standards set in their own policies and procedures.

V.   Inadequate Training on Title IX and District Policies & Procedures.

Dr. Dragan is further expected to testify that Title IX required LISD to designate a Title IX Coordinator to be in charge of coordinating the District's efforts to comply with Title IX of the Education Amendments of 1972. When LISD's Superintendent designated the District's Chief Operating Officer Dr. Kevin Rogers as Title IX Coordinator, he did not ask Dr. Rogers anything about his qualifications regarding implementing Title IX protections in instances of sexual harassment or sexual assault, whether the COO had any training to fulfill the Title IX Coordinator position, or whether Rogers had ever read any of the laws concerning Title IX. (Rogers: 13-14) Prior to being named the Title IX Coordinator, Dr. Rogers did not have any additional training for the position. He was unaware of the April 4, 2011, Dear Colleague Letter that provided guidance from the OCR until December of 2012, two months after IF reported that she was sexually assaulted. (Rogers: 107, 135)

HHS9 Principal Dalton also testified that he became aware of the Dear Colleague Letter after receiving the complaints regarding IF. The guidance had not been presented to him before then, he had not taken any courses, and had minimal training specific to Title IX investigations and handling of sexual harassment and sexual violence complaints. (Dalton: 12, 90, 277-278) Mr. Dalton further testified that he did not have any particular resources that he referenced, and did not reach out to anyone to find out what his duties and responsibilities were under Title IX, as he did not think he needed to at that moment. (Dalton: 45-46)

Dr. Dragan is further expected to testify that, based upon his review of the documents and testimony listed above and by applying his education, training and professional experience it is his opinion that the District, through its administration and/or other staff, failed to act reasonably and appropriately and failed to meet the professional standard of care in the field of education administration and supervision when it had a duty to implement the regulations of Title IX of the Education Amendments of 1972 which prohibit discrimination on the basis of sex in any federally funded education program or activity.

Dr. Dragan is further expected to testify that it is his opinion that the District breached the professional standard of care and the standards set in their own policies and procedures as it relates to Title IX, sexual harassment, sexual violence, bullying and cyberbullying. The District acted with deliberate indifference when it failed to adequately train and supervise their administration and/or employees in regards to their policies and procedures regarding Title IX, sexual harassment, bullying, intimidation and cyberbullying and failed to implement those policies and procedure through their administration and/or other employees after it received a report of a hostile school environment and bullying against IF on October 10, 2012, which was related to sexual assault that was reported to the school on October 15, 2012.

Dr. Dragan is further expected to testify that it is his opinion that the District:

1.  Had actual notice that two male students sexually assaulted IF and as a result IF endured bullying, sexual harassment and a hostile school environment in the weeks after her assault;

2.  Violated its own policies and the Title IX federal law by taking an unreasonable amount of time to begin conducting their investigation and exposed IF to a hostile school environment, discrimination and preventing her to attend school and benefit from her education, extra curricular activities and other resources;

3.  Failed to provide adequate and required training regarding its own policies and Title IX, including the Dear Colleague Letter published by the U.S. Department of Education, Office of Civil Rights which contained information and guidance regarding investigation steps and other duties under Title IX as it relates to sexual violence and harassment;

4.  Failed to conduct a timely and appropriate investigation regarding the report of bullying and harassment of IF reported on October 10, 2012 as required by their own policies and procedures;

5.  Failed to conduct an adequate, reliable, equitable and impartial investigation and take remedial action in order to protect IF from a hostile school environment after receiving a report of her sexual assault on October 15, 2012;

6.  Delayed the investigation of IF's sexual assault and based its decision to investigate on the conclusion of the law enforcement, despite the Title IX distinct guidance and instruction to conduct an investigation as soon as police clears it and at the same time;

7.  Failed to conduct an adequate investigation beginning January 8, 2013, by a qualified and adequately trained Title IX coordinator and/or other school personnel as required by federal law, even though it had sufficient notice and information that more likely than not male students sexually assaulted IF while she was intoxicated and incapacitated and that as a result she experienced retaliation, bullying, harassment and intimidation which left her with no choice but to stop going to school in order to escape it; and,

8.  Demonstrated a flawed investigation that resulted in no findings of inappropriate conduct, bullying, harassment, cyber bullying and a hostile school environment despite having sufficient information regarding retaliation against IF at school and severely offensive, pervasive and harassing comments and cyber bullying in reference to her sexual assault, which was prohibited by and under the jurisdiction of the District's own policies and procedures.

Dr. Dragan is further expected to testify that, based on the totality of the facts available from documents and testimony and what was reported and known by the District beginning on October 10, 2012, it is clear that as a result of a sexual assault on IF she was retaliated against, bullied, harassed, and left with no choice but to remove herself from the hostile school

environment caused by retaliation and presence of male students who sexually assaulted her. The District was required to take specific steps to protect its students from a hostile environment. Nonetheless, LISD failed to conduct a timely and adequate investigation, which was done outside the structure of school policy and federal law resulting in a flawed conclusion by the District that IF was not a victim sexual assault and hostile school environment.

Dr. Dragan is further expected to testify that the District's failure to comply with requirements of Title IX and implement their own policies and procedures, failure to take any action whatsoever, resulted in discrimination against IF who was unable to continue with her normal course of studies, extra curricular activities and use of the District's resources that she was entitled to. The District's agreement to provide home instruction to IF without any other action, left IF with no ability to participate in extracurricular activities and School's counseling services in the context of their failures to address the hostile school environment and take other action, did not satisfy their duty under Title IX and failed to prevent discrimination of IF as intended by the guidelines and Title IX law.

Dr. Dragan is further expected to testify that requirements and guidelines of Title IX and related school district policies are clear on the way that an investigation and response should take place, along with interim action and remediation of a hostile school environment as was represented in the District's own policies and procedures. These guidelines are established in order to protect victims of sexual violence and prevent discrimination based on sex in terms of having access to education. In this case, the evidence is clear that the District had actual notice, and the information available to them indicated that, more likely than not, sexual assault against IF took place, and the School was under duty to protect her from further damage and harm of a hostile school environment created by the presence of her rapists and/or other students who retaliated in reference to the sexual assault she experienced.

Dr. Dragan is further expected to testify that the accused students who attended the same school were under the jurisdiction of the District's Code of Conduct and other applicable policies which clearly indicated that certain conduct, such as conduct containing elements of felony or conduct of sexual assault against another student, is something that needed to be addressed through the options and available discipline in the Code of Conduct and other policies, including alternative placement, suspension during investigation, discipline through extra curricular activities and separating the accused from the victim.

Dr. Dragan is further expected to testify that the District failed to properly supervise and train their administration and staff, resulting in failure to implement their policies and stay compliant with the Title IX requirements in other to protect IF from a hostile school environment which forced her to alter her only educational placement, and miss out on educational opportunities, resources and extra curricular activities she had a right to. As a result of their lack of training and implementation of policies, the District failed to provide prompt and equitable opportunity to present witnesses, evidence, and conduct a timely and appropriate

investigation and institute remedial action to protect IF. IF was left with no choice due to circumstances and a hostile school environment in which the School's failures to fulfil their duty rendered the School an unsafe place and not conducive to learning and IF not benefitting from education. The District's failure to comply with Title IX, take any action whatsoever to address retaliation and the hostile school environment resulted in discriminatory effects of IF who became the victim for a second time and was the only one who suffered consequences and changes to her education as a result.

Dr. Dragan will also testify that LISD's conduct amounts to gross negligence. ***Dr. Dragan's opinions are set forth in his expert report which is being produced to counsel for Defendants, but not filed with the Court.***

**2.** **Roger K. Pitman, M.D.**
Professor of Psychiatry
Harvard Medical School
Massachusetts General Hospital
120 Second Avenue
Charlestown, MA 02129
(617) 726-5333

Dr. Pitman received his medical degree from the University of Vermont, College of Medicine.  Dr. Pitman also completed a Research Fellow in Behavioral Neurology at Harvard Medical School, and was a Resident in Psychiatry at Boston VA Hospital-Tufts New England Medical Center Collaborative Program.  Dr. Pitman also is certified in Psychiatry with added qualifications in Forensic Psychiatry by the American Board of Psychiatry and Neurology.

Dr. Pitman is currently a Professor of Psychiatry at Harvard Medical School, a Visiting Scientist at Massachusetts Institute of Technology, a Psychiatrist at Massachusetts General Hospital, and a Research Psychiatrist at VA Medical Center.  Dr. Pitman is also a Leader of the Posttraumatic Stress Disorder Program, Center for the Integration of Medicine and Innovative Technology (CIMIT).  Dr. Pitman also has a part-time private practice of forensic psychiatry.

Dr. Pitman is an internationally recognized researcher in post-traumatic stress disorder (PTSD), has received the International Society for Traumatic Stress Studies Lifetime Achievement Award, as well as the International Society for Traumatic Stress Studies Award for Outstanding Scientific Achievement in the Field of Post-Traumatic Stress Disorder, and is listed in America's Top Doctors and Guide to America's Top Psychiatrists.

Dr. Pitman is also the co-founder of the Laboratory for Traumatic Stress Studies, Institute of Psychology, Russian Academy of Sciences, in Moscow, Russia, and is the co-founder of the Center for Traumatic Stress Psychophysiology Laboratory, Hadassah University Hospital in Jerusalem, Israel.  Dr. Pitman is also currently on the Editorial Board of the Journal of Traumatic

Stress.  Dr. Pitman is very familiar with post-traumatic stress disorder and the effects of the same.

For a more complete summary of Dr. Pitman's qualifications, please see his curriculum vitae (**attached hereto as Exhibit 3**).  Dr. Pitman has been qualified as an expert witness by multiple courts and has testified numerous times.  A list of the cases in which he has testified during the last four years is **attached hereto as Exhibit 4**.

Dr. Pitman is expected to testify based on his education, experience, and reasonable medical probability.  Dr. Pitman is expected to testify that he interviewed IF for approximately four and one half hours with regard to possible psychiatric sequelae of a sexual assault.  He also interviewed her mother for approximately an hour.

Dr. Pitman is expected to testify that his interview of IF revealed the following factual scenario:

On the night of September 28, 2012, in the beginning of her freshmen year at Hebron High School, IF, then 14. years old, was attending a party being thrown by some kids from her school. The party was at the house of the Strifler family, and the parents were out of town. IF went with a friend whose house she had told her parents she was staying at. At the party were several other students from different grades whom IF knew on a casual basis, but no one she was especially close to. She remembers hanging out and, drinking, consuming-about two beers and a cup of alcohol (whiskey or vodka) that a boy poured for her. After taking the drink, IF started to feel deaf, like someone was talking to her but she was unable make out the words. She remembers talking with another boy, AV, who tried to kiss her, but she pushed him away, saying, "Whoa, what the heck?" Right after this, she fell on the lawn and blacked out.

According to the next thing IF remembers, AV and a third boy IG, were putting their penises into her mouth in an attempt to get her to perform oral sex on them. She remembers JT being outside at some point as well. She asked, "Why are you doing this?" One of the boys replied, "Because we love you." She then asked, "Who are you?" to which one replied, "Tyler, the Creator," evidently referring to a famous rapper whom he resembled. IF blacked out again. The next thing she remembers is lying on the ground and a couple of hands trying to grab her breasts. She knocked the hands away and said, "Stop, just stop." She couldn't see who was doing what and felt blind and deaf due to her level of intoxication. It was as if her eyes were shut and she had earplugs in her ears. The boys tried to take her shirt off. She said no and blacked out again. IF then remembers lying on the ground with no pants on and the boys' trying to have vaginal intercourse

with her. She couldn't tell who was doing what. She felt a stab of pain in her genital area and blacked out again.

The next morning, IF woke up to find blood in her underwear. She realized she'd been raped. Up until the night of the party, she'd been a virgin. She went back to her friend's house and then home, where she isolated herself in her room, not telling her parents what had happened. As if the incident itself hadn't been bad enough, rumors about the encounter between IF and the boys began circling throughout school almost immediately. Some of the perpetrators even flaunted the encounter in public. For instance, a day or two after the rape, she heard that AV stood on a table in the lunchroom, pointed to a bloodstain on his pants, announced that he had "fucked [IF],'" and that "this is her popped cherry on my shorts." Classmates of IF's started bullying her, calling her "whore" and "slut." She was told the rape was her fault because she had worn short shorts and drank alcohol and on the night of the assault. Even though she hadn't intended to put herself in that kind of situation, she began to question whether she really was what people were saying. She began to feel beaten down by the insults and didn't know what to do.

A couple weeks after the incident, IF's mother found out what had occurred from another parent. She and IF were able to piece together most of what had happened, and they reported it to the police. IF went to the hospital to have an exam. She was referred to the Dallas Area Rape Crisis Center (DARCC), where she received an assessment and supportive counseling. Due to the severe, persistent bullying, within weeks of the incident IF stopped attending the Hebron High School campus and entered a program to be educated at home.

Following the incident, IF began to experience a number of psychological symptoms. She had almost constant, unwanted memories of it. She had nightmares almost every night. In some of them, it was as if a recorder was replaying what had happened, and she was powerless to stop any of it. Other times she dreamt about more obscure but frightening scenarios. For instance, she dreamt she was in an elevator that was filling up with water, and she was unable to press a button that would have let her escape. In another dream, an unknown man was kidnapping her while a police officer watched and simply waved in response to her cries for help. In yet another dream, she was being raped by a stranger who then went on to assault her mother. In addition to these dreams, IF had flashbacks to the incident, which caused her to zone out and forget where she was for a couple minutes at a time. She was emotionally upset by reminders of the incident, such as hearing the word "rape," seeing any of her assailants around town, and being bullied and teased about the incident at Hebron High School. She was also reminded when she sat down on grass. Such reminders

caused her emotional and physical distress. On one occasion she became so emotionally overwhelmed that she vomited. After the incident, IF felt more leery of being touched. She shrank away and became irritated even when her mother tried to hug her or show affection. When she saw her assailants, e.g., at a Fourth of July fireworks celebration, she became upset, especially when they acted in an intimidating manner toward her.

IF tried to avoid thinking about the incident every day. She tried to avoid feeling sad and vulnerable. She did things like bang her forehead or listen to music to stop herself from getting upset about it. She also avoided places that reminded her of the incident, such as parties and events at Hebron including basketball and football games.

IF had difficulty remembering portions of the incident, which she thinks is due in part to her having been intoxicated at the time. For the first couple weeks afterwards, everything seemed foggy to her, but she slowly began to piece together memories of what had happened. She blamed herself, thinking that maybe what the bullies at school said about her was true. No matter how many times she was told otherwise, she always came back to the conclusion that the incident was her fault, and that she should have said or done something different. Often she experienced shame, rage, and sadness over it; sometimes she just felt numb. She lost interest in activities she had previously enjoyed, such as exercising, putting on makeup, going to school, and even cheerleading.

Following the incident, IF became more irritable than usual. She lost her temper nearly every day. On one occasion soon after the incident, she attacked AV. She also engaged in reckless and self-destructive behavior. For instance, a week after the incident, she took an unknown drug (possibly ketamine) that was given to her by a boy during a visit to a haunted house, which necessitated a trip to the emergency department and incapacitated her for several days. IF walked around downtown Dallas by herself at night, even though she knew it was dangerous. Paradoxically, she felt overly watchful for bad things to happen and avoided people whom she thought looked suspicious. If someone opened the door behind her, she would "freak out." She had difficulty concentrating on schoolwork during the day and had trouble sleeping at night. Before the incident, she slept 8-9 hours. After it, she slept only 4.

In addition to the above symptoms, because of the sexual assault incident, and her being bullied at school about it, IF felt depressed most of the day, nearly every day. She lost 25 lbs. in the two months immediately after the incident, after which her weight fluctuated due to stress and stomach problems. She had low energy. As previously mentioned, she lost interest in many of her favorite

activities. She felt fidgety and anxious, and others would ask her whether she was "tweaking." On days when she felt especially depressed, she would move more slowly. She didn't want to leave the house for fear that someone would say something about the incident. She felt like there was no purpose in living and thought about killing herself by hanging. She cut herself, vertically along her arms, because she had read that this was how you killed yourself.

Over the ensuing years, as the above symptoms persisted, IF turned to alcohol and drugs to help her cope.

Following the September 28, 2012 incident, a psychiatrist whom IF had previously seen in connection with attention deficit hyperactivity disorder (ADHD), and who had helped prepare her psychologically for hip surgery, Dr. Regina McFarland, diagnosed her with posttraumatic stress disorder (PTSD) and re-prescribed fluoxetine (Prozac). IF stayed on this medication until the middle of her sophomore year, at which time she stopped because she didn't like the way it made her feel. After experiencing a worsening of her depression in mid-2015, she resumed taking fluoxetine, which she believes has helped alleviate her symptoms but also blunts her emotions. IF was also prescribed methylphenidate (Concerta, a psychostimulant) for her difficulty concentrating on schoolwork. In addition to the methylphenidate and fluoxetine, she currently takes aiprazolam (Xanax) as needed for anxiety attacks, which occur every couple months. At DARCC, IF has received about twenty 30-60 minute individual counseling sessions. Although she has found it helpful to have a place to vent her feelings, she still doesn't feel she has successfully worked through her problems related to the incident of September 28, 2012. She hopes to hire the services of a private therapist to do this important work in the near future.

IF continues to experience many of the symptoms she developed following the incident, albeit to a lesser degree. She has fewer nightmares and is less emotionally upset by reminders. She still thinks about being raped and wonders what she could have done to prevent it. She still can't shake the feeling that it was her fault. She goes out of her way not to see anyone who reminds her of the incident. She is afraid of ever being vulnerable again and still does not like being touched, even by her mother. She still feels ashamed of what happened and gets enraged easily. She stated to Dr. Pitman that, "Very rarely will you not see me mad." Fortunately, she is able to feel closer with her family and friends who have stuck by her through it all, but she has trouble giving "a piece of my heart" to new people. She has become able to feel more positive emotions while spending time with her friends or engaging in activities she enjoys, such as seeing a good movie. Although she is still watchful for bad things to happen and has difficulty concentrating, her sleep as improved to about 6 hours a night.

After the incident of September 28, 2012, IF left the Hebron campus and enrolled in the Homebound program because of the vicious bullying she experienced. IF had to teach herself difficult subjects like algebra and chemistry at home. Eventually she matriculated at iSchool High, a STEM (science, technology, engineering and math) charter school in Lewisville, TX. She recently graduated and plans to go onto college, although she has yet to take the SATs. Alternately, she thinks she might like to get her cosmetology license, or work with animals.

Dr. Pitman is expected to testify that his opinions will also be based on results of the following clinical testing performed on IF:

**The Clinician-Administered PTSD Scale (CAPS)** is a validated instrument for assessing the American Psychiatric Association's Diagnostic and Statistical Manual for Mental Disorders, fifth edition (DSM-5) diagnostic criteria for posttraumatic stress disorder (PTSD). The CAPS was administered with regard to the incident of September 28, 2012. Focusing on the time period during the month prior to this evaluation, IF met 4 out of 5 "B" (intrusion) criteria, with 1 required for a PTSD diagnosis; 2 out of 2 "C" (avoidance) criteria, with 1 required; 6 out of 7 "D" (negative cognitions and mood) criteria, with 2 required; and 4 out of 6 "E" (hyperarousal) criteria, with 2 required. Thus she met far more than the required number of DSM-5 criteria to qualify for a diagnosis of current PTSD. Her total CAPS score was 43, which according to the instrument's creator, Dr. Frank Weathers, is in the "severe" PTSD range. Her past (i.e., worst ever since the incident) CAPS score was 64, which is in the extreme range. The change from 64 to 43 indicates mild to moderate improvement over the three and a half years since the incident.

**The Structured Clinical Interview for DSM-5 (SCID-5)** is a validated interview instrument that addresses most of the major Axis I disorders in the DSM-5. On the SCID, when she was at her worst since the incident of September 28, 2012, IF met 8 of the 9 criteria for Major Depressive Disorder (MDD), with 5 required for the diagnosis. During the month prior to the evaluation, she met 4 criteria, which is consistent with MDD in partial remission,. IF also met criteria for Opioid Use Disorder, in sustained remission.

With regard to Dr. Pitman's interview of IF, he is expected to testify that she was waiting in her hotel lobby when she was picked up for the examination. She was casually but appropriately attired. She appeared her stated age of 18. She was polite and well-mannered. Her speech was fluent. Her affect was moderately anxious, despondent, and angry. She smiled once during the lengthy interview and did not laugh at all. She exhibited an initial reluctance to participate in the evaluation, stating, "I just don't want to talk about it." It took a substantial

amount of rapport building to overcome this. Even then, at several points during the interview, when asked about the alleged sexual assault, she sobbed and pleaded to be allowed just to go home. With patience, this reluctance was overcome, and she was able to open up about the incident and the effect it has had upon her. Initially IF stated that she did not recall the details of sexual acts during the incident. However, after rapport was established, she was able to recall having had at least two penises forcibly inserted into her mouth and one into her vagina, over her protests and attempts to resist. IF's thought processes were well-ordered. There was no evidence of delusions or hallucinations. Her cognitive processes appeared intact.

Dr. Pitman also had IF perform written psychological testing.  He is expected to testify that the results of the written tests revealed the following:

**The Personality Assessment Inventory (PAl)** was scored and interpreted via a computer program of Leslie C. Morey, Ph.D. Pertinent excerpts from the interpretation include:

> ... did attend appropriately to item content and responded in a consistent fashion to similar items no evidence to suggest that the respondent was motivated to portray herself in a more negative or pathological light than the clinical person would warrant ... person with a history of substance abuse problems who is experiencing prominent stress and anxiety ... use of drugs has had numerous ill effects on her functioning ... likely to display significant symptoms related to traumatic stress ... has likely experienced a disturbing traumatic event in the past-an event that continues to distress her and produce recurrent episodes of anxiety'... suspiciousness and hostility in her relations with others ... quite sensitive in her interactions ... behavior is likely to be reckless; she can be expected to entertain risks that are potentially dangerous to herself and to those around her ... mild or transient depressive symptomatology ... experiencing notable stress and turmoil in a number of major life areas ... reports experiencing recurrent thoughts related to a suicidal act ... level of treatment motivation is somewhat lower than is typical of individuals being seen in treatment settings ... treatment would be fairly challenging, with a difficult treatment process and 'the probability of reversals ... diagnostic possibilities: Substance Dependence ... Posttraumatic Stress Disorder ... all available sources of information should be considered prior to establishing final diagnoses.

**The Detailed Assessment of Posttraumatic Stress (DAPS)** provides detailed information about an individual's symptomatic responses to a specific traumatic event. This includes feelings and thoughts that occurred during or soon after the event, as well as later posttraumatic symptoms. The DAPS was scored and

interpreted via a computer program of John Briere, Ph.D. Pertinent excerpts from the interpretation include:

> ... item endorsements do not suggest that she is attempting to portray herself in an especially negative or pathological manner ... index trauma is "Rape September 28th,, experienced more distress during or soon after the index trauma than the average trauma victim ,.. was significantly traumatized by what she experienced ... clinically significant levels of peritraumatic dissociation at the time of the index trauma ... undergoing significant posttraumatic stress regularly bothered by intrusive recollections of the traumatic event and may feel unable to control these reexperiencing symptoms ... experiencing significant posttraumatic avoidance symptoms ... significant withdrawal, apathy, and emotional numbing ... tendency to avoid people, places, or situations that remind her of the index trauma ... may be reluctant to discuss her symptoms with therapists or others ... In some cases, this avoidance pattern is associated with a more severe and chronic course ... tension, irritability, and a tendency to be jumpy or "on edge" ... ability to function on an ongoing basis has been compromised appears to satisfy DSM-IV-TR diagnostic criteria for PTSD ... in the severe range ... reports clinically meaningful levels of trauma-specific dissociation, substance abuse, and suicidality ....This clinical presentation, especially in the presence of other significant symptomatology, may signal the presence of a more "complex" PTSD. This more complicated clinical picture often requires more extended or intense psychological and/or pharmacological treatment ... the results of a DAPS administration should always be integrated with a diagnostic interview and whatever other psychometric testing may be required. A diagnosis of PTSD should not be made on the basis of any single psychological test, including the DAPS ...

On the Civilian Mississippi PTSD Scale, IF's score of 128 was highly elevated.

**Psychophysiological testing** was also performed on IF.  Dr. Pitman is expected to testify that the results of the psychophysiological testing revealed the following:

> IF's heart rate, skin conductance, and corrugator and frontalis electromyogram (EMG) responses during script-driven personal imagery of her being sexually assaulted on September 28, 2012 were dramatically higher than her responses during imagery of her other personal life events, and the standard comparison events.

IF's skin conductance and corrugator EMG responses during script-driven personal imagery of her being sexually assaulted on September 28, 2012 were higher than those of the reference sample of PTSD subjects. Her heart rate and frontalis EMG responses were between those of the reference sample of PTSD subjects and the reference sample of non-PTSD subjects, but closer to the former. The probability of IF's belonging to the PTSD class of subjects based upon these responses was 79%. These results support the presence of DSM-V PTSD criterion B.5, viz., "Marked physiologic reactivity after exposure to trauma-related stimuli."

This psychophysiological assessment should be viewed as an aid to diagnosis, supplementing appropriate interview-based, psychometric, and other data. The contents of this report should be considered by the evaluating psychiatrist within the context of a thorough diagnostic evaluation.

Dr. Pitman is further expected to testify that he reviewed records from the following healthcare providers:

1.    Regina McFarland, MD, Park Cities Psychiatry;
2.    Texas Health, Presbyterian Hospital Plano;
3.    Children's Medical Center;
4.    Dallas Area Rape Crisis Center;
5.    Howard B. Smith, MD;
6.    H. Neil Jacobson, MD; and
7.    Manisha H. Dave, MD, Texas Digestive Disease Consultants.[1]

Dr. Pitman is further expected to testify that he also interviewed IF's mother, in person for approximately one hour on the same day he interviewed IF.  IF's mother reported that:

In late 2011 or early 2012, she brought her daughter for counseling due to bullying she'd been receiving from some other girls. As a result of this bullying, IF cried on occasion and seemed more anxious and angry than usual. In early 2012, IF was scheduled to undergo major hip surgery at the Scottish Rite hospital in Dallas. There they did some testing and recommended that IF have a pre-surgical mental health evaluation to be sure she was prepared for the surgery and especially the difficult convalescence to follow. Her parents took IF to a psychiatrist, Dr McFarland, who placed her prophylactically on an antidepressant, Prozac. Following the hip surgery, IF had to watch cheerleading and gymnastic practices from a wheelchair and then crutches.  Although this was

---

[1]All of these medical records have previously been produced to LISD.

difficult for she her, by the Fall of 2012, she had returned to her usual gregarious, determined, motivated self.

IF's mother reported that since the September 28, 2012 sexual assault incident, she no longer recognizes her daughter compared to who she used to be. Prior to the incident, her mother never worried whether IF would succeed in life given her focus and drive to accomplish things. After the rape, everything changed overnight. IF didn't want to get up or do anything. She would beg her mother not to leave the house. She became depressed, suicidal, angry, argumentative, and defiant. She felt like all the adults, including her parents, the school system, and the police, didn't believe in her, or understand what she had been through. She said she felt like an outcast and that didn't belong in society. She became distrustful. She had to be dragged out of bed in the morning to do her schoolwork, and constantly reminded to finish things and stay focused. IF became overly controlling of small things, lashed out when she felt impinged upon, and was often defiant. She expressed suicidal feelings, saying things like, "I can't do it anymore," and "I can't live with these feelings."

After the rape, IF had flashbacks during which she would scream and moan. She had bad dreams every night, and for months after the rape her mother had to sleep in the same bed with IF. Occasionally, IF still asks her mother to sleep with her. When reminded of the rape, IF will get really angry, which she tries to keep inside but eventually comes out. She is "triggered" when she sees her assailants, who often act provocatively toward her. After seeing AV one Fourth of July, IF called her mother hysterically crying, and afterwards she flew into a rage. There is a three-foot hole in the garage wall where IF hit it in a fit of rage about three months ago. Even though she tries to act as though she isn't afraid, it seems to her mother that deep down IF really is. IF's mother has even seen her daughter develop panic attacks with shortness of breath when she is reminded of the sexual assault, e.g., if someone at her new school finds out who she is. IF told her mother than one student there even made a comment to the effect that, "Oh you're the IF that got run through like a train."

IF avoids talking about college because she associates the fraternity culture with rapists who get away with everything, and she doesn't want to subject herself to that environment. Since the incident, she has struggled in school. She wonders whether she's brain damaged, because her mind doesn't work like she thinks it should. If someone comes up behind IF and startles her, she will visibly jump and gasp. She doesn't like being touched or hugged, and then complains that that she doesn't get the same affection as her brothers. She is always on guard and fears someone will hurt her. She doesn't trust anyone anymore and isolates herself from people at school. For a while she carried mace and a pocketknife when she

went out. She doesn't know who in town knows about the rape, and how they might use it against her.

IF has told her mother that her main goal in life now is just to survive. Anything beyond that is like climbing a mountain. IF's mother and father believe that IF is still just barely treading water, and that sometimes she goes under and has to be pulled back up.  IF's mother has prepared herself for the possibility that IF might not be there the next day because she might end her life. She really wants IF to have intensive therapy, saying that counseling is just a band-aid, and that she needs more help.

Dr. Pitman is further expected to testify that the results of all of the testing and his personal interactions with IF and her mother lead him to the following diagnoses:

309.81          Posttraumatic Stress Disorder (PTSD), caused by sexual assault incident of September 28, 2012, severe

296.25          Major Depressive Disorder (MDD), onset prior to September 28, 2012, exacerbated by sexual assault incident, and further exacerbated by subsequent increased bullying at school regarding this incident, currently in partial remission.

304.00          Opioid Use Disorder, onset following September 28, 2012, in sustained remission.

Dr. Pitman is further expected to testify that the following are the diagnostic criteria for posttraumatic stress disorder (PTSD) from the American Psychiatric Association's current Diagnostic and Statistical Manual for Mental Disorders, fifth edition (DSM-5) that are relevant to IF. The criteria are followed by his comments as to whether she has met them and why.

A)          *Directly experiencing sexual violence.* Criterion met. IF was sexually assaulted by three adolescents while she was attending a party on September 28, 2012.

B)          *Persistent intrusion (re-experiencing) of the traumatic event.* Criterion met. IF had almost constant, unwanted memories of the incident. She had nightmares almost every night. She had flashbacks to the incident, which caused her to zone out and forget where she was. She was emotionally upset by reminders of the incident, such as hearing the word "rape," seeing any of her assailants around town, being bullied and teased about the incident at Hebron High School, and even when she sat down on grass. Such reminders caused her emotional and physical distress.

C)    *Persistent effortful avoidance of distressing trauma-related stimuli.* Criterion met. IF tried to avoid thinking about the incident every day. She did things like bang her forehead or listen to music to stop herself from getting upset about it. She also avoided places that reminded her of the incident, such as parties and events at her school including basketball and football games.

D)    *Negative alterations in cognition and mood.* Criterion met. IF blamed herself for the incident, thinking that maybe what the bullies at school said about her was true. No matter how many times she was told otherwise, she always came back to the conclusion that the incident was her fault. Often she experienced shame, rage, and sadness; sometimes she just felt numb. She lost interest in activities she had previously enjoyed, such as exercising, putting on makeup, going to school, and even cheerleading.

E)    *Alterations in arousal and reactivity.* Criterion met. Following the incident, IF lost her temper nearly every day. She engaged in reckless and self-destructive behavior, walking around downtown Dallas by herself at night. Paradoxically, she felt overly watchful for bad things to happen. If someone opened the door behind her, she would "freak out." She had difficulty concentrating on schoolwork during the day and had trouble sleeping at night.

F)    *Duration more than 1 month.* Criterion met.

G)    *Clinically significant distress or social, occupational, or other impairment.* Criterion met. IF suffered severe distress from the symptoms described above. According to her mother, after the incident, she didn't want to get up or do anything. She became depressed, suicidal, angry, argumentative, and defiant. She had to be dragged out of bed in the morning to do her schoolwork, and constantly reminded to finish things and stay focused.

H)    *Disturbance not attributable to the physiological effects of a substance or another medical condition.* Criterion met. No evidence of this.

Dr. Pitman is further expected to testify that, despite the passage of more than three years since the sexual assault incident, IF continues to meet the full diagnostic criteria for PTSD, with symptoms in the severe range.

Dr. Pitman is further expected to testify that, prior to the sexual assault incident of September 28, 2012, IF began to develop depression. In the fifth grade, she felt treated badly by "mean girls," and in the seventh grade, her mood started to fall. In the eighth grade, she received brief psychotherapy for being bullied and feeling insecure. In anticipation of a surgical procedure in early 2012, she was prophylactically placed on fluoxetine (Prozac), an

antidepressant, by her psychiatrist. Following the sexual assault incident, IF's depression became markedly worse. She felt depressed most of the day, nearly every day, and had a low energy level. According to her report, she lost 25 lbs. She had low energy. As previously mentioned, she lost interest in many of her favorite activities. She felt like there was no purpose in living and thought about killing herself by hanging. She met more than sufficient criteria for a diagnosis of Major Depressive Disorder. Over recent years, her depressed mood has gradually improved, to the point that she still suffers from some depressive symptoms, but not enough for a full MDD diagnosis.

Dr. Pitman is further expected to testify that, importantly, the PTSD and exacerbation of depression that followed the sexual assault of September 28, 2012 represent far more than a mere continuation of IF's pre-existing depression. Rather PTSD represents a new disorder with a new cause, viz., the sexual assault. The "B" and "C" criteria for PTSD, which are the defining features of PTSD, are specific to that traumatic event and could not have developed without it. Pre-existing emotional problems cannot come close to accounting for the severe emotional disturbance in IF that developed following this unhappy event, and that has continued up to the present.

Dr. Pitman is further expected to testify that, in his opinion, the bullying and teasing IF received at Hebron High School about the incident of September 28, 2012 substantially contributed to the post-incident psychopathology she developed in two ways. First, by serving as a reminder of the incident, it caused IF intense and prolonged psychological distress. Second, it contributed to the exacerbation of her Major Depressive Disorder.

Dr. Pitman is further expected to testify that the information provided by IF's mother documents a number of additional features of PTSD and depression and is entirely consistent with the above conclusions. So is the information in the medical records, in which the diagnosis of PTSD related to the sexual assault of September 28, 2012 is made by her psychiatrist and mentioned by another physician. Both psychological tests he administered yielded PTSD diagnoses in the absence of any evidence of symptom exaggeration or overreporting. The psychophysiological test results provide objective evidence of increased physiological reactivity during IF's mental imagery of the sexual assault that is also consistent with PTSD. All in all, it is difficult to imagine a more clear-cut case of PTSD than IF's, and it is a severe one that has had a pervasive negative impact on her mental state and functioning.

Dr. Pitman is further expected to testify that, in arriving at his opinions, he relied upon his interviews with IF and her mother, the results of the structured interview instruments, his mental status examination of IF, the psychological and psychophysiological testing results, and the contents of the medical records. He also reviewed the depositions of IF and her mother and father, but the material therein did not serve as a source of data for his report. However, he found nothing in these depositions that altered his opinion. To the contrary, he found that the content of these depositions supported his conclusions.

Dr. Pitman is further expected to testify that IF is in need of vigorous assistance in facing and overcoming the disastrous psyähological consequences of the sexual assault of September 28, 2012. This can best be provided by a doctoral-level clinician experienced in both the cognitive-behavioral and psychodynamic therapy of PTSD. The therapy required will be more complex, and more demanding, than typical therapy for PTSD. Dr. Pitman estimates that twice weekly sessions for a year are indicated (i.e., 100 sessions), followed by  weekly sessions for an additional two years (100 more sessions), after which the frequency may be able to be cut down to bi-weekly for a year- (25 more sessions) and then monthly for an additional year (12 more sessions), if she is making adequate progress.  Dr. Pitman also recommends an additional course of weekly family therapy sessions for a year (50 more sessions) . Thus, he foresees a need for at least an estimated 287 therapy sessions, which at $200 per session amounts to an estimated cost of $57,400.

Dr. Pitman is further expected to testify that IF is also in need of more continued pharmacotherapy. In addition to selective serotonin reuptake inhibitors, there are other potentially helpful drugs, e.g., prazosin, that do not appear to have been tried. Monthly sessions with a psychiatrist for a year are indicated, after which the frequency may be able to be cut down to bi- and then tn-monthly over another two years, if she makes adequate progress. Thus, he foresees a need for at least an estimated 22 psychiatric sessions, which at $300 per session amounts to an additional estimated cost of $6,600.

Dr. Pitman is further expected to testify that, in the event that IF were to become actively suicidal, brief hospitalization(s) may be required. Such hospitalizations typically cost tens of thousands of dollars.

Dr. Pitman is further expected to testify that the typical course of PTSD is one of gradual improvement over time. IF has reported mild to moderate improvement over the years since the sexual assault incident. Although Dr. Pitman would expect to see this continue over the ensuing years, especially with appropriate treatment, he regards IF's prognosis for recovery from PTSD as guarded. Most persons who continue to have PTSD three years after a traumatic event continue to have it ten years later. Even if she does improve to the point that she no longer meets the full diagnostic criteria for PTSD, Dr. Pitman anticipates that she will have residual symptoms into the indefinite future. He does not believe she will ever be fully free of the adverse psychiatric consequences of the sexual assault.

Dr. Pitman's opinions are set forth in further detail in his written report.[2]  Dr. Pitman's diagnostic impressions and opinions expressed in his report are held to a reasonable degree of medical certainty and he reserves the right to revise or update the contents of his report,

---

[2]Due to privacy concerns, Dr. Pitman's report is being produced to LISD, but not filed with the Court.

including the diagnoses and opinions, upon the receipt of additional information that he had not received at the time of its writing.

Dr. Pitman may also rely upon any expert testimony gleaned from experts both retained and non-retained.  Further, it is expected that Dr. Pitman will be relying upon Scott P. Orr, Ph.D. for Dr. Orr's psychophysiological testing done on I.F. as well as Dr.  Leslie Morey and Dr. John Briere for computer-based algorithms used for scoring and interpreting the testing questions answered by IF. Dr. Pitman may also testify to any matters testified to by any expert of the Defendants.

For a more complete summary of Dr. Pitman's opinions in this matter, please see his Forensic Psychiatric Evaluation, Results of Psychophysiological Testing for Post-Traumatic Stress Disorder (PTSD) Detailed Assessment of Posttraumatic Stress - Interpretive Report, and Personality Assessment Inventory - Clinical Interpretive Report.[3]

NON-RETAINED EXPERTS

**Alexandria Doyle, PhD**
5949 Sherry Lane, Suite 840
Dallas, TX 75225
214-361-5900

Dr. Doyle is IF's treating psychologist.  Her qualifications are set forth in detail in her CV *(attached hereto as Exhibit 5)*.  Dr. Doyle is expected to testify based on her education, experience and interactions with IF.  Since Dr. Doyle is not a "retained" expert, Plaintiff cannot compel a written report from her; however, the medical records pertaining to her care and treatment of IF will be produced to counsel for LISD.

**Jody White & Shea Alexander**
DALLAS AREA RAPE CRISIS CENTER
4210 Junius St.
Dallas, TX 75246
972-641-7273

Ms. White and Ms. Alexander are both counselors at Dallas Area Rape Crisis Center who have provided counseling services to IF.  They are expected to testify based on their education, experience and interactions with IF.  Since they are not "retained" experts, Plaintiff cannot compel a written report from them; however, the records pertaining to IF's care and treatment at DARCC have previously been produced to counsel for LISD.

---

[3]Due to privacy concerns, all of these reports are being produced to LISD, but not filed with the Court.

Plaintiff also designates as "non-retained experts" any other healthcare provider of IF whose has been previously disclosed and whose records have been previously produced in this matter.

DEFENSE EXPERTS

Plaintiff hereby cross-designates and reserves the right to solicit opinions from any of Defendant's witnesses.

SUPPLEMENTATION

Plaintiff further reserves the right to supplement this designation as additional information becomes available.

Respectfully submitted,

_/s/ Brent R. Walker_

CHARLA G. ALDOUS, lead counsel
Texas Bar No. 20545235
caldous@aldouslaw.com
BRENT R. WALKER
Texas Bar No. 24047053
bwalker@aldouslaw.com
HEATHER L. LONG
Texas Bar No. 24055865
hlong@aldouslaw.com

ALDOUS \ WALKER, LLP
2311 Cedar Springs Rd., Suite 200
Dallas, TX 75201
Phone: (214) 526-5595
Fax:     (214) 526-5525

ATTORNEYS FOR PLAINTIFF

* * *

<u>CERTIFICATE OF SERVICE</u>

On May 20, 2016 this document is being served upon all Parties of record through the Court's e-filing system.

_/s/ Brent R. Walker_____

BRENT R. WALKER